NO. 23-2134

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

CLEARPLAY, INC.,

*Appellant,*

*v.*

DISH NETWORK L.L.C.

*Appellee,*

Appeal from the United States District Court
For the District of Utah in Case No. 2:14-CV-00191-DN
District Judge David Nuffer

## NON-CONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT CLEARPLAY, INC.

Joseph R. Re
*Principal Counsel*
Alan G. Laquer
Jeremiah S. Helm
Rhett Ramsey
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Michael K. Erickson
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, UT 84111
(801) 532-1500

June 28, 2024

L. Richard Williams
Dennis K. Blackhurst
Abigail M. Terhune
**WILLIAMS BLACKHURST TERHUNE PLLC**
701 North 44th Street
Phoenix, Arizona 85008
(480) 429-3200

David J. Jordan
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, UT 84111
(801) 401-8900

*Counsel for Plaintiff-Appellant
ClearPlay, Inc.*

## PATENT CLAIMS AT ISSUE

## U.S. Patent No. 7,577,970 (claims 28 and 33)

27.    In a computerized system for enabling a consumer to filter multimedia content that is comprised of video content, audio content, or both, and wherein a consumer computer system includes a processor, a memory, a decoder, and an output device for playing the multimedia content, a method for assisting the consumer to identify portions of the multimedia content that are to be filtered and to thereafter filter the identified portions, the method comprising:

> accessing a plurality of navigation objects, each defining a start position and a stop position and a specific filtering action to be performed on a portion of the multimedia content;

> providing for disabling of one or more of the navigation objects such that the specific filtering action specified by the disabled navigation object is ignored;

> updating a position code in association with decoding the multimedia content on the consumer computer system;

> comparing the position code with the navigation objects to determine whether the position code corresponding to the multimedia content falls within the start and stop position defined by one of the navigation objects;

> activating the filtering action assigned to the corresponding navigation object in order to filter the portion of the multimedia content defined by the corresponding navigation object; and

> playing the multimedia content at the output device excluding the portion thereof which is filtered in accordance with the corresponding navigation object and ignoring the filtering action specified by any disabled navigation objects.

28.    A method as recited in claim 27 wherein the filtering action is skipping the portion of the multimedia content defined by the particular navigation object.

33.    A method as recited in claim 28 wherein skipping further comprises:

> terminating the decoding of the multimedia content at the start position of the particular navigation object;

advancing to the stop position of the particular navigation object; and

resuming the decoding of the multimedia content at the stop position of the particular navigation object.

### U.S. Patent No. 6,898,799 (claim 12)

12.    In a computerized system for enabling a consumer to digitally filter multimedia content that is comprised of video content, audio content, or both, and wherein a consumer computer system includes a processor, a memory, a decoder, and an output device for playing the multimedia content, a method for assisting the consumer to automatically identify portions of the multimedia content that are to be filtered and to thereafter automatically filter the identified portions, the method comprising the acts of:

creating an object store which can be loaded into a memory of the consumer computer system, the object store including a plurality of navigation objects, each of which defines a portion of the multimedia content that is to be filtered by defining a start position and a stop position and a specific filtering action to be performed on the portion of the multimedia content defined by the start and stop positions for that portion;

decoding the multimedia content on the consumer computer system and as the multimedia content is output from a decoder of the consumer computer system, continuously updating a position code;

as the multimedia content is decoding, continuously monitoring the position code to determine whether the position code of the multimedia content falls within the start and stop positions defined by one of the navigation objects;

when the position code is determined to fall within the start and stop positions defined by a particular navigation object, activating the filtering action assigned to the particular navigation object in order to filter the portion of the multimedia content defined by the particular navigation object;

transferring the multimedia content to an output device, whereby the multimedia content is played at the output device excluding each portion thereof which is filtered in accordance with the plurality of navigation objects;

assigning a configuration identifier to the decoder; comparing the configuration identifier of the particular navigation object with the

configuration identifier of the decoder to determine if the particular navigation object applies to the decoder; and

determining that the particular navigation object applies to the decoder based on the configuration identifier of the particular navigation object matching the configuration identifier of the decoder.

# **CERTIFICATE OF INTEREST**

Pursuant to Fed. Cir. R. 47.4(a), Counsel for Plaintiff-Appellant ClearPlay, Inc. certifies the following:

1.     The full names of the parties represented by undersigned counsel in this case:  ClearPlay, Inc.

2.     The full names of all real parties in interest for the entities if different from the represented entities: None/Not Applicable.

3.     The full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities: None/Not Applicable.

4.     The law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities, but who have not already entered an appearance in this Court, are:

> Beus Gilbert McGroder PLLC: Leo R. Beus, David Alexander Neal, K. Reed Willis,
> Ray Quinney & Nebeker P.C.: Samuel C. Straight,
> Foley & Lardner LLP: David L. Mortensen,
> Kirton McConkie P.C.: James T. Burton, Brian D. Tucker, Joshua S. Rupp,
> Newman Jones PLLC: Daniel Joseph Anderson,
> The Jon Corn Law Firm: Lee M. Andelin,
> Mills + Wood Law PLLC: Thomas A. Connelly, and
> Ernst, Brown, and Draper PLLC.

5.     The case titles and numbers of any case known to be pending in this Court or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal:

*VidAngel LLC v. ClearPlay Inc.,* 2:14-cv-00160 (D. Utah).

6.    Information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees): None/Not Applicable.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  June 28, 2024        By: /s/ *Joseph R. Re*
                                       Joseph R. Re

*Counsel for Plaintiff-Appellant*
*ClearPlay, Inc.*

# **TABLE OF CONTENTS**

**Page No.**

PATENT CLAIMS AT ISSUE

CERTIFICATE OF INTEREST ............................................................... i

STATEMENT OF RELATED CASES .....................................................x

JURISDICTIONAL STATEMENT ..........................................................1

I.     INTRODUCTION ............................................................................2

II.    STATEMENT OF THE ISSUE ......................................................4

III.   STATEMENT OF THE CASE ........................................................4

      A.     The Patented Technology ...................................................4

            1.   '970 Patent .................................................................6

            2.   '799 Patent .................................................................7

      B.     DISH's AutoHop .................................................................7

      C.     Prior Proceedings ............................................................10

            1.   *Markman* Proceedings ...........................................10

            2.   Summary Judgment Rulings ....................................11

                a)    '970 Patent: Disabling Navigation Objects ...................11

                b)    '799 Patent: Structure Of Navigation Objects ...................12

            3.   Proposed Jury Instructions Before Trial .................13

            4.   Trial .........................................................................14

                a)    Jury Instruction Proposals During Trial .........................15

# TABLE OF CONTENTS
## (*cont'd*)

Page No.

   b)  Rule 50(a) Arguments During Trial ...............16

  5.  The Verdict And Additional Rule 50(a) Briefing....................16

  6.  JMOL Opinion ......................................18

   a)  '970 Patent ....................................19

    i.  Dismissal Of The "Pop-Up" Evidence.............20

    ii.  Dismissal Of The "Fast-Forward" Evidence ...............................22

   b)  '799 Patent ....................................23

    i.  Dismissal Of Literal Infringement .......................23

    ii.  Dismissal Of Doctrine Of Equivalents.................24

  7.  Denial Of ClearPlay's Rule 59 Motion....................25

IV. SUMMARY OF THE ARGUMENT ........................25

V. STANDARD OF REVIEW ................................28

VI. ARGUMENT.........................................28

 A. The JMOL Undermined The Role Of The Jury .................28

 B. The Court Erred In Granting JMOL On The '970 Patent .................31

  1.  Substantial Evidence Supports The Jury's Finding That AutoHop Satisfied The "Providing For Disabling" Limitation ...........................32

   a)  Segment Bookmark Pairs As "Navigation Objects" ........................................33

# TABLE OF CONTENTS
### (cont'd)

**Page No.**

            b)    AutoHop Disables The Segment Bookmarks Pairs ...............................................................................33

            c)    AutoHop Does Not Target "Something Other Than" The Segment Bookmarks ..........................36

    2.    Substantial Evidence Supports The Jury's Finding That AutoHop Satisfied the "Playing . . . And Ignoring . . . Any Disabled" Navigation Object Limitation...............................................................37

    3.    The Court Invaded The Province Of The Jury .........................40

            a)    The Court Undermined The Verdict By Interpreting "Directly Disable" In The Jury Instruction...............................................................40

            b)    The Court Improperly Acted As The Trier Of Fact ...............................................................43

            c)    The Court Discounted Probative Evidence ....................46

            d)    The Court Improperly Restricted Its Analysis To ClearPlay's Case-In-Chief .........................50

C.    The Court Erred By Granting JMOL On The'799 Patent..................51

    1.    Substantial Evidence Supports The Jury's Verdict That AutoHop Literally Satisfied The "Navigation Object" Limitation .................................................52

            a)    The Court Again Deviated From The Claim Construction Provided To The Jury ...............................52

            b)    Substantial Evidence Satisfies The Jury Instruction...............................................................55

# TABLE OF CONTENTS
## (*cont'd*)

Page No.

2.    Substantial Evidence Supports The Jury's Verdict
That AutoHop Satisfied The "Navigation Object"
Limitations Under The Doctrine Of Equivalents......................60

a)    ClearPlay Presented Particularized And
Linking Evidence Of Equivalence..................................60

b)    Claim 12 Of The '799 Patent Does Not
"Specifically Exclude" Navigation Objects
From Sharing A Common Filtering Action
And Configuration Identifier ..........................................66

VII.   CONCLUSION....................................................................................68

**Rule 25.1(e)(1)(B) Statement:**  The material omitted from pages 9, 10, 21, 32-37, 39, 43, 45-46, 48, and 55 and addendum pages Appx00050-00053, Appx00066-00067, Appx00069-00070 and Appx00074 contains information that Appellees DISH Network LLC and EchoStar Technologies LLC designated as Confidential Business Information under the Protective Order in Case No. 2:14-cv-00191-DN.

# TABLE OF AUTHORITIES

**Page No(s).**

*Apple Inc. v. Samsung Elecs. Co.*,
   839 F.3d 1034 (Fed. Cir. 2016) ...................................................37, 60

*Baltimore & Carolina Line v. Redman*,
   295 U.S. 654 (1935)............................................................................31

*Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*,
   967 F.3d 1353 (Fed. Cir. 2020) ..........................................................66

*Combustion Sys. Servs., Inc. v. Schuykill Energy Res., Inc.*,
   No. 924228, 1993 WL 496946 (E.D. Pa. Nov. 19, 1993) ...................49

*Comcast IP Holdings v. Sprint Commc'ns Co.*,
   850 F.3d 1302 (Fed. Cir. 2017) ...................................................38, 42

*Connell v. Sears, Roebuck & Co.*,
   722 F.2d 1542 (Fed. Cir. 1983) .............................................29, 30, 50

*Cordis Corp. v. Boston Sci. Corp.*,
   658 F.3d 1347 (Fed. Cir. 2011) .............................................40, 41, 42

*Core Wireless Licensing S.A.R.L., v. LG Elec., Inc.*,
   880 F.3d 1356 (Fed. Cir. 2018) ..........................................................49

*Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*,
   559 F.3d 1308 (Fed. Cir. 2009) ...................................................61, 64

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
   149 F.3d 1309 (Fed. Cir. 1998) ..........................................................68

*Graver Tank & Mfg. v. Linde Air Prods.*,
   339 U.S. 605 (1950)............................................................................65

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
   340 F.3d 1314 (Fed. Cir. 2003) ....................................................*passim*

## TABLE OF AUTHORITIES
### (*cont'd*)

**Page No(s).**

*Interactive Pictures Corp. v. Infinite Pictures, Inc.,*
274 F.3d 1371 (Fed. Cir. 2001) ............................................................64

*Johnson v. New York, N.H. & H.R. Co.,*
344 U.S. 48 (1952) .............................................................................29

*K-TEC, Inc. v. Vita-Mix Corp.,*
696 F.3d 1364 (Fed. Cir. 2012) ............................................................28

*Klein v. Grynberg,*
44 F.3d 1497 (10th Cir. 1995) ..............................................................28

*Lite-Netics, LLC v. Nu Tsai Capital LLC,*
60 F.4th 1335 (Fed. Cir. 2023) ............................................................68

*Lockwood v. Am. Airlines, Inc.,*
107 F.3d 1565 (Fed. Cir. 1997) ............................................................43

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.,*
806 F.2d 1565 (Fed. Cir. 1986) ............................................................30

*Paice LLC v. Toyota Motor Corp.,*
504 F.3d 1293 (Fed. Cir. 2007) ......................................................60, 65

*Peguero–Moronta v. Santiago,*
464 F.3d 29 (1st Cir. 2006) ..................................................................50

*Primus Grp., Inc. v. Inst. for Env't Health, Inc.,*
395 F. Supp. 3d 1243 (N.D. Cal. 2019) ............................................38, 39

*Reeves v. Sanderson Plumbing Prod., Inc.,*
530 U.S. 133 (2000) ..........................................................28, 29, 36, 50

*SEC v. Jarkesy,*
No. 22-859, slip op. (U.S. June 27, 2024) ..............................................30

*Stroup v. United Airlines, Inc.,*
26 F.4th 1147 (10th Cir. 2022) ............................................................50

## <u>TABLE OF AUTHORITIES</u>
### (*cont'd*)

**Page No(s).**

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
  90 F.3d 1558 (Fed. Cir. 1996) ..............................................................61

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  822 F. Supp. 2d 953 (N.D. Cal. 2011) ..................................................49

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ....................................................*passim*

*Virnetx, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ............................................................49

*Wi-Lan, Inc. v. Apple, Inc.*,
  811 F.3d 455 (Fed. Cir. 2016) ......................................................28, 40

## OTHER AUTHORITIES

U.S. Const. amend. VII ....................................................................*passim*

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1295 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1338 ......................................................................................1

Rule 50 ..............................................................................................*passim*

Rule 59 ....................................................................................................25

## <u>STATEMENT OF RELATED CASES</u>

No other appeal was ever filed in this or any other appellate court from this civil action.  Counsel is aware of one pending case that may be directly affected by this Court's decision in the pending appeal:

*VidAngel LLC v. ClearPlay Inc.*, Case No. 2:14-cv-00160-DBB-CMR (D. Utah), filed on December 30, 2013.

## <u>JURISDICTIONAL STATEMENT</u>

This action arose under 28 U.S.C. §§ 1331, 1338(a).  ClearPlay appeals a final order or judgment.  Appx00001-02; Appx00035-84 (addendum).  On June 30, 2023, ClearPlay timely filed a notice of appeal.  This Court has jurisdiction under 28 U.S.C. §§ 1291, 1295(a)(1).

## I.    <u>INTRODUCTION</u>

In 2014, ClearPlay sued DISH for infringing U.S. Patent Nos. 7,577,970 and 6,898,799 based on the AutoHop feature of DISH's "Hopper" set-top boxes. AutoHop gives television viewers the option to automatically skip commercial breaks while watching primetime shows.  After succeeding in several invalidity challenges of the patents at the United States Patent & Trademark Office (USPTO), ClearPlay presented its case to a jury in a two-week trial.

The jury found AutoHop infringed claims 28 and 33 of the '970 patent and claim 12 of the '799 patent.  The jury awarded ClearPlay $469 million in damages reflecting DISH's decade of widespread infringement.  After the verdict, the district court granted DISH's Rule 50(a) JMOL motion of noninfringement.  But the court's analysis of the evidence shows that it overstepped its limited role in reviewing the record under Rule 50.

To arrive at JMOL of non-infringement, the court narrowed the scope of the claims beyond what it had instructed the jury.  Moreover, rather than determining whether substantial evidence could have supported the verdict, the court usurped the jury's role as the trier of fact.  It did so by re-examining the evidence to make its own factual findings, not giving ClearPlay all reasonable inferences, dismissing probative evidence, and limiting its analysis to ClearPlay's case-in-chief.

2

In overstepping its role, the court violated the Re-examination Clause of the Seventh Amendment and ClearPlay's right to a jury trial. Once the court instructed the jury with the claims' meaning, it was the jury's sole responsibility to apply the construed claims to AutoHop. Dissatisfied with the verdict, the district court improperly reweighed the evidence to show how non-infringement could have been found. The court explained away the jury's infringement findings, observing, unremarkably, that "patent cases are necessarily complex, dealing with patent claims and technology outside the experience of the average person." Appx00059. But the perceived complexity of the case does not authorize re-examining the evidence and acting as the trier of fact in violation of the Seventh Amendment, as the court did here.

A review of the complete trial record shows that substantial evidence supports infringement on all three claims tried to the jury under the constructions provided to it. Accordingly, this Court should reverse the JMOL and reinstate the jury's infringement verdict.

## II.    <u>STATEMENT OF THE ISSUE</u>

Whether the district court violated the Re-examination Clause of the Seventh Amendment and Rule 50 of the Federal Rules of Civil Procedure when it granted JMOL of no infringement on both the '970 and '799 patents because it acted as the trier of fact and applied claim constructions not given to the jury.

## III.    <u>STATEMENT OF THE CASE</u>

### A.    <u>The Patented Technology</u>

Matthew Jarman, ClearPlay's founder, worked as an assistant editor for a film production company making family-friendly content, having interned for shows such as Mister Rogers' Neighborhood and Sesame Street.  Appx18000.  Jarman had a "Eureka moment" after learning that Paramount Pictures revoked a theater's distribution license for "Titanic" because the theater cut the film to remove an objectionable scene.  Appx18014-16.  Instead of cutting and splicing the film, Jarman thought of using the film's timing codes to identify the beginning and end of an objectionable scene, assigning a filtering action, and accessing that information from a consumer's playback device when they watch it.  Appx18016-17.  This was a commercially viable method that allowed viewers to choose whether to skip content without altering the recording and violating copyright laws.  Appx18015-19; Appx18030-36.  It also allowed scaling, at a minimal incremental cost, to a much larger audience than a single movie theater.  Appx18016-17.  Since 2001,

4

ClearPlay's products/services have allowed users to choose to filter out unwanted content.  Appx18006; Appx18028-30; Appx18101.

Jarman claimed his resulting inventions in the '799 and '970 patents.  The patents recite methods for filtering unwanted material from multimedia content such as movies or television shows.  Appx00329 (1:15-20); Appx00362 (1:7-11).  The '970 patent is a continuation of the '799 patent and shares its specification.  Appx00314; Appx00348.

The patents' methods use "navigation objects," which define a start position, a stop position, and a filtering action to be performed between those two positions.  Appx00340 (23:29-58); Appx00372 (21:49-22:25).  Navigation objects are stored separately from the show content and allow the viewer to filter content (*e.g.*, skip unwanted portions) without changing the underlying recording.  Appx00363 (4:32-65).[1]  A user may disable navigation objects so that they are ignored.  Appx00337 (18:61-66).

When the viewer watches the show, software monitors the position in the show as it plays.  Appx00363 (4:55-65).  When playback reaches the navigation object's start position, the method activates the filtering action assigned to the navigation object and filters the content between the start and the stop position.

---

[1] Exemplary citations are to the '799 specification.

Appx00367 (12:21-27); Appx00363-64 (4:65-5:17). Figure 4B (below) illustrates a navigation object (490) with a start position (491), a stop position (493), and skipping as its filtering action (495).



Appx00357 (highlighted).

### 1.   '970 Patent

Claims 28 and 33 of the '970 patent are at issue. They recite "skipping" as the filtering action, and both depend from claim 27. Appx00308-310; Appx00340. Claim 27's method includes the steps: "providing for disabling of one or more of the navigation objects such that the specific filtering action specified by the disabled navigation object is ignored," and "playing the multimedia content at the output device excluding the portion thereof which is filtered in accordance with the corresponding navigation object and ignoring the filtering action specified by any disabled navigation objects." Appx00340 (23:37-58).

### 2.    **'799 Patent**

Claim 12 is the only claim at issue from the '799 patent.  Appx00308-09; Appx00372.  It recites storing and accessing navigation objects and comparing a "configuration identifier" to determine compatibility with the consumer's device. *Id*.  The patent explains that the configuration identifier "identifies the hardware and software configuration of a consumer system to which the navigation object applies."  Appx00368 (14:19-26).

## B.    **DISH's AutoHop**

DISH is a satellite television provider.  In 2012, DISH announced its "Hopper" set-top box with "PrimeTime Anytime" and its "AutoHop" feature. Appx16522-23; Appx18240-42; Appx20451; Appx20454.  Before DISH introduced AutoHop, skipping through commercials required repeatedly pressing a 30-second skip button on the remote control.  Appx19263-64; Appx20466.

AutoHop eliminates this process for primetime shows.  Appx20466.  Users could record the previous evening's shows onto their Hopper set-top box.  *Id.* AutoHop then allows users to choose to automatically and precisely skip those shows' commercial breaks without using the remote.  *Id.*

To generate data used by AutoHop, DISH technicians watch primetime shows live and mark the start and stop times used to skip unwanted commercial breaks. Appx18251-54; Appx18330-31; Appx23803.  The technician pushes one button to

mark each position where a show segment ends and a commercial break starts, and a different button to mark each position where the commercial break ends and the next show segment resumes.    Appx18255-57; Appx18266-68; Appx18389-91; Appx23803.

DISH's system sends information by satellite to millions of DISH set-top boxes using "announcement files."    Appx18250-51; Appx18349-50; Appx23802. DISH uses different types of announcement files for different purposes. Appx18349-50; Appx18540.    DISH uses "Show Metadata" (designated "0x08") announcement files to send AutoHop skipping data generated by its technicians pushing the start and stop buttons.  Appx18250-51; Appx18540; Appx18999-19000.

Within an announcement file, DISH includes a "model_targeting_descriptor" identifying the set-top box models to which the file is targeted.    Appx18373-75; Appx18561-63; Appx18568-69.  When a set-top box receives an announcement file, it checks whether its model is in the targeting descriptor.    Appx18373-74; Appx18561-63; Appx18568-69; Appx20472.  "Show Metadata" announcement files list Hopper models as their targets.  Appx18259-66.  Thus, when a Hopper receives a "Show Metadata" announcement file, it recognizes its model in the file's model_targeting_descriptor.  *Id.*  The Hopper therefore saves AutoHop data from the announcement file into "Segment Bookmarks" which it uses for skipping

8

commercials.    Appx17289;  Appx18354-55;  Appx18612-13;  Appx18764-66;

Appx20472; Appx23910-11; Appx23920-23(¶11, ¶11.3).

Whenever a user chooses to watch a show recorded with PrimeTime Anytime,

AutoHop presents a pop-up message allowing the user to either enable or disable

automatic commercial skipping "for this event."  Appx23922; Appx23929-30.



Appx23846; Appx17285; Appx20465-67.  If the user chooses "Yes," AutoHop sets

a variable  called  the  [Code]  variable  to  [Code]  and  automatically  skips

commercials.  Appx18520-23; Appx17395-98.  If the user chooses "No Thanks,"

AutoHop sets the [Code]" variable to [Code]" and automatic commercial skipping

does not occur.  Appx18520-23; Appx17395-98.

Another  variable,  called  [Code],"[2]  is set to "[Code]" during normal

playback and is changed when playback is in fast-forward or rewind.  Appx18524-

---

[2] Witnesses also refer to this as "[Code]" or "[Code]"

25. During playback, when AutoHop reaches each segment bookmark at the start of a commercial break, it determines if the ███████████" variable is ███████████" and the ███████████" is "███████" Appx18520-26; Appx17395-98. If so, AutoHop's segment bookmarks are enabled and the set-top box software advances playback to the next segment bookmark, skipping the commercial break. Appx18520-26; Appx17395-98.

## C.    **Prior Proceedings**

In 2014, ClearPlay sued DISH for patent infringement. Appx00381-98. In 2013 and 2014, a third party filed petitions for *inter partes* review of the '970 patent. Appx00105. In response, the court stayed the litigation. *Id.* In 2016, the USPTO upheld the asserted claims, and the court lifted the stay. Appx00345-46. In 2020 and 2021, DISH requested *ex parte* reexamination of both patents. Appx00341-44; Appx00377-80. The court again stayed the litigation. Appx00135. The USPTO confirmed the claims without changes, and the court lifted the stay. Appx00341-44; Appx00377-80.

### 1.    *Markman* **Proceedings**

In 2019, the district court issued a *Markman* order. Appx03140-158. Neither party sought a construction of the "providing for disabling" limitation and the court did not construe it. The court adopted the parties' stipulation that "navigation

object" has its "plain and ordinary meaning (as defined by the terms of the claims themselves)." Appx03144; Appx03157.

In July 2021, DISH moved for supplemental claim construction, arguing that "navigation object" should be construed to mean that "each navigation object must contain its own 'start position,' 'stop position,' and distinct 'filtering action' within a single file or data structure." Appx03336. The court denied DISH's motion, holding that DISH was reneging on the parties' stipulated construction. Appx05468-71.

### 2.     <u>Summary Judgment Rulings</u>

DISH filed for summary judgment of non-infringement of both patents. On January 30, 2023, less than a month before trial, the court ruled on the motion. Appx00031-33. The court granted-in-part and denied-in-part the motion depending on ClearPlay's infringement position. *Id.* The court held a triable issue of fact existed for several of ClearPlay's infringement positions. Appx00032-33.

### a)     <u>'970 Patent: Disabling Navigation Objects</u>

DISH's summary judgment motion sought to narrow the "providing for disabling" limitation. Appx05584-86. The court held that it was "unnecessary" to construe "disabling." Appx00025. The court declined to import the specification's example of "including an indication within the navigation objects" into the "disabling" limitation. Appx00025-26. But then the court proceeded to construe the

claims by holding that "disabling AutoHop functionality as a whole is broader than the Disabling Claims' limitations for disabling navigation objects." Appx00026. The court gave examples, including "the user unplugging the Dish STB, or by the user choosing not to record or watch AutoHop-enabled programming." Appx00026. The court held that genuine issues of fact exist regarding "whether the alleged segment bookmark navigation object . . . is disabled such that its alleged filtering action is ignored" and denied summary judgment on corresponding infringement positions. Appx00027; Appx00031-32.

### b)    '799 Patent: Structure Of Navigation Objects

The court held that "the elements a navigation object 'defines' or 'comprises' are contained within the same object, file, or data structure (that being the navigation object)" and referred to that interpretation as the "single-object approach." Appx00012; Appx00016. The court contrasted that approach with a "multi-object approach" in which the navigation object's "elements are not necessarily within the same object, file, or data structure." Appx00012. The court denied summary judgment of no literal infringement for positions based on the single-object approach. Appx00016-18; Appx00032. The court also denied DISH's motion for summary judgment of no infringement under the doctrine of equivalents, holding that a "reasonable jury could determine the single-object and multi-object approaches to navigation object[s] are equivalent." Appx00021-22.

The court also held that genuine issues of material fact exist regarding whether the "model_targeting_descriptor" in AutoHop announcement files satisfies the construction of "configuration identifier." Appx00023. The court therefore denied-in-part DISH's motion for summary judgment on that issue. Appx00023; Appx00032. It also held that disputed facts preclude summary judgment under the doctrine of equivalents for that configuration identifier limitation. Appx00023; Appx00032.

### 3.    <u>Proposed Jury Instructions Before Trial</u>

On January 23, 2023, the parties filed proposed jury instructions. Appx14046-14142. Later, the court ordered the parties to meet and confer on amended proposed jury instructions to "take into account the rulings on summary judgment." Appx14840.

DISH proposed construing "navigation object" to require that "the start, stop, and filter elements that comprise the navigation object must be contained within the same object, file, or data structure." Appx14881-75. DISH further proposed including within the instruction:

> an "object" is singular. It is not a formless assigning or specifying of associated or linked information from multiple sources. Otherwise, the navigation ceases to be ***an object***.

13

Appx14927-28 (emphasis in original).[3]

DISH also proposed instructing the jury that "disabling of one or more navigation objects" requires:

> disabling of particular navigation objects so that the filtering actions of the disabled navigation objects are ignored, and that simply turning on or off functionality as a whole (*e.g.*, turning the AutoHop feature as a whole on or off) is not disabling.

Appx14929.  ClearPlay objected to both proposed instructions.  Appx15044-45.

### 4.    Trial

The trial began on February 27, 2023.  Appx17904.  ClearPlay's technical expert was Dr. Nicholas Feamster, a computer science professor at the University of Chicago.  Appx18432-35.  Feamster explained AutoHop's operation using DISH's source code, associated DISH technical documents, as well as testimony from DISH employees.  *See, e.g.,* Appx18435-36, Appx18472-74; Appx18499-503.  Feamster performed a detailed analysis for each limitation of the asserted claims and testified how AutoHop satisfied each of them.  *See, e.g.,* Appx18440-511; Appx18515-70; Appx18607-08; Appx18717-18.  Dan Minnick, DISH's Software Vice-President, also testified about AutoHop, as did several other witnesses, in both ClearPlay's and DISH's case presentations.

---

[3] All emphasis added unless noted otherwise.

**a)**    **Jury Instruction Proposals During Trial**

On the second day of trial, the court sent the parties the court's jury instructions. Appx16916. The court rejected the portion of DISH's proposed construction of "navigation object" which sought to further define "object." Appx16935-36. The court also rejected the portion of DISH's proposed construction of "disabling" that sought to exclude disabling a feature "as a whole." Appx16935-36.

On March 8, after ClearPlay closed its case-in-chief, the court sent the parties a new jury instruction on claim construction. Appx17091. The court explained that its revised version "includes language adapted from" its summary judgment order. *Id.* The court further explained that the instruction changes were "making clear that claim 12 of the '799 Patent requires the configuration identifier to be contained within the navigation object." *Id.* It also added a new instruction that "providing for disabling" requires that an "action must directly disable a navigation object." *Id.*; Appx00267.

ClearPlay objected, arguing that modifying the instructions after its case-in-chief closed was prejudicial. Appx17095-96. The court overruled ClearPlay's objections and instructed the jury using the new constructions. Appx17100; Appx00266-68; Appx19835-37.

**b)**    **Rule 50(a) Arguments During Trial**

On March 3, DISH filed its Rule 50(a) motion for JMOL of non-infringement of both patents.  Appx16763-82.  Three days later, after ClearPlay's case-in-chief had closed, the court raised DISH's motion and a separate "question that [the court was] not satisfied has been properly identified."  Appx19176-77.  The court reviewed the limitations in claim 27 reciting "providing for disabling" and "playing the multimedia . . . and ignoring the filtering action specified by any disabled navigation objects."  *Id.*  The court posited that a "navigation object is disabled and then it is ignored."  Appx19177.  The court reflected that it was "a little concerned" that "ignoring is different, I think, than disabled."  Appx19176.  The court then requested supplemental briefing addressing the meaning of "disabling" and "ignoring" and how that meaning applied to the facts of the case.  Appx19179-80.

On March 8, after receiving the parties' supplemental briefing and after the jury was released for the day, the court heard argument on the Rule 50 motion and reserved its ruling.  Appx16897-98.

**5.**    **The Verdict And Additional Rule 50(a) Briefing**

On March 10, the jury returned a verdict for ClearPlay, awarding $469 million in damages reflecting DISH's infringement for millions of active Hopper devices for over a decade.  Appx00308-12; Appx16523.  After excusing the jury, the court announced there were "serious matters under advisement."  Appx20002.  The court

explained that it needed to study the parties' JMOL motions "in light of the verdict." Appx20003.

The following day, the court ordered more briefing on DISH's Rule 50(a) motion. Appx17202. The court ordered the parties to submit supplemental memoranda with appendices that include "concise excerpts from the trial transcript of ClearPlay's case-in-chief presentation of any evidence . . . that support or contradict" whether DISH's accused products:

1. "literally infringe the element of claim 27 of the '970 Patent of 'providing for disabling . . .'" Appx17203.

2. "literally infringe the element of claim 12 of the '799 Patent that requires each navigation object of the plurality of navigation objects define a filtering action." *Id.*

3. "literally infringe the element of claim 12 of the '799 Patent that requires a configuration identifier to be contained within each navigation object of the plurality of navigation objects." *Id.*

4. "infringe claim 12 of the '799 patent under the doctrine of equivalents with specific attention to whether Dr. Feamster offered particularized testimony of the function, means, result test, or the insubstantial difference test regarding each navigation object of the plurality of navigation objects sharing a filtering action." Appx17203-04.

5.      "infringe claim 12 of the '799 patent under the doctrine of equivalents,"
with the same attention to Dr. Feamster's testimony regarding each
navigation object sharing a configuration identifier.  Appx17204.

On March 21, days after receiving the parties' briefs, the court orally granted
DISH's Rule 50(a) motion.  Appx20800-38.  The court explained that "this has been
one of the most difficult decisions I've ever made . . . I sentenced someone to life
plus 80 years.  This was harder."  Appx20837; *see also* Appx20797-98.  The court
directed DISH to write an order consistent with the court's oral order.  Appx20798.
DISH filed a 51-page proposed order expanding the court's oral order.  *Compare*
Appx20800-38 (oral order) *with* Appx20839-94 (DISH's proposal).   ClearPlay
submitted detailed objections.  Appx20897-967.  On June 2, the court issued its order
granting JMOL under Rule 50(a), largely adopting DISH's proposed order.[4]
Appx00035-84.

**6.      JMOL Opinion**

In its JMOL opinion, the court devoted sixteen pages of "Background," in
which the court listed forty-three paragraphs of purported "facts."  Appx00040-56.
In the next six pages, the court explained its view of the evidence ClearPlay
presented in its case-in-chief.  Appx00056-62.  The court acknowledged that the

---

[4] The court denied all remaining motions as moot and entered final judgment.
Appx00082-83.

evidence ClearPlay presented "from DISH's technical documents, advertising, and internal communications consisting of descriptions of AutoHop and its functionality" was "helpful and appealing to the jury in terms they understand." Appx00056-57.  But the court dismissed that "helpful" evidence and instead held that only the source code "is the dispositive relevant evidence." Appx00057 & n.98. The court also dismissed as irrelevant "discussions of end-user experiences and analogies to common experiences" as not bearing "on the heart of the real issues." Appx00058.

Next the court expressed its view about the difficulty of trying highly technical patent cases, opining that the technical nature of the patents "presented unusual challenges for the jury hearing the evidence" and for the court.  Appx00059.  The court then accused ClearPlay of broadening "its patent claims beyond their scope." *Id*.

### a) **'970 Patent**

For the '970 patent, the court held that ClearPlay presented "evidence that DISH's segment bookmarks contain the required elements of a navigation object." Appx00063.  The court held, however, ClearPlay did not present "legally sufficient evidence that DISH's accused products meet the 'providing for disabling' element of claim 27 of the '970 Patent."  Appx00063.

The court held that the "plain meaning" of the "providing for disabling" limitation "requires evidence that a segment bookmark, *itself*, must be disabled." Appx00064 (emphasis in original). But the jury was not instructed with that "plain meaning." Appx00267. So the court cited its summary judgment order for support, *id*. n.123, but that Order required merely "that some action must be taken to disable a navigation object . . . ." Appx00026.

Nevertheless, the JMOL found a "critical[]" issue is whether a "*change* is made to disable the segment bookmarks . . . ." Appx00070. The court determined that ClearPlay failed to present sufficient evidence for a reasonable jury to find "that some action *is taken on* one or more of DISH's segment bookmarks . . . to disable them, as opposed to merely ignoring the entire segment bookmarks during playback." Appx00065. Though that language was also not given to the jury, the court concluded that "the evidence confirmed that no action is taken on the segment bookmarks under either of ClearPlay's two theories." *Id*.

### i.    <u>Dismissal Of The "Pop-Up" Evidence</u>

The court held that ClearPlay "presented no evidence" that selecting "No Thanks" at the AutoHop pop-up "provides for disabling segment bookmark pairs . . . rather than disabling AutoHop *as a whole*." Appx00065. The court found that selecting "No Thanks" would "not disable the segment bookmarks for playback of the selected recording" and instead "the whole of AutoHop is not enabled for the

playback." Appx00066. This "as a whole" language was also not given to the jury. Appx00267.

The court then found that "the undisputed evidence, based on the parties' stipulation [Appx00307] also demonstrates that when 'No Thanks' is selected on the pop-up message prior to playback, AutoHop is not enabled for playback of the selected recording." Appx00066. But the stipulation stated merely that "[i]f the user selects 'No Thanks,' AutoHop does not skip commercials." Appx00307.

The court applied its understanding of the stipulation to find that selecting "No Thanks" "is outside the claim language that requires the navigation object to be disabled, as was pointed out at summary judgment." Appx00066 & n.135. The court recognized that ClearPlay's expert Feamster testified about the ███ Code variable being set to ███" but found that "affects AutoHop *as a whole*—not the alleged navigation objects, *i.e.*, the segment bookmarks." Appx00066. The court criticized ClearPlay and Feamster for pointing to "no code, command, or other process that would directly disable the segment bookmarks, as opposed to AutoHop *as a whole*." *Id*.

The court dismissed Feamster's testimony that "No Thanks" disables each of the segment bookmark pairs and does not disable AutoHop as a whole. Appx00067 n.137. That included Feamster's testimony that AutoHop's functionality can vary when viewing a show multiple times or on multiple devices. Appx00067 & n.138.

The court found the "No Thanks" selection "only causes AutoHop as a whole for the selected playback session to not be enabled," and only "*indirectly*" affects . . . segment bookmarks." Appx00067.

The court also held that the "No Thanks" selection does not meet claim 27's requirement of "playing the multimedia content" while "excluding the portion thereof which is filtered." Appx00067. The court reasoned that for the "No Thanks" selection "[e]ither all navigation object segment bookmarks are ignored or bypassed" or "all the alleged navigation objects are observed and implemented." Appx00068. Thus, the court held that "DISH's system and accused products do not support both (a) excluding some media due to a navigation object's filtering action and (b) ignoring other disabled navigation objects' filtering actions." *Id*.

### ii.     <u>Dismissal Of The "Fast-Forward" Evidence</u>

Regarding the "fast-forward" evidence, the court found that "ignoring or bypassing a navigation object *is different* than disabling the navigation object such that the disabled navigation object's filtering action is ignored." Appx00069. The court found that "an *indirect* consequence" of fast-forwarding is that "the AutoHop software that uses a segment bookmark for skipping . . . is ignored." Appx00069-70. The court found that, in this instance, AutoHop checks "a variable stored in the AutoHop software—and [is] *not* looking in the segment bookmarks within the segment bookmark file." Appx00070. Relying on its new interpretation of the

22

claims, the court found it "critical[]" that "no change is made to disable the segment bookmarks, nor does Dr. Feamster identify anything other than ignoring the skip action that would have resulted."  Appx00070.

### b)    '799 Patent

### i.    Dismissal Of Literal Infringement

On the '799 patent, the court granted JMOL of no literal infringement, holding that ClearPlay's infringement position required the alleged plurality of navigation objects to share a single filtering action and single configuration identifier. Appx00073-74.  The court held that ClearPlay's position was "contrary to the claim construction that each particular navigation object must define *its own* start position, stop position, and filtering action, and contain *its own* configuration identifier." Appx00074.   But the jury instructions required merely that a navigation object "define" a start, stop, and filtering action, where "define" was construed as "assign or specify."   Appx00266-67.  The instructions also permitted "the start, stop, and filter elements" to be "contained within the same object, *file*, or data structure." Appx00266-67.   Nevertheless, the court found that ClearPlay's "theory regarding the announcement *file*" relied on a "configuration identifier shared by multiple navigation objects and not contained within any of them." Appx00075-76.  Relying on its new interpretation of the claim, the court granted JMOL of no literal infringement.  Appx00076.

23

ii.    **Dismissal Of Doctrine Of Equivalents**

The court also granted JMOL of no infringement under the doctrine of equivalents. The court held that Feamster's testimony was not sufficiently particularized regarding "each prong of the function-way-result test, or the insubstantial difference test, for the navigation objects' shared configuration identifier and filtering action limitations." Appx00076. The court quoted but dismissed pages of Feamster's equivalents testimony, holding the testimony was "conclusory, not particularized, and did not link to the function, way, and result of each limitation, or explain how the components are not substantially different from the claim language." Appx00076-79.

The court discounted Feamster's testimony explaining why it would be "inefficient" or "a ridiculous way" of designing software to repeat identical configuration identifiers or filtering actions for every single navigation object. Appx00079. The court found this testimony "is not the relevant inquiry." Appx00079. Instead, the court found, as a matter of law, Feamster's testimony "established substantial differences." Appx00079.

The court also held ClearPlay's evidence of infringement under the doctrine of equivalents was "legally insufficient due to structural variants." Appx00081. The court held as a matter of law that "the multi-object structure cannot be an equivalent of the single-object structure." Appx00081. That holding contradicted its summary

judgment ruling that the issue presented a question of fact for the jury.  Appx00021-22.

### 7.    Denial Of ClearPlay's Rule 59 Motion

ClearPlay moved under Rule 59 to alter or amend the judgment, arguing that the court improperly granted JMOL by narrowing the claim constructions on both patents from those given to the jury and then reviewing the record under those narrowed constructions, contrary to this Court's cases.  Appx21130-33; Appx21139-40; Appx21145-47.  In denying that motion, the court held the "clarifying language included in the jury instructions (*as well as the language* used in the order granting judgment of noninfringement as a matter of law) did not alter the claim construction."  Appx00088.

## IV.    SUMMARY OF THE ARGUMENT

The district court violated the Re-examination Clause of the Seventh Amendment and Rule 50 of the Federal Rules of Civil Procedure when it granted JMOL of no infringement on both the '970 and '799 patents because it acted as the trier of fact and applied claim constructions not given to the jury.  After the jury renders its verdict, the court cannot re-examine the factual record and decide the jury must have been confused by certain evidence or argument.  Nor can the court reevaluate the instructions given to the jury and decide, after seeing all the evidence,

that the claims should have been construed more narrowly. Otherwise, the protections of the Seventh Amendment would be compromised.

ClearPlay presented substantial evidence of infringement of both patents' asserted claims. That evidence included copious testimony from Dr. Feamster analyzing DISH's source code and technical documents. It also included admissions from DISH's employees and experts that confirmed AutoHop's infringement. Substantial evidence supports the jury's verdict under the constructions submitted to the jury. Accordingly, the court should have denied JMOL.

Rather than seek substantial evidence in support of the verdict, as Rule 50 requires, the court sought evidence to undermine the verdict. In the process, it discounted probative evidence it deemed not "centrally relevant." It drew inferences against ClearPlay, the verdict winner. It failed to look at the whole record. And it significantly narrowed the governing claim constructions.

One glaring example concerns the limitations of the '970 patent that require "providing for disabling of one or more of the navigation objects such that the specific filtering action specified by the disabled navigation object is ignored." The jury was instructed that the claim required "direct" disabling. Whether AutoHop's navigation objects are disabled "directly" was for the jury to decide. On JMOL, the court narrowed "directly disable" to require a "change" to the navigation object

"itself" while excluding anything that could disable AutoHop "as a whole." But those additional requirements were never given to the jury.

Another example occurred with respect to the '799 patent. The jury was instructed that "the start, stop, and filter elements that comprise the navigation object must be contained within the same object, file, or data structure." The jury was further instructed that claim 12 "requires the configuration identifier to be contained within the navigation object." On JMOL, the court narrowed the construction to require that each navigation object have its own exclusive elements that cannot be shared with other navigation objects even if in the same file. But those additional requirements were never given to the jury.

Finally, also regarding the '799 patent, the court erred by rejecting ClearPlay's expert testimony on the doctrine of equivalents as not particularized. But Feamster's testimony was directed specifically to the very limitation at issue. Moreover, the court erred by taking the equivalency issue from jury by ruling that a multi-object structure can never be equivalent to a single-object structure. But again, those requirements were never part of any jury instruction.

Because substantial evidence supports the verdict under the instructions given to the jury, this Court should reverse JMOL.

## V.    STANDARD OF REVIEW

This Court applies regional circuit law when reviewing JMOL decisions.  *K-TEC, Inc. v. Vita-Mix Corp*., 696 F.3d 1364, 1373 (Fed. Cir. 2012) (citation omitted).  The Tenth Circuit reviews a grant of JMOL *de novo*.  *Klein v. Grynberg*, 44 F.3d 1497, 1503 (10th Cir. 1995).  A court must construe the evidence and inferences most favorably to the nonmoving party.  *Id*.  Where "there is evidence upon which the jury could have properly relied in reaching its verdict, that verdict ***must stand***."  *Id*.  In looking for substantial evidence, "the court should review all of the evidence in the record," *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 150 (2000), but "must disregard all evidence favorable to the moving party that the jury is not required to believe," *id*. at 151.

A "verdict must be tested by the charge actually given and by giving the ordinary meaning of the language of the jury instruction."  *Hewlett-Packard Co. v. Mustek Sys., Inc*., 340 F.3d 1314, 1321 (Fed. Cir. 2003).  Thus, the JMOL inquiry "is limited to whether substantial evidence supports the jury's verdict under the issued construction."  *Wi-Lan, Inc. v. Apple, Inc*., 811 F.3d 455, 465 (Fed. Cir. 2016).

## VI.    ARGUMENT

### A.    The JMOL Undermined The Role Of The Jury

ClearPlay exercised its right to have the jury determine whether AutoHop infringed.  Appx00397; Appx16530.  The parties presented evidence to the jury over two weeks.  The jury heard testimony from several witnesses about AutoHop.  The

jury also reviewed AutoHop's source code and technical documents which further confirm the asserted claims read on AutoHop. The jury received detailed instructions from the court and returned an infringement verdict on both patents.

"Jury verdicts must be treated with great deference." *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1546 (Fed. Cir. 1983). Once the jury renders its verdict, the court is bound by that verdict except as provided by Rule 50. *Reeves,* 530 U.S. at 150. The "verdict solves factual questions" against the loser, leaving only the legal questions for the court. *Johnson v. New York, N.H. & H.R. Co.*, 344 U.S. 48, 53 (1952). In applying Rule 50(b), the district court determines whether substantial evidence supports the verdict under the jury instructions. *Hewlett-Packard*, 340 F.3d at 132. The court, however, "cannot substitute its view for that of the jury." *Connell*, 722 F.2d at 1546.

When there is "substantial evidence in support of each of the jury's critical findings," a court that makes contrary findings has "inappropriately invaded the province of the jury, in derogation of [the plaintiff's] rights as expressed in the Seventh Amendment to the Constitution." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1571 (Fed. Cir. 1986). "The right to trial by jury is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right has always been and should be scrutinized with

the utmost care." *SEC v. Jarkesy*, No. 22-859, slip op. at 7 (U.S. June 27, 2024) (internal quotes omitted).

The JMOL opinion recited the proper standard of review. Appx00039-40. But later it explained that "the technical nature of the Asserted Patents" and accused product "presented unusual challenges for a jury." Appx00059. The court even recognized its own difficulty in deciding the Rule 50 motion, the consequence of supplanting the jury. Appx20837. The complexity of a case, however, does not give a court any right to act as the trier of fact. "So long as the Seventh Amendment stands, the right to a jury trial should not be rationed, nor should particular issues in particular types of cases be treated differently from similar issues in other types of cases," even when "complex and complicated." *Connell*, 722 F.2d at 1547.

The Re-examination Clause of the Seventh Amendment provides "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." A court, under the common law, cannot "itself determine the issues of fact and direct a judgment for the defendant, for this would cut off the plaintiff's unwaived right to have the issues of fact determined by a jury." *Baltimore & Carolina Line v. Redman*, 295 U.S. 654, 658 (1935). Because substantial evidence supports the jury verdict, the district court erred in overturning it.

**B.**    **The Court Erred In Granting JMOL On The '970 Patent**

The jury found that DISH literally infringed claims 28 and 33 of the '970

patent.  Appx00309.  Those claims depend on claim 27, which includes what the

court collectively called the "disabling limitations."  *See, e.g.,* Appx00044 & n.38;

Appx00065.

Regarding the "providing for disabling" limitation of claim 27, the court

instructed the jury as follows:

> "providing for disabling of one or more of the navigation objects such
> that the specific filtering action specified by the disabled navigation
> object is ignored" means "providing for some action to be taken to
> disable a navigation object so that its filtering action is ignored." An
> action must ***directly disable*** a navigation object so that its filtering
> action is ignored, as opposed to disabling something other than the
> navigation object that results in the navigation object's filtering action
> being ignored.

Appx00267; Appx19836-37.  The court did not provide further instruction on the

meaning of "directly" or "disable."  But the court found that DISH's accused

products do not literally infringe the "providing for disabling" limitation, finding

that ClearPlay did not present any evidence of direct disabling.  Appx00063.

The last limitation of claim 27 recites "playing the multimedia content at the

output device excluding the portion thereof which is filtered in accordance with

the corresponding navigation object and ignoring the filtering action specified by

any disabled navigation objects."  Appx00340(23:54-58).  The court did not

instruct the jury on this limitation.  The court rejected ClearPlay's position based

31

on the "█████" variable as not meeting this limitation. Appx00067-68. The court

did not address ClearPlay's "fast-forwarding" position regarding this limitation.

Because substantial evidence supported the jury's findings on the disabling

limitations, the district court erred by relying on these limitations to grant JMOL.

### 1. Substantial Evidence Supports The Jury's Finding That AutoHop Satisfied The "Providing For Disabling" Limitation

ClearPlay presented two ways in which AutoHop provides for disabling

segment bookmark pairs, which the JMOL acknowledges are navigation objects.

Appx00063 & n.120. First, ClearPlay presented evidence that selecting "No

Thanks" from AutoHop's pop-up message sets the "████" variable to "████" and

directly disables each segment bookmark pair (the navigation object) for that

playback. Second, ClearPlay presented evidence that fast-forwarding changes the

█████████ variable and directly disables individual segment bookmark pairs.

AutoHop "provides" for both of those acts of direct disabling, which cause the

segment bookmarks pairs' filtering action to be ignored on playback.

The court issued a claim construction for "providing for disabling" that

includes the "directly disable" requirement after ClearPlay closed its case-in-chief,

over ClearPlay's objection. Appx17093. While that insertion improperly narrowed

the claim and precluded ClearPlay's witnesses from using that language in its

infringement case, the jury still had substantial evidence to find infringement.

### a)    Segment Bookmark Pairs As "Navigation Objects"

In development, AutoHop used the codename "███████" Appx20392-93. DISH's ██████ Architecture" illustrates AutoHop's commercial skipping in "Figure 1: How ██████ Works." Appx23907. Feamster explained that "interstitial portions" (*e.g.*, commercials) are skipped (the filtering action) while show segments are played. Appx18472 & Appx18451. He explained how AutoHop's source code accomplishes commercial skipping using data extracted from the "Show Metadata" announcement file and saved into segment bookmark pairs (or sets). Appx18465; *see also* Appx20395 (technical document explaining jump indexes instruct the set-top box where to skip over commercials); Appx20657; Appx20240-41.

The court held that "ClearPlay has presented evidence that DISH's segment bookmarks contain the required elements of a navigation object for the '970 Patent," including the filtering action of skipping. Appx00063.

### b)    AutoHop Disables The Segment Bookmarks Pairs

When designing AutoHop software, DISH explained it "should allow the user to easily ***enable or disable*** automatic Interstitial skipping." Appx20408. "When enabled the [set-top box software] should play from the first start Segment Bookmark to the first end Segment Bookmark, and then skip the Interstitial and then repeat for the next sets (i.e. starts and ends) of Segment Bookmarks until the end of the Show." *Id.*; *see* Appx23922.

Feamster explained how AutoHop's source code accomplishes this. He explained that two variables in AutoHop's source code, "████" and "████████," enable or disable the segment bookmarks for commercial skipping. Appx18484, Appx18522-24; Appx18530-32. When the pop-up menu asks if the user wants to play with or without AutoHop's automatic commercial skipping, selecting "Yes" sets the "████" variable to "████;" selecting "No Thanks" sets the "████" variable to "████." Appx18520-23; *see* Appx23929. The "████████" variable is set based on the Hopper's playback state, such as play, fast-forwarding, or rewinding. Appx18483; Appx18523-24; Appx18530.

During playback, AutoHop uses check-in conditions to determine whether to skip commercials. Appx18483; Appx18500-11; Appx20574-638 (source code exhibit); Appx18291-293 (confirming that code runs DISH's set-top box); Appx17369-72. Feamster explained DISH's code at Appx20618, lines 5809-5813. When the software crosses an "end type" bookmark in the pair during playback, it checks whether the "████" variable has a value of "████ (line 5810) and whether the "████████" variable has a value of "████████ (line 5813). Appx18523-26 (testimony); Appx17394-98. If those two conditions are met, the "████" (line 5811) specifies to the software to use the segment bookmark pair to skip. Appx18522-26. If, however, either the "████" variable is set to ████████ or the "████████" variable is set to other than "████," then the skip filtering

**CONFIDENTIAL MATERIAL REDACTED**

action is ignored.  Appx18520-26; Appx17398.  Feamster explained that "right in the condition statement, we see both of the conditions that allow the user ***to disable this particular pair of segment bookmarks***." Appx18524-18525.

Feamster testified the " Code ██ " variable does not disable AutoHop as a whole: "AutoHop remains enabled.  Segment bookmarks are disabled for the playback of that particular show."  Appx18518-20; Appx18727; Appx18733.  Similarly, he testified that the " Code ████ " variable disables the particular pair of segment bookmarks that the user fast-forwards or rewinds into.   Appx18524-18525; Appx18607-08; Appx18727; Appx18733; Appx18761-62.

While demonstrating AutoHop in court, DISH's Minnick confirmed that the skip does not occur when a user fast-forwards into a commercial.  Appx18347.  Minnick also testified that fast-forwarding does not turn off AutoHop because "AutoHop software is running underneath doing the processing that it always does." *Id.*

It was undisputed that the act of setting the " Code ██ " variable to Code ████ or the " Code ████ " variable to something other than Code ████ " causes the segment bookmarks' skipping action to be ignored.  Appx20718-23.  DISH did not cross-examine Feamster about the operation of the source code, or whether AutoHop's disabling was "direct."  Appx18761; *see also* Appx18769.  And Benjamin Goldberg, DISH's non-infringement expert, did not contest Feamster's testimony that

**CONFIDENTIAL MATERIAL REDACTED**

AutoHop satisfied the "disabling" limitations, even under the revised "directly disable" jury instruction. Appx19198. The jury was entitled to make inferences based on that acquiescence. *Reeves*, 530 U.S. at 151 (court "should give credence to the evidence favoring the nonmovant").

**c)  AutoHop Does Not Target "Something Other Than" The Segment Bookmarks**

ClearPlay also presented evidence demonstrating that the [Code] and [Code] " variables disable the segment bookmarks, and not "something" else. Appx00267. The court found ClearPlay's evidence relating to the [Code] " variable showed disabling of "AutoHop as a whole," not navigation objects. Appx00065-67. But the jury was not instructed that "directly disable" excluded disabling AutoHop "as a whole." Appx00267.

Regardless, Feamster explained that setting the "[Code] variable to "[Code] does not cause AutoHop "as a whole" to be disabled. Appx18518-22. Moreover, Minnick identified only one way to disable AutoHop as a whole—disabling the entire Primetime Anytime feature. Appx19099; *see also* Appx20465-67. The jury could have reasonably concluded that the [Code] variable does not disable "AutoHop as a whole" or disable "something other than" the segment bookmarks.

The court also found that changing the "[Code] " variable from "[Code] " causes the "AutoHop software" to be ignored, not the segment bookmarks. Appx00069-70. But Feamster testified that changing [Code] " disables

36

**CONFIDENTIAL MATERIAL REDACTED**

segment bookmark pairs, such that the skipping is ignored during playback. Appx18518-20; Appx18524-18525; Appx18607-08; Appx18727; Appx18733; Appx18761-62. Feamster's unrebutted testimony shows that changing Code ▮▮▮▮▮▮▮" leaves AutoHop's software enabled, contrary to the court's finding. Appx18519-20.

Because the jury returned a verdict of infringement in ClearPlay's favor, it is presumed to have resolved the factual question that AutoHop directly disables the navigation objects in ClearPlay's favor. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1040 (Fed. Cir. 2016) ("We presume the jury resolved all underlying factual disputes in favor of the verdict.").

## 2. Substantial Evidence Supports The Jury's Finding That AutoHop Satisfied the "Playing . . . And Ignoring . . . Any Disabled" Navigation Object Limitation

The court also granted JMOL on the '970 patent by finding that a "No Thanks" selection is "binary" and does not meet the "playing . . . and ignoring . . . any disabled" navigation objects limitation. Appx00067-68. The court took no position whether JMOL was warranted on this limitation on AutoHop's fast-forwarding feature.

The last limitation of claim 27 recites "playing the multimedia content at the output device excluding the portion thereof which is filtered in accordance with the corresponding navigation object and ignoring the filtering action

specified by *any* disabled navigation objects." The court did not instruct the jury on this limitation. Thus, the jury "was free to rely on the plain and ordinary meaning" of the words in this limitation. *Comcast IP Holdings v. Sprint Commc'ns Co.*, 850 F.3d 1302, 1311-12 (Fed. Cir. 2017).

AutoHop's pop-up message provides users with the option to enable or disable AutoHop's segment bookmarks. The jury could reasonably have found that selecting "Yes" at AutoHop's pop-up message satisfies the claim limitation because no segment bookmarks are disabled, and thus no filtering actions need be ignored, as Feamster explained. Appx18526-27 ("It doesn't say that a user has to disable any."); Appx18520-21. The court improperly dismissed this evidence by further narrowing the claim to require "ignoring other disabled navigation objects[]" instead of ignoring "any disabled navigation objects." Appx00068.

The jury was free to interpret ignoring "any" as a contingent step that is performed only if there are "any" disabled navigation objects. *See Primus Grp., Inc. v. Inst. for Env't Health, Inc.*, 395 F. Supp. 3d 1243, 1252, 1265-66 (N.D. Cal. 2019) ("If the condition for performing a contingent step is not satisfied, the performance recited by the step need not be carried out in order for the claimed method to be performed.") (quoting *Cybersettle, Inc. v. Nat'l Arb. Forum, Inc.*, 243 F. App'x 603, 607 (Fed. Cir. 2007)). Indeed, the claim recites "***providing for*** disabling of one or more navigation objects," and ***not*** disabling at least one of

**CONFIDENTIAL MATERIAL REDACTED**

those objects.  Appx00340(23:41-43).  Unlike other claim limitations, the contingent "ignoring" refers to "any disabled navigation objects," and not, *e.g.*, "at least one" navigation object. *Compare* Appx00338 (claim 1) *with* Appx00340 (claim 27).

The jury also heard evidence that repeated or simultaneous playback of the same show could take place with skipping enabled in some instances and disabled in others.  Appx18518-19.  That shows that AutoHop selection is not "binary," as the court found.  Appx00068.  The court improperly dismissed this evidence by further narrowing the claim to exclude disabling "AutoHop as a whole *for the selected playback session*."  Appx00067-68 & n.142.  The court did not instruct the jury regarding "the selected playback session."  The jury could have reasonably relied on evidence of varying AutoHop behavior across sessions or devices as meeting the "playing . . . and ignoring . . . any disabled" limitation. *Id.*

Finally, the jury heard evidence that the " ███████ " variable disables segment bookmarks mid-show during the same playback session.  Appx18515-16; Appx18523-27.  The JMOL does not address this evidence.  But the jury could have reasonably concluded that disabling via fast-forwarding includes both filtering and disabling at least one filtering action during playback, even under the JMOL's restrictive interpretation.

### 3. **The Court Invaded The Province Of The Jury**

### a) **The Court Undermined The Verdict By Interpreting "Directly Disable" In The Jury Instruction**

A district court may not grant JMOL "based on a reconstruction of the claims that went far beyond clarifying a meaning inherent in the construction" given to the jury. *Wi-Lan,* 811 F.3d at 466; *see Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1356 (Fed. Cir. 2011) (court permitted only to clarify "what was inherent in the construction" and make "plain what . . . should have been obvious to the jury"). The court went far beyond merely clarifying inherent meanings in the jury instructions.

The jury instruction explains that "[a]n action must directly disable a navigation object so that its filtering action is ignored, as opposed to disabling something other than the navigation object that results in the navigation object's filtering action being ignored." Appx00267. Even though this construction was issued after ClearPlay's case-in-chief closed, substantial evidence supported the infringement verdict under this construction.

On JMOL, however, the court held that "directly disable" excludes "*acting on* or disabling something else *that indirectly affects* the segment bookmark or simply results in the segment bookmarks being ignored." Appx00064. The court then held that ClearPlay needed to provide evidence that DISH's "segment bookmark, *itself*, must be disabled." Appx00064. The Court further explained disabling requires (a) "some action is taken *on* the navigation object" (Appx00065),

(b) AutoHop "***looking in*** the segment bookmarks" (Appx00070), and (c) that a "change is made" to the segment bookmarks (*id.*). The court granted JMOL because, in its view, "the segment bookmark has not changed or been disabled at all." Appx00070. The court found that, under its narrowed construction, disabling required changing the value of the segment bookmark itself, "such as the SEGMENT_END flag being set to false." Appx00066-67.

But the jury instruction did not include any of these requirements. The court held that infringement required the type of disabling "as was pointed out at summary judgment." Appx00066 & n.135 (*citing* Appx00025-26). But the court did not instruct the jury with its summary judgment order. Moreover, that Order held the claim requires "that some action must be taken to disable a navigation object so that its filtering action is ignored." Appx00026. The Order did not require that the "segment bookmark, ***itself***, must be disabled," that disabling requires "some action is taken on the navigation object," that AutoHop must look "in the segment bookmarks," or that a "change is made" to the segment bookmarks. Appx00025-27.

The jury was instructed merely that "[a]n action must ***directly disable*** a navigation object so that its filtering action is ignored, as opposed to disabling something other than the navigation object that results in the navigation object's filtering action being ignored." Appx00267. The "verdict must be tested" against "the ordinary meaning of the language of the jury instruction," directly disable.

*Comcast*, 850 F.3d at 1311-12 (*quoting Hewlett-Packard*, 340 F.3d at 1321).   Under that meaning, the jury was also free to find that changing the variables controlling commercial skipping directly disabled the segment bookmarks (*i.e.*, the navigation objects).

The jury was also free to make findings contrary to the court's finding that "No Thanks" does not disable navigation objects because it supposedly disables "AutoHop as a whole."  Appx00065-66.  While the court discussed that on summary judgment, it gave the non-analogous example of unplugging the system from the wall.  Appx00026.  But none of that was included in the jury instructions.  DISH proposed instructing the jury "that simply turning on or off functionality as a whole (*e.g.*, turning the AutoHop feature as a whole on or off) is not disabling." Appx14929.  The court rejected DISH's proposed construction.  Appx16935-36.  It was error for the court to revive that proposed construction after the verdict.

It "is too late at the JMOL stage to argue for or adopt a new and more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation."  *Hewlett-Packard*, 340 F.3d at 1321.  The court's new construction was not "inherent in the construction" and would not have "been obvious to the jury."  *Cordis Corp.*, 658 F.3d at 1356.  The court incorrectly ruled that the "clarifying language" used in the JMOL opinion "did not alter the claim construction."  Appx00088.

**CONFIDENTIAL MATERIAL REDACTED**

### b)    The Court Improperly Acted As The Trier Of Fact

The jury was charged with applying the claims as construed to AutoHop. Appx00263.  That is a factual finding solely within the province of the jury.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1302 (Fed. Cir. 2011); *see Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1573 (Fed. Cir. 1997) ("Application of the properly construed claim to the accused device is a question of fact.").  Instead of searching for substantial evidence supporting the verdict, however, the district court reexamined the evidence and made its own findings of fact.  By acting as the trier of fact, the court violated the Re-examination Clause of the Seventh Amendment and its limited role under Rule 50.

The court's JMOL order finds that selecting "No Thanks," thereby setting the "Code ██████" variable to "Code ██████," disables "AutoHop as a whole" and does not disable the segment bookmark pairs.  Appx00065-67.[5]  But the jury was free to find otherwise based on evidence including Feamster's testimony, which repeatedly highlighted that changing the AutoHop variables disables the segment bookmark pairs and not AutoHop "as a whole."  *See supra* section VI(B)(1).  The court is not

---

[5] The court's citations do not support many of its findings.  But that is beside the point.  Only the jury was to make such findings and the court reviews them only for legal sufficiency.

free to re-weigh Feamster's testimony because it is "decidedly the jury's role to evaluate the weight to be given to the testimony." *Uniloc*, 632 F.3d at 1306.

The court relied on the parties' stipulation to find "undisputed evidence" showing that AutoHop was disabled as a whole and to discard Feamster's testimony. Appx00066.  That stipulation set forth the parties' basic agreement that, if a user selects "No Thanks," "AutoHop does not skip commercials."  Appx00307.  But the stipulation reflects only the user experience, not the inner workings of the software. Finding otherwise required drawing inferences against ClearPlay.

Similarly, the court found that there was "no evidence that selecting 'No Thanks' provides for disabling segment bookmark pairs . . . rather than disabling AutoHop as a whole." Appx00065 & n.131.  The court relied, in part, on Feamster's testimony about the graphical user interface that asks the user to choose "Yes" or "No Thanks." Appx00065 & n.131 (citing Appx18446:7-23).

But the cited evidence shows that, to make those findings, the court had to reexamine the evidence and draw inferences against ClearPlay.  Feamster testified that the message's user-facing text does not control the actual device operation. Appx18761.  Feamster testified that disabling commercial skipping for a specific playback does not "disable the AutoHop system as a whole" and that "AutoHop remains enabled."  Appx18518-20.

The court also incorrectly found, without citation, that the "█████ ^{Code}" variable affects AutoHop as a whole, not the navigation objects.  Appx00066.  But Feamster testified that the "████ ^{Code}" variable targets the operation of the segment bookmarks, not AutoHop as a whole.  Appx18518-20; Appx18522.

The court also repeatedly relied on its own finding of fact in paragraph 22 of its JMOL opinion to buttress its finding that AutoHop did not directly disable the segment bookmarks.  Appx00050, cited at Appx00065 n.129; Appx00067 n.137, n.139.  Paragraph 22 found ClearPlay "did not present evidence that the segment bookmarks themselves are directly disabled," and Feamster's testimony was limited to "evidence that a user could 'disable skipping' (or bypass or ignore segment bookmarks as opposed to disabling segment bookmarks) based on 'check-in conditions.'"  Appx00050.  But the evidence cited in support of paragraph 22 does not support the finding.  As discussed, Feamster's testimony was not "limited" to showing that AutoHop merely disables skipping as the court found.  Appx00050.  Rather, he explained the AutoHop software disabled segment bookmarks based on check-in conditions.  Appx18518-26.

In paragraph 25, the court found "Feamster never offered any testimony or evidence that setting the █████ ^{Code} variable directly disabled any particular segment bookmark."  Appx00050-51.  Not so.  Feamster testified the "████ ^{Code}" variable allows the user to disable a "particular pair of segment bookmarks."  Appx18525;

**CONFIDENTIAL MATERIAL REDACTED**

Appx18518-20; Appx18522.  As with the finding in paragraph 22, the court re-weighed the evidence while drawing inferences against ClearPlay.

The court also improperly re-examined evidence demonstrating fast-forwarding changes the "████████ [Code]" variable and disables a segment bookmark pair.  The court found that, when "████████ [Code] is set to something other than ████ [Code]," the "AutoHop software" or "the standard playback software" is ignored, rather than segment bookmarks.  Appx00069-71.  The court asserted that Feamster "pointed only to code that … indirectly affects the use made of segment bookmarks."  Appx00071.  But the cited testimony does not support these findings.  Appx00070 & n.147.  Feamster testified that when fast-forwarding, "AutoHop is still running," the executed code checks ████████ [Code], the segment bookmarks are disabled, and the filtering action ignored.  Appx18523-25.  DISH's engineer, Minnick, confirmed ████████ [Code]" does not disable AutoHop.  Appx18347.

### c)    The Court Discounted Probative Evidence

The court's JMOL analysis shows it discarded probative evidence and argument.  The court discounted "DISH's technical documents, advertising, and internal communications consisting of descriptions of AutoHop and its functionality," despite admitting they were "helpful and appealing to the jury in terms they understand."  Appx00056-57.  The court found these documents "legally insufficient to establish the actual operation of functionality of DISH's accused

products," (Appx00057) but that is irrelevant. ClearPlay did not rely on those documents by themselves. ClearPlay also relied on the source code and Feamster's explanatory testimony, and all of the evidence of record concerning AutoHop. The court cannot justify dismissing evidence because of "counsel's reticence to object" to "matters beyond the centrally relevant evidence." Appx00059. Counsel not objecting indicates the evidence was probative to some degree.

The court held the source code was more than "centrally relevant;" it held it to be "the dispositive relevant evidence." Appx00057 & n.98. But the court is not entitled to reweigh the evidence and dismiss some as not "centrally relevant." *Uniloc*, 632 F.3d at 1306. Feamster recognized source code is important but explained that the technical documents are important too because they "describe the source code," "guide the development of the code," and "the whole point of writing these documents is to describe what we expect the code to do." Appx18474. DISH's Minnick confirmed DISH wrote these technical documents so people who "actually wrote the code can communicate with each other about how the system operates." Appx18279.

The discarded technical documents provide important evidence that the jury considered. For example, one document explains that AutoHop software "should allow the user to easily enable or disable automatic Interstitial skipping." Appx23922. It explains that, when enabled, the software will play "from the first

start Segment Bookmark to the first end Segment Bookmark," skip, and "then repeat" for segment bookmark pairs "until the end of the Show." *Id.* Relying on this document and the code itself, Feamster explained that AutoHop disables skipping using an analogous approach that repeatedly checks the ▮▮▮ [Code] variable and disables skipping for each segment bookmark pair. Appx18517-27. The court's finding that there "is only an action to not enable AutoHop—not to disable the segment bookmarks—that indirectly affects the use made, or not made, of segment bookmarks" conflicts with DISH's technical document and Feamster's analysis, which demonstrate AutoHop is not disabled as a whole. Because the jury was entitled to consider all of the evidence, the court erred by dismissing technical documents on JMOL.

The court also erroneously dismissed "analogies to common experiences" as "irrelevant" for not bearing "on the heart of the real issues." Appx00058. But analogies to common experiences could be helpful to the jury in deciding whether something directly causes a result. For example, during opening statements, ClearPlay analogized AutoHop's ability to disable to that of a thermostat. Appx17939-40. When a thermostat is deactivated because the homeowner is away, it "disables" the furnace without removing the furnace, though the thermostat continues measuring the temperature. *Id.* The jury was entitled to similarly use analogies to understand whether AutoHop's "▮▮▮ [Code]" and "▮▮▮▮▮ [Code]" variable

48

directly disabled the segment bookmarks. By categorically discarding even helpful analogies, the court diminished the jury's role in applying the claim to AutoHop. *See Uniloc*, 632 F.3d at 1301-02.

Whether an infringing act satisfies the "directly" limitation is a factual question for the jury. *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1319-20 (Fed. Cir. 2014) (jury finding that accused product met "direct communication" limitation); *Core Wireless Licensing S.A.R.L., v. LG Elec., Inc.*, 880 F.3d 1356, 1368-69 (Fed. Cir. 2018) (whether device satisfied "reached directly from the main menu" limitation presented "a fact question that we presume the jury resolved"). In many areas of the law, juries regularly assess the factual question of whether a causal relationship is "direct." *See e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953, 967 (N.D. Cal. 2011) (factual question whether conduct had a direct effect on commerce); *Combustion Sys. Servs., Inc. v. Schuykill Energy Res., Inc.*, No. 924228, 1993 WL 496946, at *2 (E.D. Pa. Nov. 19, 1993) (whether claim for damages is "direct or consequential is an issue of fact").

The court admitted this patent case posed an "unusual challenge," noting the "complexity of the case," and "the complex technology of each party." Appx00059. The court inferred that the jury must also have been confused by the analogies and non-source code documents describing AutoHop. Appx00056-57; Appx00059. Complexity does not justify excluding "helpful" evidence or arguments, particularly

when admitted at trial without objection. *See* Appx00059 (noting, but then dismissing, lack of objections). There is no exception to the Seventh Amendment allowing courts to take cases away from the jury, no matter how "complex and complicated" the technology. *Connell*, 722 F.2d at 1547. And, once submitted, the jury was free to consider all evidence when applying the claims to AutoHop.

The above shows the court acted as the trier of fact, dismissed probative evidence, and substituted its conclusions for the jury's. In a jury trial, the Re-examination Clause of the Seventh Amendment prohibits the court from doing so.

### d)      The Court Improperly Restricted Its Analysis To ClearPlay's Case-In-Chief

The district court improperly granted DISH's JMOL motion under Rule 50(a) even though the jury had returned a verdict. The court ordered supplemental briefing after trial addressing evidence from "ClearPlay's case-in-chief presentation." Appx17203. The court, however, was required to consider the totality of the evidence that was presented to the jury. *Reeves*, 530 U.S. at 150; *Stroup v. United Airlines, Inc.*, 26 F.4th 1147, 1156 (10th Cir. 2022) ("we consider the record in its entirety"). Because "the district court examined only the evidence presented in Plaintiffs' case when granting Defendants' renewed Rule 50(a) motion," that was "an error of law." *Peguero–Moronta v. Santiago*, 464 F.3d 29, 33 (1st Cir. 2006).

Evidence presented by DISH's experts demonstrated a broad application of the claimed "disabling" limitation. For example, one DISH expert testified that,

when applying the claims to the prior art, turning off a circuit would "discontinue any filtering." Appx19655-56. Another invalidity witness linked "disabling" to the ability to view "any or all of the signal," and not a particular object. Appx19139. The jury was also entitled to rely on the absence of any DISH rebuttal to Feamster's "disabling" testimony and infer that DISH did not find any inaccuracy. Appx19198. The jury was free to find that "directly disabling" could be accomplished in many ways and not just by changing the navigation object itself, as the JMOL held. But by looking only to ClearPlay's *prima facie* case, the court erroneously never looked to the whole record to examine what the jury could have found to support the verdict.

## C.   The Court Erred By Granting JMOL On The '799 Patent

The jury found that DISH infringed claim 12 of the '799 patent both literally and under the doctrine of equivalents. Appx00309. On JMOL, the court held each navigation object must define its own exclusive start position, stop position, filtering action, and configuration identifier. Appx00071; Appx00074-75. For the '799 patent, ClearPlay asserted DISH's announcement files included navigation objects. The court held ClearPlay's theory required the "navigation objects to share a single filtering action and a single configuration identifier," and granted JMOL on this basis. Appx00073. The court also granted JMOL by rejecting the jury's alternative finding of infringement under the doctrine of equivalents, finding ClearPlay presented insufficiently particularized testimony and was barred from relying on the

doctrine of equivalents as a matter of law. Appx00076-82. Because substantial evidence supported the jury's findings for the "navigation object" limitation, literally or, alternatively, under the doctrine of equivalents, the court erred in granting JMOL.

### 1. Substantial Evidence Supports The Jury's Verdict That AutoHop Literally Satisfied The "Navigation Object" Limitation

#### a) The Court Again Deviated From The Claim Construction Provided To The Jury

Claim 12 of the '799 patent recites an "object store . . . including a plurality of navigation objects, each of which defines a portion of the multimedia content that is to be filtered by defining a start position and a stop position and a specific filtering action to be performed on the portion of the multimedia content defined by the start position and stop position for that portion." Appx00372. The claim further recites "comparing the configuration identifier of the particular navigation object with the configuration identifier of the decoder to determine if the particular navigation object applies to the decoder." Appx00372.

The court instructed the jury that "navigation object":

means its "plain and ordinary meaning (as defined by the terms of the claims themselves)." For example, claim 27 of the '970 Patent states that each navigation object "defin[es] a start position and a stop position and a specific filtering action to be performed on a portion of the multimedia content." In all claims, the start, stop, and filter elements that comprise the navigation object must be contained within the same object, *file*, or data structure.

Appx00266-67; Appx19836.

The court instructed the jury that "configuration identifier":

> means "an identifier of the consumer system (including hardware and software) that is used to determine if the navigation objects apply to the particular consumer system." Claim 12 of the '799 Patent requires the configuration identifier to be contained within the navigation object.

Appx00267.

The jury instructions required only that the elements defined by a navigation object are contained within the same file. Applying this construction, Feamster explained that each "Show Metadata" announcement *file* is an object store that contains navigation objects defining a start position, a stop position, a filtering action to be performed, and a configuration identifier. Appx18535-38; Appx18552-53; Appx18562-63.

On JMOL, the court held that ClearPlay's evidence was "contrary to the claim construction that each particular navigation object must define *its own* start position, stop position, and filtering action, and contain *its own* configuration identifier." Appx00074. The court also held that the jury verdict "violates the single-object approach required by the court's claim construction." Appx00073. But the verdict cannot violate a construction never given to the jury.

Because the jury instructions do not mention a "single-object approach," the court's JMOL analysis relies upon its summary judgment order for its construction. Appx00073-75 nn.161-162, 165, 168-169 & 171-174. But once finding infringement is charged to the jury, the instructions are the definitive claim

construction, not something discussed in an order.  *Hewlett-Packard*, 340 F.3d at 1321.

This rule has even greater force here because DISH previously tried—and failed—to insert into the instructions the requirement that a "navigation object" have "its own" elements.  DISH first attempted narrowing "navigation object" in a supplemental claim construction rejected by the court, which recognized the parties' stipulated construction controlled.  Appx03336; Appx05468-71.  Later, DISH tried to incorporate language from the summary judgment order into the jury instructions.  Appx14927-28.  The court again refused to instruct the jury with DISH's proposed requirement that "an 'object' is singular," or that a navigation object "is not a formless assigning `or specifying of associated or linked information from multiple sources.  Otherwise, the navigation ceases to be ***an object***."  Appx16935 (emphasis in original).  DISH yet again proposed that narrowing language when drafting the court's JMOL order.  Appx20884.  The court finally adopted the restriction in JMOL despite having excluded it from the jury instructions.  Appx00074 & n.168.

The court held that navigation objects ***cannot share*** any of the elements, even if they are in the same file.  But the jury instructions required merely that "the start, stop, and filter elements that comprise the navigation object must be contained within the same object, ***file***, or data structure," without any limitation whether an element is shared.  Appx00266-67.

**CONFIDENTIAL MATERIAL REDACTED**

Thus, the jury was free to find that AutoHop's navigation objects specify a filtering action and contain a configuration identifier, even if they shared those elements with other navigation objects, particularly when they were all in the same file. Thus, the court erred by further construing the limitation post-verdict.

### b)      Substantial Evidence Satisfies The Jury Instruction

The jury could have reasonably found that AutoHop's announcement files include navigation objects because all of the required elements are within the same AutoHop announcement file, which is all the instruction required. Substantial evidence supported the jury's finding of literal infringement.

Feamster explained to the jury how the "Show Metadata" (0x08) announcement file included navigation objects. Feamster used a detailed DISH technical specification describing the announcement file format, and an announcement file itself. Appx18250-51; Appx18547; Appx20326; Appx20410-27. DISH's technical specification explained that a "Show Metadata" announcement file is identified by a 0x08 "package_type." Appx20326. The file carries data using its Code ██████████████." Appx20327. The specification further explained that multiple segment descriptors "are used in one announcement to convey the interstitial information for an entire Show." Appx20355. Feamster explained that a segment descriptor from the announcement file is used to generate a segment end bookmark. Appx18543-44; Appx18547. The technical specification also explained

that each announcement file contains a "model_targeting_descriptor" that "is used to target a package/resource to particular STB models."  Appx20341.

Feamster reviewed a "Show Metadata" announcement file used by AutoHop and confirmed that its model_targeting_descriptor section, Appx20411-12; identifies DISH set-top box model numbers compatible with that announcement file, Appx18562-64.  Minnick confirmed the contents of the "Show Metadata" announcement file.  Appx18250-51; Appx18259-61; Appx18295.

Feamster testified that the "Show Metadata" announcement file defines a specific filtering action for each navigation object by including an 0x08 designation in the file.  Appx18552-53.  Feamster explained that when the set-top box receives a "Show Metadata" (0x08) announcement file, AutoHop "gathers the info in order to skip" commercials.  Appx18550-52; *see generally* Appx18548-52 (discussing Appx23997-98); *see also* Appx24808-13 (source code).  Feamster testified that the "0x08 designation appl[ies] equally to each start and stop position in the 0x08 announcement file."  Appx18553; Appx18709-10.  And Feamster explained that each navigation object within the file thus "has a show metadata type" of 0x08.  Appx18709-10.  The arrangement described by Feamster, where the navigation objects share a filtering action element, is illustrated below.



Feamster also testified that the model_targeting_descriptor in the announcement file is a "configuration identifier." Appx18561-63. DISH's Minnick confirmed that the AutoHop announcement files are "sent to all boxes" but only certain Hopper models will use them. Appx18373-74. Minnick explained that DISH targets these models using a "configuration identifier." Appx18374. Feamster further explained that the model_targeting_descriptor determines if the DISH set-top boxes have the combination of hardware and software needed to process announcement files. Appx18561-62; Appx18566-68. He testified that the model_targeting_descriptor is contained within the same announcement file as the start and end offset navigation objects. Appx18561-63; Appx18569-70. The jury could have credited Feamster's testimony explaining how each navigation object contained, within the same announcement file, the model_targeting_descriptor as a shared configuration identifier and found this limitation satisfied.

Even if the jury found that claim language does not apply to multiple navigation objects defining the same shared filtering action, substantial evidence still showed that each navigation object in the announcement file defines its ***own*** filtering action. Feamster testified that the announcement file captures the start and stop positions for each commercial break, calculated as the distance from a unique string of closed caption words in the show segments. Appx18537-39. Feamster explained that the "end offset" is placed in a specific location in the announcement file and specifies where the skipping begins. Appx18462-63; *see also* Appx18305-06 (Minnick). Feamster explained that this location specifies to the set-top box software to skip at that position in the show. Appx18463-64. As a result, based on the location of the end offset, each navigation object in the announcement file defines a start position, a stop position and a filtering action. Appx18464-65. Feamster testified that specifying information using a particular location in a file is common in computer programming. Appx18539; *see also* Appx19529-30 (Goldberg); Appx18305-06 (Minnick).

DISH's technical documents confirm Feamster's testimony. They explain the set-top box software processes the announcement file "to create all the Segment Bookmarks for the Show" and that "[t]he CC Metadata and the Segment Metadata from the announcement are used to create Segment Bookmarks." Appx23921-

23922.  The jury could have thus concluded that AutoHop uses navigation objects with each required element.

The court recognized that Feamster testified that "the 'position' of the end offsets in the "Show Metadata" announcement file specifies a skip filtering action." Appx00054 & n.88.  But the court then found that Feamster "subsequently clarified" that testimony by "(1) admitting the end offset is only 'used to generate the segment end bookmark' and 'derive a start position' and (2) identifying the 'Show Metadata type field' as 'specifying' the filtering action." *Id.*  The cited Feamster testimony, however, demonstrates no change in position.  Most of the citations are cross-examination based on DISH's demonstrative with which Feamster disagreed.  The court's finding impermissibly re-interprets the evidence with inferences drawn against ClearPlay.  *See Uniloc*, 632 F.3d at 1301-02.

The JMOL did not address this evidence on the merits.  But the jury was entitled to rely on Feamster's testimony and could have reasonably found that the end offset's position defines a separate filtering action for each navigation object.  Because the jury returned a verdict of infringement, it presumably resolved in ClearPlay's favor the factual questions of whether AutoHop's "Show Metadata" announcement file included navigation objects satisfying the configuration identifier requirement.  *Apple*, 839 F.3d at 1040.  Substantial evidence supports that finding.

Accordingly, the grant of JMOL of no literal infringement of the '799 patent should be reversed.

### 2.    Substantial Evidence Supports The Jury's Verdict That AutoHop Satisfied The "Navigation Object" Limitations Under The Doctrine Of Equivalents

The jury found that DISH also infringed the '799 patent under the doctrine of equivalents. Appx00309. That equivalents issue was limited to whether AutoHop satisfies the limitation "a plurality of navigation objects" of Claim 12. Appx00076. ClearPlay showed that (1) each navigation object sharing a common designation to skip, and a common configuration identifier, is not substantially different from (2) each navigation object having its own separate, but identical, designation to skip and configuration identifier. Appx18554-57; Appx18568-70. The court once again believed the jury was wrong, giving two reasons. Appx00076-82. Either of those reasons constituted reversible error.

### a)    ClearPlay Presented Particularized And Linking Evidence Of Equivalence

The court's first reason was that Feamster did not offer "'particularized testimony and linking argument' for each prong of the function-way-result test, or the insubstantial difference test." Appx00076. To prove infringement by equivalency, a patentee must present "particularized testimony and linking argument" of equivalence between the claimed invention and the accused device or process. *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1304-05 (Fed. Cir.

2007). "Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." *Id.* (quoting *Texas Instruments Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558, 1567 (Fed. Cir. 1996)). This prohibition on "generalized testimony" of "overall similarity" requires evidence of insubstantial differences "on a limitation-by-limitation basis." *Texas Instruments*, 90 F.3d at 1566; *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).

Feamster's evidence of equivalence was directed specifically to claim 12's "a plurality of navigation objects" limitation and, relatedly, the "configuration identifier" limitation. Appx18554-57; Appx18568-70. Feamster testified that AutoHop's shared filtering action element and shared configuration identifier is equivalent to each of the "plurality of navigation objects" having its own identical filtering action element and its own identical configuration identifier. Appx18568-70.

Regarding AutoHop's shared filtering action, Feamster explained that the announcement file contains an 0x08 designation (*i.e.*, the filtering action element), which specifies to skip. Appx18552-53. Feamster testified that this 0x08 (skip) designation applies "equally to each start and stop position" in the announcement file. *Id.* He then testified that, if having the 0x08 (skip) designation "shared or assigned to each of the set of start and stop positions" did not support literal

infringement, there was an insubstantial difference between (1) sharing a common filtering action element and (2) separately defining the exact same filtering actions for each start and stop position in the announcement file. Appx18554-57.

As discussed above for literal infringement, Feamster explained the function of various lines of code associated with the announcement files, explained how they specified a filtering action, and the result of that filtering. Appx18550-57. Feamster pointed to specific elements within the announcement file that specified skipping. *Id.* The jury also heard Minnick explain how DISH's announcement files work in the AutoHop system, the purpose of those files, and the result of AutoHop receiving and loading an 0x08 announcement file. Appx18349-56. Both Feamster and Minnick referred to specific portions of DISH's code and DISH's technical documents describing that code. Appx18550-57; Appx18349-56.

Against this background Feamster testified that applying a shared 0x08 (skip) designation to each navigation object "is achieving the same function in the same way, to achieve the same result, as just repeating 0x08 for every single navigation object in the file." Appx18557. Feamster explained, a person of ordinary skill in the art would have recognized that separately writing out an identical 0x08 (skip) for each navigation object is unnecessary and "inefficient" because every navigation object in DISH's announcement file has the same filtering action. *Id.* Thus, applying a shared 0x08 (skip) to each navigation object in the announcement file provides the

same function of designating a filtering action for the navigation object, in the same way, and with the same result as achieved by repeating the duplicate value for each navigation object. *Id.*

Regarding AutoHop's shared configuration identifier, Feamster testified that the announcement file's shared configuration identifier is equivalent to assigning separate, identical configuration identifiers to each navigation object. Appx18568-70. Claim 12's "comparing" limitation explains that the configuration identifier's purpose is to determine whether the navigation object is compatible with the device. The specification confirms that as well. Appx00372(14:37-41). The jury was entitled to find that the function of including a configuration identifier within a navigation object is to provide information to determine whether the navigation object is compatible with the device.

Feamster explained that the announcement file's model_targeting_descriptor (the configuration identifier) accomplishes the function of determining whether that announcement file applies to a particular set-top box. Appx18561-63; Appx18568-69. He explained that AutoHop's shared configuration identifier indicates that all navigation objects within the announcement file apply for that particular set-top box. Appx18566-70. Feamster testified that assigning each navigation object its own identical configuration identifier would "be a ridiculous way to write your code." Appx18569. Applying the same logic as he did for the shared 0x08 (skip) filtering

action, Feamster testified that this shared configuration identifier performs that same function, in the same way, to achieve the same results as repeating the same configuration identifier for each navigation object. *Id.*

ClearPlay's evidence was more than sufficient to support the jury's finding of infringement under the doctrine of equivalents. Courts "will not disturb a jury finding of infringement by equivalents unless the evidence so favors the accused infringer that reasonable jurors could not arrive at a contrary verdict." *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1376 (Fed. Cir. 2001) (cleaned up). A reasonable jury could rely on ClearPlay's evidence, including Feamster's testimony and the patent's teachings, to find equivalence. *See Crown Packaging*, 559 F.3d at 1315 (equivalence is a factual question with inferences drawn in favor of nonmoving party).

The JMOL quoted pages of Feamster's testimony only to summarily dismiss it, finding it "conclusory" and "not particularized, and did not link to the function, way, and result of each limitation, or explain how the components are not substantially different from the claim language." Appx00076-79. But Feamster's testimony was particularized to a specific limitation and did not simply compare the entire product to the claims generally. *See Crown Packaging*, 559 F.3d 1308. Feamster's testimony was directed specifically to the navigation object and configuration identifier limitations, explained in the context of specific pieces of

code and technical documents. Moreover, the JMOL improperly ignored the extensive testimony Feamster provided about how the specific portions of the announcement file worked, their functions, and the result. Feamster's later testimony discussing equivalence relied on that earlier testimony about DISH's 0x08 announcement files. *See Paice*, 504 F.3d at 1305 ("Our 'particularized testimony' standard does not require [an expert] to re-start his testimony at square one when transitioning to a doctrine of equivalents analysis. Indeed, we think it desirable for a witness to incorporate earlier testimony in order to avoid duplication.").

The court discounted Feamster's explanation that it would be "inefficient" or "a ridiculous way" of designing software to repeat identical configuration identifiers or filtering actions for every single navigation object as "not the relevant inquiry." Appx00079. The court found Feamster's testimony "established substantial differences." *Id*. But that was for the jury to decide. Feamster's testimony explained that repeating the exact same information many times for each start and stop position in the 0x08 announcement file would be "inefficient" and "ridiculous" because the file could share one filtering action element or configuration identifier. That testimony shows why the shared filtering action element and configuration identifier in the DISH announcement file was insubstantially different, interchangeable, and provides the same function, in the same way, with the same result as having each individual navigation object repeat identical elements over and over. *See Graver*

*Tank & Mfg. v. Linde Air Prods.*, 339 U.S. 605, 609 (1950) (known interchangeability an "important factor" for equivalents).

### b)    Claim 12 Of The '799 Patent Does Not "Specifically Exclude" Navigation Objects From Sharing A Common Filtering Action And Configuration Identifier

The court's second reason barring the doctrine of equivalents was that ClearPlay's evidence was "legally insufficient due to structural variants." Appx00081. The court held that "the ClearPlay patents make clear that they claim only a single structure navigation object" and that equivalency "cannot embrace a structure that is specifically excluded from the scope of the claims." Appx00081. From this premise, the court concluded: "Legally, the multi-object structure cannot be an equivalent of the single-object structure." *Id.* These holdings are legally incorrect.

Courts should not "attempt to limit the inquiry to a binary choice" and conclude "infringement under the doctrine of equivalents is unavailable . . . as a matter of law." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1368 (Fed. Cir. 2020). Instead, the "appropriate inquiry is whether a reasonable juror could have found" infringement by equivalents. *Id.*

No claim language requires "only a single structure navigation object" or excludes objects sharing common elements within the same file. Claim 12 requires only that each of the navigation objects "defines" the content to be filtered by

"defining a start position and stop position and a specific filtering action to be performed," and "comparing the configuration identifier of the particular navigation object" to the decoder. Appx00477. The jury was instructed to give a plain meaning to "navigation object," and that "the start, stop, and filter elements that comprise the navigation object must be contained within the same object, *file*, or data structure." Appx00266-67. The jury was thus free to find infringement based on the announcement file structure.

The JMOL created a single versus multi-object distinction, relying on its summary judgment order, which made the distinction between the "single-object" and "multi-object" approach. Appx00081 & n.191; *see* Appx00072-75 nn.158, 161-62, 166, 168-69, 171-74 (citing summary judgment). But the jury was not instructed about "single-object" and "multi-object" approaches, Appx00266-67, so that distinction cannot lead to JMOL. Regardless, even if the jury had received that instruction for deciding literal infringement, the jury would still decide the significance of the difference between "single-object" or "multi-object" approaches for the doctrine of equivalents, as the court held on summary judgment. Appx00021-22 ("reasonable jury could determine the single-object and multi-object approaches to navigation object[s] are equivalent.")

The court's application of the doctrine of equivalents cannot be squared with precedent. This Court has held one-object and multi-object structures can be

equivalent. *See, e.g., Lite-Netics, LLC v. Nu Tsai Capital LLC*, 60 F.4th 1335, 1346-47 (Fed. Cir. 2023) (overturning finding two half-disk magnets cannot be equivalent to one full-disk magnet); *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1320 (Fed. Cir. 1998) (two physical components combined equivalent of one element). Just as the court could not bar ClearPlay from presenting the doctrine of equivalents to the jury, the court also could not replace the jury's factual findings on that doctrine, which was supported by substantial evidence.

## VII.   CONCLUSION

Because substantial evidence supports the jury's infringement verdict for both patents, this Court should reverse the JMOL and reinstate the jury verdict.

Respectfully submitted,

Dated: June 28, 2024        By:/s/ Joseph R. Re

Joseph R. Re
*Principal Counsel*
Alan G. Laquer
Jeremiah S. Helm
Rhett D. Ramsey
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614 (949) 760-0404

L. Richard Williams
Dennis K. Blackhurst
Abigail M. Terhune
**WILLIAMS BLACKHURST TERHUNE, PLLC**
701 North 44th Ave.
Phoenix, AZ 85008

(480) 429-3003

Michael K. Erickson
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, UT  84111
(801) 532-1500

David J. Jordan
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, UT  84111
(801) 401-8900

*Attorneys for Appellant,*
*ClearPlay, Inc.*

## INDEX TO APPENDED MATERIALS

1.  Judgment dated June 2, 2023 (Appx00001-00002);

2.  Memorandum Decision and Order granting Motion for Judgment as a Matter of Law dated June 2, 2023 (Appx 00035-00084);

3.  Memorandum Decision and Order denying ClearPlay's Rule 59 Motion dated December 12, 2023 (Appx00085-00089);

4.  U.S. Patent No. 7,577,970 (Appx00313-00346);

5.  U.S. Patent No. 6,898,799 (Appx00347-00380).

# ADDENDUM

## THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH

| | |
|---|---|
| CLEARPLAY, INC., <br><br>                       Plaintiff <br><br> v. <br><br> DISH NETWORK L.L.C., and <br> ECHOSTAR TECHNOLOGIES L.L.C., <br><br>                       Defendants. | **JUDGMENT IN A CIVIL CASE** <br><br><br> Case No. 2:14-cv-00191-DN-CMR <br><br> District Judge David Nuffer <br> Magistrate Judge Cecilia M. Romero |

IT IS ORDERED, ADJUDGED, AND DECREED THAT:

Judgment is entered in favor of Defendants DISH Network L.L.C. and EchoStar Technologies L.L.C. (collectively, "DISH") and against Plaintiff ClearPlay, Inc.'s ("ClearPlay") as to all claims in ClearPlay's Complaint.

Judgment is further entered declaring that:

1. Claims 28 and 33 of U.S. Patent Nos. 7,577,970 (the "'970 Patent") are not infringed by DISH's Hopper 1, Hopper 2, and Hopper 3 devices, along with DISH's data input, server, and satellite systems (collectively, the "Accused Products");

2. Claim 12 of U.S. Patent Nos. 6,898,799 (the "'799 Patent") is not infringed by the Accused Products;

3. DISH is the prevailing party;

4. This judgment is without prejudice to DISH's right to seek attorneys' fees pursuant to, *inter alia*, 35 U.S.C. § 285; and

1

5.   This judgment is without prejudice to DISH's right to seek costs pursuant to, *inter alia*, Fed. R. Civ. P. 54(d).

Signed this 2nd day of June, 2023.

BY THE COURT:

_____

David Nuffer
United States District Judge

2

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CLEARPLAY, INC.<br><br>          Plaintiff,<br><br>v.<br><br>DISH NETWORK L.L.C., and<br>ECHOSTAR TECHNOLOGIES L.L.C.,<br><br>          Defendants. | **REDACTED**<br>**MEMORANDUM DECISION AND ORDER**<br>**GRANTING DISH'S MOTION FOR**<br>**JUDGMENT AS A MATTER OF LAW**<br><br>Case No. 2:14-cv-00191-DN-CMR<br><br>District Judge David Nuffer<br>Magistrate Judge Cecilia M. Romero |

This Memorandum Decision and Order resolves the motion of Defendants DISH

Network L.L.C. and DISH Technologies L.L.C. f/k/a EchoStar Technologies L.L.C.

(collectively, "DISH") for judgment as a matter of law ("JMOL")[1] and related briefing filed by

the parties.[2] DISH seeks judgment as a matter of law of noninfringement regarding Plaintiff

ClearPlay, Inc.'s ("ClearPlay") patents, U.S. Patent Nos. 7,577,970 (the "'970 Patent") and

6,898,799 (the "'799 Patent") (collectively, the "Asserted Patents").[3]

---

[1] Defendants' Motion for Judgment as a Matter of Law ("JMOL"), docket no. 862, filed Mar. 3, 2023.

[2] Supplemental Briefing in Support of Defendants' Judgment as a Matter of Law Under Rule 50(a) ("Dish's Suppl Brief"), docket no. 883, filed Mar. 7, 2023; Defendants' Supplemental Memorandum in Support of Motion for Judgment as a Matter of Law of Noninfringement Under Rule 50(a), docket no. 951, filed under seal Mar. 16, 2023; Appendix to Defendants' Supplemental Memorandum in Support of Motion for Judgment as a Matter of Law of Noninfringement Under Rule 50(a), docket no. 951-1, filed under seal Mar. 16, 2023. ClearPlay filed briefing in opposition to DISH's JMOL. ClearPlay's Opposition to Defendants' Motion for Judgment as a Matter of Law Under Rule 50(a) ("ClearPlay's Opposition"), docket no. 863, filed Mar. 5, 2023; ClearPlay's Supplemental Briefing Regarding Disabling, docket no. 886, filed under seal Mar. 7, 2023; Appendix of Exhibits for ClearPlay's Supplemental Memorandum in Opposition to Dish's Motion for Judgment as a Matter of Law Under Rule 50(a), docket no. 946, filed Mar. 16, 2023; ClearPlay's Supplemental Memorandum in Opposition to Dish's Motion for Judgment as a Matter of Law Under Rule 50(a) ("ClearPlay's Suppl. Brief"), docket no. 949, filed under seal Mar. 16, 2023; Appendix of Exhibits for ClearPlay's Supplemental Memorandum in Opposition to Dish's Motion for Judgment as a Matter of Law Under Rule 50(a), docket no. 952, filed under seal Mar. 16, 2023.

[3] Trial Exs. 1 and 4.

Jury trial was held February 27 through March 10, 2023.[4] The jury's verdict finding in favor of ClearPlay and awarding $469,074,468 was returned March 10, 2023.[5]

Following oral argument during trial near the close of ClearPlay's case, ruling on DISH's JMOL was reserved.[6] In a hearing March 21, 2023, an oral ruling was issued, which stated the basis for granting DISH's JMOL.[7] After that hearing, a draft order was submitted by DISH;[8] and an extensive response was received from ClearPlay.[9]

This Memorandum Decision and Order memorializes the complete findings and conclusions regarding DISH's JMOL. DISH's JMOL is resolved pursuant to Rule 50(a) based on the evidence presented in ClearPlay's case-in-chief. Nothing, however, turns on whether the JMOL is resolved under Rule 50(a) or if instead the supplemental briefing is treated as renewing the JMOL pursuant to Rule 50(b). The standard for granting judgment as a matter of law under Rule 50(b) is "precisely the same" as under Rule 50(a).[10]

---

[4] The trial transcript ("Tr.") consists to ten volumes as follows: Vol. I Feb. 27, 2023 (pgs. 1-87), docket no. 934, filed Mar. 16, 2023; Vol. II Feb. 28, 2023 (pgs. 88-319), docket no. 935, filed Mar. 16, 2023; Vol. III Mar. 1, 2023 (pgs. 320-505), docket no. 936, filed Mar. 16, 2023; Vol. IV Mar. 2, 2023 (pgs. 506-757), docket no. 937, filed Mar. 16, 2023; Vol. V Mar. 3, 2023 (pgs. 758-964), docket no. 938, filed Mar. 16, 2023; Vol. VI Mar. 6, 2023 (pgs. 965-1274), docket no. 939, filed Mar. 16, 2023; Vol. VII Mar. 7, 2023 (pgs. 1275-1535), docket no. 940, filed Mar. 16, 2023; Vol. VIII Mar. 8, 2023 (pgs. 1536-1805), docket no. 941, filed Mar. 16, 2023; Vol. IX Mar. 9, 2023 (pgs. 1806-2083), docket no. 942, filed Mar. 16, 2023; Vol. X Mar. 10, 2023 (pgs. 2084-2092), docket no. 943, filed Mar. 16, 2023.

[5] Verdict Form, docket no. 914, filed Mar. 10, 2023.

[6] Minute Entry for Proceedings Held Before Judge David Nuffer, docket no. 901, filed Mar. 8, 2023.

[7] Minute Entry for Proceedings Held Before Judge David Nuffer, docket no. 954, filed Mar. 21, 2023; Transcript of Status Conference Mar. 21, 2023, docket no. 956, filed Mar. 30, 2023.

[8] Notice of Filing of Dish's Proposed Order Granting Dish's Motion for Judgment as a Matter of Law and Proposed Judgment, docket no. 962, filed Apr. 14, 2023; [Sealed Version of docket no. 962], docket no. 964, filed under seal Apr. 14, 2023.

[9] Notice of Filing of ClearPlay's Objections to Dish's Proposed Order Granting Dish's Motion for Judgment as a Matter of Law and Proposed Judgment, docket no. 969, filed May 12, 2023; [Sealed Version of Exhibit A to docket no. 969, filed May 12, 2023], docket no. 971, filed under seal May 12, 2023; Plaintiff's Notice of Errata to docket no. 969-1, Exhibit A to docket no. 969, docket no. 973, filed May 22, 2023.

[10] 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2537 (3d ed. 1998); *see, e.g.*, *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1288 (10th Cir. 2000). Additionally, some courts have viewed the distinction between 50(a) and 50(b) as a formality, so long as the motion for judgment as a matter of law was

After careful consideration of the parties' oral argument regarding the evidence presented in ClearPlay's case-in-chief and the extensive filings before and after that time, including the draft order and objections thereto, and for good cause appearing, and for the reasons discussed herein, DISH's JMOL[11] is GRANTED. ClearPlay's claims for infringement, induced infringement, and willful infringement fail as a matter of law because the accused devices do not practice the methods of the asserted claims of the '970 Patent and '799 Patent and do not literally, or under the doctrine of equivalents, infringe the asserted claims.

Contents

I.    LEGAL STANDARD..................................................................................................... 1

II.   BACKGROUND ........................................................................................................... 2

III.  CLEARPLAY'S CASE-IN-CHIEF PRESENTATION OF EVIDENCE.............................. 8

      A.    DISH's AutoHop Operation ................................................................................. 8

      B.    The '970 Patent .................................................................................................. 11

            1.    Trial evidence addressing the alleged navigation objects in DISH's segment bookmark files ............................................................................ 11

            2.    Trial evidence addressing the alleged disabling based on "No Thanks" on the AutoHop pop-up message ................................................................. 12

            3.    Trial evidence addressing the alleged disabling based on fast-forward/rewind into commercials ........................................................... 14

      C.    The '799 Patent .................................................................................................. 16

---

brought before the 28-day deadline after judgment. *See, e.g.*, *Finger v. County of Riverside*, No. EDCV 15-01395 JGB (KKx), 2018 WL 6010356, *3 (C.D. Cal. Jan. 10, 2018) ("[T]his Court has found[] cases in the Eleventh, Fourth, and Fifth Circuits to hold that a Rule 50(b) motion is unnecessary when the district court reserves ruling on a party's Rule 50(a) motion.") (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 n.4 (11th Cir. 2002) ("The Rule 50(b) motion was unnecessary because the district court had reserved ruling on [the defendant's] Rule 50(a) motion until after the jury returned its verdict."); *First Safe Deposit Nat'l Bank v. W. Union Tel. Co.*, 337 F.2d 743, 746 (1st Cir. 1964) ("In the case at bar the court acted within six days of the verdict. Manifestly it could have asked the defendant to file an immediate Rule 50(b) motion, and have acted upon it. To say that it could not, instead, act on the reserved pre-verdict motion would be to insist upon form over substance.") (footnote omitted); *Nichols Constr. Corp. v. Cessna Aircraft Co.*, 808 F.2d 340, 354-56 (5th Cir. 1985) ("We conclude that, in the present circumstances, the rule of *Johnson* is inapplicable and that Cruse's failure to file a motion for judgment n.o.v. did not prevent the district court from granting Cruse's motion for directed verdict on which the decision had previously been reserved.").

[11] Docket no. 862, filed Mar. 3, 2023.

iii

        1.    Trial evidence addressing the alleged filtering action in DISH's announcement files ................................................................. 16

        2.    Trial evidence addressing the alleged configuration identifier in DISH's announcement files ........................................... 17

IV.  ANALYSIS OF THE EVIDENCE ................................................. 18

    A.    Background on "providing for disabling" limitation ............................ 21

    B.    ClearPlay failed to present legally sufficient evidence of "providing for disabling the alleged navigation object such that the filtering action of the disabled navigation object is ignored" as required by the Disabling Claims of the '970 Patent ............................................................................. 24

        1.    The "No Thanks" pop-up message does not directly disable segment bookmarks ................................................................. 27

        2.    Fast-forwarding or rewinding into commercials does not disable segment bookmarks .............................................. 30

    C.    ClearPlay failed to present legally sufficient evidence of the "plurality of navigation objects" required by claim 12 of the '799 Patent .............................. 33

        1.    DISH's single-object "comparison" argument does not compel judgment as a matter of law ................................................. 34

        2.    DISH's announcement file cannot satisfy the "plurality of navigation objects" limitations in claim 12 of the '799 Patent ................................. 35

    D.    ClearPlay failed to present legally sufficient evidence of the "plurality of navigation objects" required by Claim 12 of the '799 Patent under the doctrine of equivalents ................................................................. 38

        1.    Dr. Feamster did not offer particularized testimony under either of the function-way-result or the insubstantial difference tests ......................... 38

        2.    ClearPlay's evidence for the "navigation object" limitation is legally insufficient for infringement under the doctrine of equivalents ............... 43

V.   SUMMARY ................................................................. 44

VI.  ORDER ................................................................. 45

## I.  LEGAL STANDARD

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial, and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]"[12] Rule 50(a) allows the trial court to enter judgment as a matter of law when "the facts are sufficiently clear that the law requires a particular result."[13] "Judgment as a matter of law is cautiously and sparingly granted and then only when the court is certain the evidence conclusively favors one party such that reasonable jurors could not arrive at a contrary verdict."[14]

All reasonable inferences are drawn in favor of the nonmoving party, and the district court does not make credibility determinations or weigh the evidence.[15] As quoted in ClearPlay's supplemental brief,[16] the question is "whether a reasonable jury could find that [DISH] infringed the properly construed claims based on the evidence presented."[17] "Sufficient evidence can mean something less than the weight of evidence and consists of such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence."[18] Even where DISH offered conflicting evidence, "the

---

[12] Fed. R. Civ. P. 50(a)(1).

[13] *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2521, p. 240 (2d ed. 1995)). The standard under Rule 50(b) is the same. *See supra* note 10.

[14] *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019) (internal quotations omitted); *see also Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1400 (Fed. Cir. 2014) (affirming "the district court's grant of JMOL of no infringement").

[15] *Bill Barrett*, 918 F.3d at 766.

[16] ClearPlay's Suppl. Brief at 2.

[17] *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1252 (Fed. Cir. 2005).

[18] *Braun v. Medtronic Sofamor Danek, Inc.*, 141 F. Supp. 3d 1177, 1187 (D. Utah 2015), *aff'd*, 719 F. App'x 782 (10th Cir. 2017).

1

jury was free to disbelieve" DISH's evidence and credit ClearPlay's evidence, including expert testimony.[19]

This is "a high hurdle to overcome" for the party moving for judgment as a matter of law.[20] But when the hurdle is overcome, the court must ensure that judgment is not entered contrary to law.[21] The complex issues and extraordinary amount of briefing involved with DISH's JMOL meant time was needed to become fully familiar with the case, settled in the law, and confident in granting judgment as a matter of law. The record considered for DISH's JMOL closed at the end of ClearPlay's case-in-chief.

## II.    BACKGROUND

1.    On March 13, 2014, ClearPlay filed a complaint asserting that the operation of AutoHop, "a commercial skipping feature" available on DISH's Hopper 1, Hopper 2, and Hopper 3 set-top boxes, infringed several of its patents.[22] By the close of ClearPlay's case-in-chief, the three claims remaining at issue were claim 12 of the '799 Patent and claims 28

---

[19] *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 850 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

[20] *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1099 (10th Cir. 2001).

[21] *See, e.g.*, *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1247 (10th Cir. 2016) ("Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position. This standard mirrors the summary judgment standard in that the trial judge *must* direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.") (emphasis added) (internal quotation marks & citations omitted); *Henry v. Storey*, 658 F.3d 1235, 1237-38 (10th Cir. 2011) ("JMOL is appropriate if, after a party has presented its evidence, the court 'finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'") (quoting Fed. R. Civ. P. 50(a)(1)); *see also* *Heuft Systemtechnik GMBH v. Indus. Dynamics Co., Ltd.*, 282 Fed. App'x 836, 838 (Fed. Cir. 2008) ("Judgment as a matter of law 'is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'") (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).

[22] Complaint for Patent Infringement, underline{docket no. 2}, filed Mar. 13, 2014; Tr. (Minnick – Direct) 342:12-17 (discussing Trial Ex. 49 (2012 Minnick Declaration) ¶ 59); *see also* Feamster Demonstratives Slide 41 (citing Trial Ex. 32 at EchoStar_CP0000380-81) ("Scrubs is the internal code name for the STB function called 'Time Saver'. The purpose of Time Saver [a prior name for AutoHop] is to automatically skip portions of the DVR event that are considered superfluous (example, commercials). . . . When the [set-top box] plays back the event in Time Saver mode it will play from event scene start to event scene end and jump to the next event scene start resulting in the unrelated material being skipped.").

2

and 33 of the '970 Patent ("Asserted Claims"), each of which requires "a plurality of navigation objects."[23]

2.    The parties agreed during claim construction, at DISH's suggestion, that "navigation object" be given its "plain and ordinary meaning (as defined by the terms of the claims themselves)."[24] The Asserted Claims state that "each" navigation object "defin[es] a start position and a stop position and a specific filtering action to be performed on a portion of the multimedia content."[25] "Defines" (or "defining") was construed to mean "assign or specify [a start position, stop position, or filtering action]," and ClearPlay agreed to this construction.[26]

3.    At summary judgment, it was determined that based on the claim construction, a navigation object is a *single* "object, file, or data structure" containing all required elements "within the navigation object."[27] That is consistent with the specification, which repeatedly describes and illustrates "all of a navigation object's elements [as] being contained within the navigation object."[28] A navigation object could not merely be "a formless assigning or specifying of associated or linked information from multiple sources"—what has been referred to as the "multi-object approach"—because "the navigation object ceases to be *an object*."[29] The multi-object approach would, for example, permit the same "programming item" to "be

---

[23] Trial Ex. 1 ('970 Patent) 23:36-40; Trial Ex. 4 ('799 Patent) 21:58-65. ClearPlay also initially asserted claim 37 of the '970 Patent at trial but withdrew its infringement assertions as to that claim during the cross-examination of Dr. Feamster. Tr. (Williams) 733:18-19; *compare* Jury Instructions at 10, docket no. 924, filed Mar. 15, 2023, *with id.* at 37.

[24] Memorandum Decision and Order Regarding Claim Construction ("Claim Construction Order") at 5, 18, docket no. 309, filed Aug. 26, 2019.

[25] Trial Ex. 1 ('970 Patent) 23:37-39; Trial Ex. 4 ('799 Patent) 21:60-65 (similar).

[26] Claim Construction Order at 17-18.

[27] Memorandum Decision and Order Granting in part and Denying in part Dish's Motion for Summary Judgment ("Summary Judgment Order") at 10-11, docket no. 653, filed under seal Jan. 31, 2023.

[28] *Id.* at 13 (discussing, e.g., Trial Ex. 1 ('970 Patent) FIGs. 1-7); *see also* Trial Ex. 1 ('970 Patent) 4:49-52, 4:62-67, 11:63-12:10, FIGs. 3A-3C, FIGs. 4A-4B, FIGs. 5A-B.

[29] Summary Judgment Order at 11 (emphasis in original).

associated with multiple start and stop times."[30] That would erase the boundaries between
navigation objects in a way that renders the claims' requirement of a "*plurality* of navigation
objects" meaningless; taken to its logical end, this approach would mean that "a single
navigation object would also be a plurality of navigation objects."[31] Because the Asserted Claims
describe "each navigation object in the plurality [of navigation objects] as containing its own
specific elements," several of ClearPlay's infringement theories that relied on the multi-object
approach were dismissed on summary judgment.[32]

4.      At trial, the jury was instructed consistent with the claim construction and
summary judgment rulings: "In all claims, the start, stop, and filter elements that comprise the
navigation object must be contained within the same object, file, or data structure."[33]

5.      At the time of trial, the parties also disputed limitations other than "navigation
objects" specific to each Asserted Claim. At issue for the '970 Patent were claims 28 and 33 (the
"Disabling Claims"), which depend from independent claim 27:

> In a computerized system for enabling a consumer to filter
> multimedia content that is comprised of video content, audio content, or
> both, and wherein a consumer computer system includes a processor, a
> memory, a decoder, and an output device for playing the multimedia
> content, a method for assisting the consumer to identify portions of the
> multimedia content that are to be filtered and to thereafter filter the
> identified portions, the method comprising:
>
>> accessing a plurality of navigation objects, each defining a start
>> position and a stop position and a specific filtering action to be
>> performed on a portion of the multimedia content;

---

[30] *Id.* at 12 (citing ClearPlay's Appendix A Response to Additional Material Facts Alleged in Dish's Argument at 4, docket no. 454-1, filed under seal Aug. 25, 2022).

[31] *Id.* (emphasis in original).

[32] *Id.* at 11, 14-15.

[33] Jury Instructions at 42-43; *see also* Summary Judgment Order at 10-12.

4

*providing for disabling of one or more of the navigation objects
such that the specific filtering action specified by the disabled
navigation object is ignored*;

updating a position code in association with decoding the
multimedia content on the consumer computer system;

comparing the position code with the navigation objects to
determine whether the position code corresponding to the
multimedia content falls within the start and stop position defined
by one of the navigation objects;

activating the filtering action assigned to the corresponding
navigation object in order to filter the portion of the multimedia
content defined by the corresponding navigation object; and

*playing the multimedia content at the output device excluding the
portion thereof which is filtered in accordance with the
corresponding navigation object and ignoring the filtering action
specified by any disabled navigation objects*.[34]

6.     At summary judgment, it was determined that it is "[c]lear from the ordinary and

customary meaning and scope of the Disabling Claims, and supported by the specification's

language, [] that some action must be taken to disable a navigation object so that its filtering

action is ignored."[35] The specification supports that ordinary meaning when it states that

navigation objects "marked as disabled" would not be part of the eventual "filtering process."[36]

"[D]isabling AutoHop functionality as a whole is broader than the Disabling Claims' limitations

for disabling navigation objects" and cannot "be reasonably viewed as satisfying the Disabling

Claims' limitations."[37]

7.     At trial and consistent with earlier proceedings, the jury was instructed that:

"providing for disabling of one or more of the navigation objects
such that the specific filtering action specified by the disabled

---

[34] Trial Ex. 1 ('970 Patent) 23:29-58 (emphasis added).

[35] Summary Judgment Order at 23-24 (citing Trial Ex. 1 ('970 Patent) 18:64-19:4); *see also* Trial Ex. 1 ('970 Patent) 23:41-43, FIG. 6.

[36] Summary Judgment Order at 23-24 (discussing and quoting '970 Patent 18:64-19:4).

[37] *Id.* at 24.

5

navigation object is ignored" means "providing for some action to be taken to disable a navigation object so that its filtering action is ignored." An action must directly *disable* a navigation object so that its filtering action is *ignored*, as opposed to disabling something other than the navigation object that results in the navigation object's filtering action being ignored.[38]

8.    Independent claim 12 of the '799 Patent (the "Configuration Identifier Claim")

requires:

In a computerized system for enabling a consumer to digitally filter multimedia content that is comprised of video content, audio content, or both, and wherein a consumer computer system includes a processor, a memory, a decoder, and an output device for playing the multimedia content, a method for assisting the consumer to automatically identify portions of the multimedia content that are to be filtered and to thereafter automatically filter the identified portions, the method comprising the acts of:

creating an object store which can be loaded into a memory of the consumer computer system, the object store including *a plurality of navigation objects, each of which defines a portion of the multimedia content that is to be filtered by defining a start position and a stop position and a specific filtering action to be performed on the portion of the multimedia content defined by the start and stop positions for that portion*;

decoding the multimedia content on the consumer computer system and as the multimedia content is output from a decoder of the consumer computer system, continuously updating a position code;

as the multimedia content is decoding, continuously monitoring the position code to determine whether the position code of the multimedia content falls is within the star and stop positions defined by one of the navigation objects;

when the position code is determined to fall within the star and stop positions defined by a particular navigation object, activating the filtering action assigned to the particular navigation object in

---

[38] Jury Instructions at 43. This language was not originally included in the draft jury instructions prepared by the court. However, it became clear the language was necessary based on ClearPlay's briefing on DISH's JMOL regarding the disabling limitations. The discussion of the disabling limitations and arguments made in ClearPlay's briefing were contrary to the law of the case regarding the ordinary and customary meaning and scope of the Disabling Claims as determined at summary judgment. *Compare* ClearPlay's Supplemental Briefing Regarding Disabling, *with* Summary Judgment Order at 23-24.

6

order to filter the portion of the multimedia content defined by the
particular navigation object;

transferring the multimedia content to an output device, whereby
the multimedia content is played at the output device excluding
each portion thereof which is filtered in accordance with the
plurality of navigation objects;

assigning a configuration identifier to the decoder;

comparing *the configuration identifier of the particular navigation
object* with the configuration identifier of the decoder to determine
if the particular navigation object applies to the decoder; and

determining that the particular navigation object applies to the
decoder based on *the configuration identifier of the particular
navigation object* matching the configuration identifier of the
decoder.[39]

9.      At claim construction, the parties agreed that "configuration identifier" is properly

construed as an "identifier of the consumer system (including hardware and software) that is

used to determine if the navigation objects apply to the particular consumer system.[40]

10.     At summary judgment, the court explained that "the elements that a navigation

object 'defines' or 'comprises' are contained within the same object, file, or data structure (that

being the navigation object)" and that "claim 12 of the '799 Patent . . . require[s] the

configuration identifier to be contained within the navigation object."[41]

11.     At trial and consistent with previous proceedings, the jury was instructed:

"configuration identifier" means "an identifier of the consumer
system (including hardware and software) that is used to determine
if the navigation objects apply to the particular consumer system."
Claim 12 of the '799 Patent requires the configuration identifier to
be contained within the navigation object.[42]

---

[39] Trial Ex. 4 ('799 Patent) 21:49-22:25 (emphasis added).

[40] Claim Construction Order at 12-13.

[41] Summary Judgment Order at 10, 20-22.

[42] Jury Instructions at 42-43; *see also* Summary Judgment Order at 21-22.

7

## III.    CLEARPLAY'S CASE-IN-CHIEF PRESENTATION OF EVIDENCE

12.    ClearPlay's expert on infringement, Dr. Nicholas Feamster, attempted to establish infringement by showing that DISH's accused products contain and use navigation objects for playback of recorded programs by "match[ing] the language in the claims to the implementation in the Dish source code."[43] Dr. Feamster testified "that to really understand if the software is meeting these claims, one has to read the code" and "match[] the language in the claims to the implementation in the Dish source code that satisfied these limitations specifically."[44] But to provide context to his understanding of the source code, Dr. Feamster also relied on the technical documents and testimony regarding the code and operation of AutoHop that were produced during the litigation and testimony elicited during ClearPlay's case-in-chief from DISH's software engineers, Dan Minnick and Mark Templeman.[45]

### A.    DISH's AutoHop Operation

13.    The AutoHop feature provides for skipping over commercials during playback of certain shows, where the shows were previously recorded with DISH's PrimeTime Anytime feature and playback by the user occurs one to seven days after the show initially aired.[46]

---

[43] Tr. (Feamster – Direct) 534:11-20 ("We're essentially looking at elements in the claim specific language we'll dive into here and then we will go and look at how the -- how the AutoHop system functions and works, both how it is described in the technical documentation as well as *what the source code is actually doing* and we'll match those up one to one.") (emphasis added), 703:2-5 ("I refer to them [the claim elements] specifically by the language in the claims, and then *I matched the language in the claims to the implementation in the Dish source code* that satisfied these limitations specifically.") (emphasis added).

[44] Tr. (Feamster – Redirect) 858:3-7; *see also* Tr. (Feamster – Direct) 530:24-531:1, 531:7-23, Tr. (Feamster – Cross) 702:23-703:10; Tr. (Feamster – Redirect) 828:3-4 ("asking [the jury] to trust my expert opinion because -- because I read the source code"). Dr. Feamster's testimony that the DISH source code—rather than technical documents, marketing materials, and internal communications—is the relevant evidence for his infringement analysis was consistent with his earlier declaration that the source code is "ultimately the focus of our inquiry." Declaration of Dr. Nick Feamster ¶¶ 15-16, docket no. 244-4, filed under seal Feb. 8, 2018.

[45] Tr. (Feamster – Direct) 530:18-531:6, 556:13-17, 602:2-603:21; Tr. (Feamster – Cross) 667:9-11, 707:5-7; Tr. (Feamster – Redirect) 854:14-16. ClearPlay presented no infringement evidence during its rebuttal case.

[46] Tr. (Minnick – Direct) 342:12-17; Tr. (Minnick – Cross) 432:24-433:16, 434:23-435:1; Trial Ex. 33 (Scrubs Architecture) EchoStar_CP0000336-338.

8

Specifically, AutoHop works with shows that the user has recorded with DISH's PrimeTime Anytime feature, which enables a user to set a single DVR timer to record all primetime shows on the four major broadcast networks (ABC, CBS, FOX and NBC).[47]

14.    AutoHop is not automatically or always enabled.[48] When a user chooses to watch a show for which AutoHop is available, a message will pop-up asking whether the user would like to use AutoHop to skip commercials for this particular playback of the show.[49] The user can select either "Yes" or "No Thanks."[50]



*Figure 1[51]*

15.    If the user does not select either option ["No Thanks" or "Yes"], the system will time out after a few minutes, and return to live TV.[52]

---

[47] *Id.*

[48] Tr. (Minnick – Cross) 432:24-433:16 (explaining that AutoHop only works on PrimeTime Anytime shows), 435:13-22 (explaining that PrimeTime Anytime has to be enabled by a user), 439:6-20 (explaining a user has to "select 'yes' to watch" a recorded show using AutoHop).

[49] Tr. (Minnick – Cross) 439:6-20 (explaining a user has to "select 'yes' to watch" a recorded show using AutoHop); Instruction Mar. 8, 2023, <u>docket no. 924-1</u>, filed Mar. 15, 2023.

[50] Instruction Mar. 8, 2023.

[51] Feamster Demonstratives Slide 11 (citing Trial Ex. 49 at DISH_CP0027663).

[52] Instruction Mar. 8, 2023.

9

16.     If a user presses "Yes" and thus chooses to use AutoHop for an AutoHop-enabled show, "the user can put the remote control down and watch the recorded show without the commercials."[53] At the end of each segment of a show, when a viewer would ordinarily see a commercial break, the recording will automatically skip ahead to the next segment of the show.[54]

17.     At a technical level, AutoHop works by way of a Show Metadata "announcement file" that is created at DISH's uplink facility in Cheyenne, Wyoming by a technician watching the show and using a tool to mark the beginning and end of show segments within each PrimeTime Anytime-eligible show.[55] Closed captioning and timing information for the show, for identifying the start and end positions of each show segment, are stored in the announcement file, which is then sent via satellite to the Hopper set-top boxes.

18.     The announcement file is used by AutoHop software on a Hopper set-top box, in conjunction with timing information in the particular PrimeTime Anytime show recording on the Hopper set-top box, to create a segment bookmark file.[56] Each segment bookmark file contains segment bookmarks that identify the start and end times of each show segment for that recording.[57] These segment bookmarks are used by the AutoHop software to play the show segments and (except for the first start time and the last end time) skip the portion of commercial breaks occurring between the identified end and start times of the show segments.[58]

---

[53] Tr. (Minnick – Direct) 345:7-11, 374:5-12, 378:24-379:4; Trial Ex. 49 (2012 Minnick Declaration) ¶¶ 60, 63.

[54] Tr. (Minnick – Direct) 343:12-24; Trial Ex. 49, ¶¶ 60, 63.

[55] Tr. (Minnick – Direct) 346:20-347:6, 347:16-21, 355:14-356:4, 361:21-365:10, 380:18-21; Tr. (Minnick – Cross) 425:10-427:9; Ex. 49 (2012 Minnick Declaration) ¶¶ 67-71, 74.

[56] Tr. (Minnick – Direct) 356:05-358:4, 394:3-395:2; Ex. 49 (2012 Minnick Declaration) ¶ 74; Tr. (Templeman – Deposition Tr.) 27:3-27:18.

[57] Tr. (Minnick – Direct) 362:3-8 (discussing Ex. 49 (2012 Minnick Declaration) ¶ 67), 369:5-10; Tr. (Minnick – Cross) 459:18-23; Tr. (Feamster – Direct) 560:22-561:10.

[58] Id.

10

19.     The AutoHop software, *i.e.*, the source "code that executes" on the Hoppers, is separate and distinct from the announcement files and the segment bookmark files.[59]

**B.     The '970 Patent**

20.     Dr. Feamster testified that he had two theories regarding how DISH's Hoppers disable navigation objects and practice the claimed methods:[60] (1) based on a user selecting "No Thanks" on the AutoHop pop-up message to turn off AutoHop for a particular show; or (2) by a user fast-forwarding or rewinding into a commercial segment for a show in which the AutoHop feature is enabled.[61]

**1.     Trial evidence addressing the alleged navigation objects in DISH's segment bookmark files**

21.     ClearPlay accused segment bookmark pairs as the "navigation objects" of the '970 Patent.[62] Specifically, ClearPlay alleged that a pair of segment bookmarks within the segment bookmark file is a "navigation object," with the first bookmarks' segment end position time stamp ("PTS") serving as the claimed "start position," the second bookmarks' segment start PTS serving as the claimed "stop position," and the first bookmark's SEGMENT_END flag serving as the claimed "filtering action."[63]

---

[59] Tr. (Feamster – Recross) 864:16-865:5, 867:14-15.

[60] Tr. (Feamster – Cross) 811:17-18.

[61] Tr. (Feamster – Direct) 612:4-14; Tr. (Feamster – Cross) 812:4-16. ClearPlay also presented multi-viewing and multi-device theories that rely on the two theories discussed by Dr. Feamster. *See, e.g.*, Tr. (Feamster – Direct) 613:24-614:21 (multi-viewing and multi-device infringement theories); *see also* Tr. (Minnick – Redirect) 478:5-479:8; ClearPlay's Opposition at 3.

[62] Tr. (Feamster – Direct) 606:11-19.

[63] ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶¶ 6-9, docket no. 912, filed under seal Mar. 10, 2023; Feamster Demonstrative Slide 49 (citing Trial Ex. 37); Feamster Demonstratives Slide 28 (citing Trial Ex. 395 at DISH-CP-SC00197, Trial Ex. 33 at EchoStar_CP0000338).

11

22.     As to both theories, ClearPlay and Dr. Feamster did not present evidence that the segment bookmarks themselves are directly disabled.[64] Instead, ClearPlay's case and Dr. Feamster's testimony was limited to argument and evidence that a user could "disable skipping" (or bypass or ignore segment bookmarks as opposed to disabling segment bookmarks) based on "check-in conditions" in the AutoHop software.[65]

### 2. Trial evidence addressing the alleged disabling based on "No Thanks" on the AutoHop pop-up message

23.     ClearPlay first argued that DISH's accused products "provid[e] for disabling of one or more navigation objects" and then at playback "ignor[e] the filtering action specified by any disabled navigation objects"[66] because when a user presses "No Thanks" in response to the enable AutoHop pop up, no commercials are skipped.[67]

24.     Dr. Feamster testified that a variable called "███" (███████████████ in Figure 2) in the AutoHop software controls whether AutoHop commercial skipping is enabled and relied on the "███" variable to meet the limitations in the Disabling Claims.[68]

25.     The "███" variable is stored in the ███████████ data structure, as shown below in Figure 2.[69] The ███████████ data structure is found only in the AutoHop software

---

[64] Tr. (Feamster – Direct) 578:10-579:13 (discussing Feamster Demonstratives Slide 26 showing AutoHop code that uses "a data structure" that "contains a lot of variables controlling the state of playback"), 613:13-614:21; *see also* Feamster Demonstratives Slide 11 (citing Trial Ex. 49 at DISH_CP00[00281]), Slide 28 (citing Trial Ex. 395 at DISH-CP-SC00197).

[65] Tr. (Feamster – Direct) 578:10-579:13 (discussing Feamster Demonstratives Slide 26 showing AutoHop code that uses "a data structure" that "contains a lot of variables controlling the state of playback"), 613:13-614:21; *see also* Feamster Demonstratives Slide 11 (citing Trial Ex. 49 at DISH_CP00[00281]), Slide 28 (citing Trial Ex. 395 at DISH-CP-SC00197).

[66] Trial Ex. 1 ('970 Patent) 23:42-43, 23:54-58.

[67] Tr. (Feamster – Direct) 613:14-23.

[68] Tr. (Feamster – Direct) 616:17-617:19 (discussing "███" variable setting to FALSE); Feamster Demonstratives Slide 57 (citing Trial Ex. 395 at DISH-CP-SC00236); Instruction Mar. 8, 2023.

[69] Tr. (Feamster – Direct) 578:23-579:13; Trial Ex. 395 at DISH-CP-SC00262-266.

12

and not in the segment bookmarks.[70] Dr. Feamster never offered any testimony or evidence that setting the "████" variable directly disabled any particular segment bookmark.



*Figure 2*[71]

26.    Dr. Feamster testified that a user choosing "No Thanks" at the pop-up message causes the AutoHop software to set the "████" variable to ████, which "disable[s] the skipping over the commercial breaks for the playback of that show."[72] He also testified that a user selecting "Yes" sets the "████" variable to ████, which "enabl[es AutoHop] skipping for that show."[73]

---

[70] Tr. (Feamster – Direct) 616:17-618:15 (discussing "████" variable setting to FALSE); Feamster Demonstratives Slide 57 (citing Trial Ex. 395 at DISH-CP-SC00236); *compare* Trial Ex. 395 at DISH-CP-SC00262-266 (showing the variables within the ████████ data structure stored in the AutoHop software), *with* Trial Ex. 395 at DISH-CP-SC00197 (showing the variables within the ████ data structure stored in the ████████ ); Tr. (Feamster – Direct) 578:23-579:13.

[71] Feamster Demonstratives Slide 57 (citing Trial Ex. 395 at DISH-CP-SC00236).

[72] *See* ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 1 (citing Tr. (Feamster – Direct) 610:17-621:4), Tr. (Feamster – Direct) 541:7-541:23, 617:16-618:6; Instruction Mar. 8, 2023; *supra* Figure 1, Figure 2; *see also* Tr. (Minnick – Direct) 395:17-22 (discussing Trial Ex. 32-0002).

[73] Instruction Mar. 8, 2023; *see supra* Figure 1, Figure 2; *see also* Tr. (Minnick – Cross) 439:6-20 (the AutoHop pop-up message appears once when playing back a particular show); Tr. (Feamster – Direct) 578:23-579:13 (explaining the ████████ data structure "contains a lot of variables controlling the state of playback" for AutoHop); Ex. 395 at DISH-CP-SC00262-266 (showing the "████" variable is stored within the ████████

13

27.    Dr. Feamster testified that when AutoHop is turned off, the "pair of segment bookmarks" is ignored—as is every other pair of segment bookmarks.[74] Dr. Feamster testified that when AutoHop is turned off, all segment bookmarks and their identified filtering actions are not "activated" and therefore playback will not skip commercials.[75] Indeed, the parties do not dispute that, as Mr. Minnick testified, pressing "No Thanks" or "Yes" is an "all or none" approach.[76]

### 3.    Trial evidence addressing the alleged disabling based on fast-forward/rewind into commercials

28.    ClearPlay also offered a fast-forward/rewind theory to argue that DISH's products satisfy the Disabling Claims' requirements.[77]

29.    To argue that navigation objects are disabled by fast-forwarding or rewinding, Dr. Feamster relied on portions of the AutoHop software that bypass or ignore the standard AutoHop playback operation when a user "fast forwards over a segment end or, in other words, into a commercial break."[78] Specifically, Dr. Feamster testified that a variable called "███████" (███████████████████ in Figure 3), which is located within the AutoHop software, controls whether "skipping would be disabled" and relied on the "████████" variable to address the limitations in the Disabling Claims.[79]

---

data structure); Tr. (Feamster – Direct) 616:17-618:15 (explaining, using Figure 2, that the ████████ ██████ when shown the AutoHop pop-up message, and that the "████" variable enables (or disables) AutoHop); Feamster Demonstratives Slide 57 (citing Trial Ex. 395 at DISH-CP-SC00236), Slide 55 (citing Trial Ex. 49 at EchoStar_CP0000281).

[74] Tr. (Feamster – Direct) 541:7-541:23, 616:17-618:15, 620:6-14.

[75] Tr. (Feamster – Recross) 838:10-23.

[76] Tr. (Minnick – Direct) 440:1-5; Tr. (Feamster – Direct) 541:7-541:23, 616:17-618:15.

[77] Trial Ex. 1 ('970 Patent) 23:42-43, 23:54-58.

[78] Tr. (Feamster – Direct) 612:7-11.

[79] Tr. (Feamster – Direct) 618:16-620:17; Trial Ex. 395 at DISH-CP-SC-00304. Note that the ████████ variable was transcribed as "████████." Tr. (Feamster) 619:10-11.

**CONFIDENTIAL MATERIAL REDACTED**



```
5808      /* should we send a auto skip msg */
5809      if((sendMsg == TRUE )              &&
5810         (scb->avPvrCtrl.scrub == TRUE) &&
5811         (bmType == temp_end_type )     &&
5812         (direction == PVR_MOVING_FORWARD) &&
5813
5814      )
```

*Figure 3*[80]

30.    The "▮▮▮▮▮▮▮" variable is stored in the ▮▮▮▮▮▮▮ data structure, as shown in Figure 3 and, as noted above, the ▮▮▮▮▮▮▮ data structure is found only in the AutoHop software and not in the segment bookmarks.[81]

31.    As an indirect consequence of bypassing or ignoring the standard AutoHop playback operation when fast-forwarding or rewinding, the AutoHop software that uses a segment bookmark to skip a commercial, which would be run when the media is in standard playback mode, is ignored when the playback is fast forwarded or rewound into a commercial.[82]

32.    Dr. Feamster explained that ▮▮▮▮▮ in Figure 3 ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ — and *not* in the segment bookmarks in the segment bookmark file.[83]

33.    Dr. Feamster never offered any testimony or evidence that setting the "▮▮▮▮▮▮▮" variable directly disabled any particular segment bookmark directly.[84] Dr. Feamster, at most, testified generally that "skipping would be disabled" rather than identifying any specific or direct action to disable the segment bookmark—the accused navigation object.

---

[80] Feamster Demonstratives Slide 59 (Ex. 395 at DISH-CP-SC00304).

[81] Tr. (Feamster – Direct) 578:23-579:13, 618:13-619:24; Trial Ex. 395 at DISH-CP-SC00262-266.

[82] Tr. (Feamster – Direct) 618:16-619:24; *see also* Feamster Demonstratives Slide 59 (Ex. 395 at DISH-CP-SC00304); ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 2 (citing Tr. (Feamster – Direct) 610:17-621:4).

[83] Tr. (Feamster – Direct) 618:16-620:17; Trial Ex. 395 at DISH-CP-SC-00304.

[84] *Id.*

15

ClearPlay presented no evidence that any segment bookmark file, nor the accused navigation object elements within the segment bookmark file (including the start PTS, the end PTS, or the SEGMENT_END flag in the DISH segment bookmark files) was ever directly disabled after the segment bookmark file is created.

### C.    The '799 Patent

#### 1.    Trial evidence addressing the alleged filtering action in DISH's announcement files

34.    ClearPlay identified only DISH's Show Metadata announcement files as containing navigation objects for claim 12 of the '799 Patent.[85]

35.    Each announcement file includes only one package_type descriptor, which contains a value that identifies the type of announcement file.[86] For the Show Metadata announcement files, the package_type descriptor contains a value of 0x08.[87]

36.    Dr. Feamster testified that the single 0x08 value "specifies" the "filtering action," within the literal meaning of that claim term, for each of the navigation objects contained within the Show Metadata announcement files, *i.e.*, that the single 0x08 value is a filtering action "shared" by the plurality of alleged navigation objects.[88]

---

[85] ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 4 (citing Tr. (Feamster – Direct) 631:15-19); *see also* Tr. (Feamster – Direct) 652:16-25; Tr. (Feamster – Cross) 677:13-678:1; Summary Judgment Order at 2 ("Dish is entitled to summary judgment of noninfringement as a matter of law on ClearPlay's literal infringement theories for the Configuration Identifier Claims, except for the theories that rely on the announcement file as the alleged navigation object."), 22-23, 29.

[86] Trial Ex. 31 at DISH_CP0027627; Tr. (Feamster – Direct) 663:17-664:24; Tr. (Feamster – Cross) 803:10-23, 804:3-804:13, 804:16-805:3.

[87] Trial Ex. 31 at DISH_CP0027627; Tr. (Feamster – Direct) 663:17-664:24; Tr. (Feamster – Cross) 803:10-23, 804:3-804:13, 804:16-805:3.

[88] ClearPlay's Proposed Findings of Fact ¶ 16 (citing Tr. (Feamster – Direct) 649:7-13, 650:19-652:6); *see also* Tr. (Feamster – Direct) 646:24-9; Tr. (Feamster – Cross) 752:10-15, 802:22-25, 803:10-23, 804:3-805:3, 809:21-810:3. Dr. Feamster also initially testified that the "position" of the end offsets in the Show Metadata announcement file specifies a skip filtering action, but subsequently clarified any assertion that the offsets specify a skip filtering action by (1) admitting the end offset is only "used to generate the segment end bookmark" and "derive a start position" and (2) identifying only the "Show Metadata type field" as "specifying" the filtering action. Tr. (Feamster – Direct)

16

37.    Dr. Feamster also stated that if sharing the single 0x08 value between a plurality of purported navigation objects does not literally define a "filtering action" for each navigation object, as claim 12 requires, it is "not substantially different" from the court's construction requiring the filtering action, along with the start and stop positions, to "be contained within the same object, file, or data structure."[89]

38.    Dr. Feamster also testified that "repeating the 0x08 for every single navigation object in the file" would be an "inefficient and pretty bad way of writing the code."[90]

### 2.    Trial evidence addressing the alleged configuration identifier in DISH's announcement files

39.    ClearPlay identified the model_targeting descriptor contained in the Show Metadata announcement files as the alleged configuration identifier.[91]

40.    Each Show Metadata announcement file includes only one model_targeting descriptor.[92]

41.    Dr. Feamster testified that the single model_targeting_descriptor is the configuration identifier, within the literal meaning of that term, for each of the navigation objects contained within the Show Metadata announcement files, i.e., that the single

---

632:9-633:14, 639:7-14; Tr. (Feamster – Cross) 751:22-752:4, 755:14-756:3, 795:24-796:8, 801:17-24; Feamster Demonstratives Slide 21.

[89] Tr. (Feamster – Direct) 649:7-13 ("It's not substantially different"), 650:20-22 (similar); Jury Instructions at 42-43.

[90] Tr. (Feamster – Direct) 651:3-652:6.

[91] ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 14 (citing Tr. (Minnick – Direct) 339:18-22; Tr. (Minnick – Cross) 470:17-21; Trial Ex. 36-0001, -0002; Tr. (Feamster – Direct) 656:16-659:2; Trial Ex. 31-0025); see also Tr. (Feamster – Direct) 662:15-663:12; Feamster Demonstrative Slide 96 (citing Trial Ex. 36 at 1-2).

[92] Tr. (Feamster – Direct) 664:14-664:24 ("There's only one model targeting descriptor."); Tr (Feamster – Cross) 750:23-751:12.

17

model_targeting_descriptor is a configuration identifier "shared" by the plurality of alleged

navigation objects.[93]

42.     Dr. Feamster also stated that if sharing the single model_targeting_descriptor

between a plurality of purported navigation objects does not literally provide a "configuration

identifier" for each navigation object, as claim 12 requires, it is not substantially different from a

"configuration identifier to be contained within the navigation object."[94]

43.     However, Dr. Feamster also testified that (1) "it would be silly to check every pair

of segment bookmarks" for the configuration identifier; (2) that doing so "would just be a

ridiculous way to write your code"; and (3) that "it wouldn't make any sense at all to repeat that

[configuration identifier] value multiple times throughout the announcement file."[95] Dr.

Feamster further testified that "the better way to write [the code] is to check [configuration

identifier] once" and that it "doesn't make as much sense, in the context of the implementation

and the announcement file, to repeat a value that has the same value over and over and over

again -- to repeat it throughout the file."[96]

## IV.    ANALYSIS OF THE EVIDENCE

ClearPlay presented evidence from DISH's technical documents, advertising, and internal

communications consisting of descriptions of AutoHop and its functionality.[97] This evidence,

---

[93] ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 17 (citing Tr. (Feamster – Direct) 663:15-665:4, 745:7-20); *see also* Tr. (Feamster – Cross) 750:22-751:12, 801:17-24, 802:22-25, 804:3-805:3 ("that single element applies to each and every one of the navigation objects in this file. It is the same value for all of them").

[94] ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 17 (citing Tr. (Feamster – Direct) 663:15-665:4, 745:7-20); Jury Instructions at 43; *see also* Tr. (Feamster – Cross) 750:22-751:12.

[95] Tr. (Feamster – Direct) 663:15-664:24, 745:6-19.

[96] Tr. (Feamster – Direct) 663:15-664:24, 747:6-21.

[97] *See, e.g.*, Tr. (Feamster – Direct) 542:19-543:1 (discussing Trial Ex. 44), 583:21-586:24 (discussing Trial Ex. 33), 569:14-571:14 (discussing Trial Ex. 32), 592:1-594:2 (discussing Trial Ex. 40), 602:2-603:1 (discussing Trial Ex. 58), 603:24-606:19 (discussing Trial Ex. 37), 637:8-25 (discussing Tr. 163), 660:6-18, 662:15-663:12 (discussing Trial Ex. 97); Feamster Demonstratives Slide 12 (citing Trial Ex. 44), Slides 23, 27-28 (citing Trial Ex. 33),

18

while helpful and appealing to the jury in terms they understand, is legally insufficient to establish the actual operation and functionality of DISH's accused products.[98] The relevant evidence presented came from ClearPlay's expert, Dr. Feamster, who testified that DISH's *source code*—rather than technical documents, marketing materials, and internal communications which merely add context to the source code—is the dispositive relevant evidence for his infringement analysis.[99]

Those descriptions of DISH's technology in this evidence are high-level ways of discussing the results of AutoHop, *i.e.*, that commercials are skipped. There are only so many ways of conveying the message that commercials are not played. This high-level evidence

---

Slides 24, 41 (citing Trial Ex. 32), Slide 29 (citing Trial Ex. 40), Slide 35 (citing Trial Ex. 58), Slides 42, 44-49 (citing Trial Ex. 37), Slides 54, 86, 89 (citing Trial Ex. 34), Slide 81 (citing Trial Ex. 163), Slide 98 (citing Trial Ex. 97).

[98] Other courts have recognized that software's operation is critical to infringement analysis. *See, e.g.*, *Fantasy Sports Props, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1119 (Fed. Cir. 2002) (remanding "the case for [the district court] to determine, using a direct infringement analysis, whether the *software* underlying that [accused] product supports" the claimed method) (emphasis added); *Uni-Sys., LLC v. U.S. Tennis Ass'n*, No. 17 CV 147 (KAM) (CLP), 2017 WL 4081904, at *6 (E.D.N.Y. Sept. 13, 2017) ("the source code is critical to an understanding of how defendants' system works") (citing Fed. R. Civ. P. 26(b)(1)); *cf. Hilgraeve Corp. v. McAfee Assocs.*, 70 F. Supp. 2d 738, 756 (E.D. Mich. 1999), *aff'd in part, vacated in part*, 224 F.3d 1349 (Fed. Cir. 2000) (finding, at summary judgment, that "marketing and promotional documents . . . do not disclose the accused product's source code" or "provide technical details about the accused product's operating steps" and therefore "do not give rise to the inference that the accused product infringes" the asserted patents because "the Court examines evidence concerning how the product *actually* operates.").

[99] Tr. (Feamster – Redirect) 858:3-7 ("The level of detail is such that to really understand if the software is meeting these claims, *one has to read the code*.") (emphasis added). Dr. Feamster also testified, for instance, that to assess infringement he "matched the language in the claims to the implementation in the Dish source code that satisfied these limitations specifically." Tr. (Feamster – Direct) 530:24-531:1; Tr. (Feamster – Cross) 702:23-703:10; *see* Declaration of Dr. Nick Feamster ¶¶ 15-16 ("Even a relatively good set of technical documents, of course, does not obviate the need to look at the code itself before preparing any sort of analysis or forming any opinions. … [T]he actual code may be different from what is described in the documentation … [and] *is ultimately the focus of our inquiry*.") (emphasis added). He further explained that he "rel[ied] on the code" because "the true judge of what a piece of software does is the code. We look at the code to figure out what it does and when it does it. . . . [Technical documentation] is often extremely helpful for providing context for what we think that code is supposed to be doing *but we don't know what it's actually doing unless we look at the code.*" Tr. (Feamster – Direct) 531:7-23 (emphasis added); *see also* Tr. (Feamster – Direct) 534:11-20; Tr. (Feamster – Cross) 703:2-5; Tr. (Feamster – Redirect) 828:3-4 ("asking [the jury] to trust my expert opinion because -- because I read the source code").

19

demonstrates the unremarkable and undisputed fact that AutoHop skips commercials.[100] The evidence of similar terms in advertising or internal management documents and communications does not demonstrate what AutoHop code is actually doing and thus whether DISH's accused products used ClearPlay's patented methods.[101]

ClearPlay's evidence demonstrating what DISH's accused products are actually doing came from Dr. Feamster's testimony and opinions about the AutoHop software, as well as the more technical testimony regarding the code and operation of AutoHop elicited during ClearPlay's case-in-chief from Dan Minnick, Vivek Khemka, and Mark Templeman.[102] The legal insufficiency of this evidence for establishing infringement is discussed below. Similar to the high-level discussions and illustrations mentioned above, the parties' arguments and presentation of evidence necessarily included discussions of end-user experiences and analogies to common experiences such as turning lights on and off in a house.[103] But none of these educational tools and techniques bear on the heart of the real issues.

The parties' evidence and arguments necessarily include some latitude to ensure that each party was able to try its case under its theories. Trial was the conclusive submission of the best

---

[100] Tr. (DISH Opening Statement) 52:10-19 ("Now, let me own something right up front. Dish, to every user that we offer it to, and to the networks that complain about it, *we skip commercials. We skip commercials*. But this is a method claim, ladies and gentlemen, and their particular method in doing it, which identifies the thing to be skipped, the thing to be edited, is different than identifying the thing to be played."); Tr. (Jarman – Cross) 201:25-202:2 (agreeing that he did not invent "all ways of skipping commercials"); Tr. (Minnick – Direct) 342:12-17 (agreeing "AutoHop is a commercial skipping feature"), 366:19-24 ("the software does the skip").

[101] *See supra* notes 98-99.

[102] *Supra* note 45 (citing Tr. (Feamster – Direct) 530:18-531:6, 556:13-17, 602:2-603:21; Tr. (Feamster – Cross) 667:9-11, 707:5-7; Tr. (Feamster – Redirect) 854:14-16); *see also supra* notes 46, 53-57; Tr. (Minnick – Direct) 342:12-17, 343:12-24, 345:7-11, 346:20-347:6, 347:16-21, 355:14-356:4, 356:05-358:4, 361:21-365:10, 362:3-8, 369:5-10, 374:5-12, 378:24-379:4, 380:18-21, 394:3-395:2; Tr. (Minnick – Cross) 425:10-427:9, 432:24-433:16, 434:23-435:1, 459:18-23; Trial Ex. 49 (2012 Minnick Declaration) ¶¶ 60, 63, 67-71, 74; Tr. (Templeman – Deposition Tr.) 27:3-27:18; Tr. (Feamster – Direct) 560:22-561:10. *See generally* Tr. (Minnick – Direct) 335:13-490:20; Tr. (Templeman – Video Deposition) 495:15-498:10; 504:1-3 (Vivek Khemka – Video Deposition).

[103] Tr. (DISH JMOL Oral Arguments) 1778:17-1779:19; *see also* Tr. (ClearPlay Opening Statement) 36:16-37:17 (comparing the "disabling" limitations to "modern thermometers"); Tr. (Minnick – Direct) 370:11-373:20 (discussing a traffic light analogy), 481:17-484:10 (discussing a boat analogy).

20

effort of each party, both for the jury as trier of fact and for the judge as legal arbiter. This latitude arising from the natural development of a trial and counsel's reticence to object and interrupt an adversary's flow allowed the jury to hear matters beyond the centrally relevant evidence.

Further, patent cases are necessarily complex, dealing with patent claims and technology outside the experience of the average person. In this case, the technical nature of the Asserted Patents and the wide distance between the actual claims and the common-sense operation of a video recording and playing device presented unusual challenges for a jury hearing the evidence and for a judge who was simultaneously analyzing the record for legal sufficiency. It is not surprising that ClearPlay's position in the case would broaden its patent claims beyond their scope. A patentee must exercise diligence in protecting and prosecuting claims. But this assertion of rights cannot be permitted to extend beyond the actual patent claims.

It is now certain that submission of the issues of infringement to the jury was improper. DISH's JMOL should have been granted at the end of ClearPlay's case-in-chief. The inability to intercede at an earlier time was due to the complexity of the case, its rapid development in trial, the need to continue with the jury once empaneled, and the benefit of having a complete transcribed record, including the complex technology of each party, developed in ClearPlay's case-in-chief. Now there is sufficient knowledge and a level of confidence necessary to make such a weighty decision.

### A.    Background on "providing for disabling" limitation

The jury instruction regarding the "providing for disabling" limitation is supported by the plain and ordinary meaning of the claim language itself, as was discussed and determined on

21

summary judgment.[104] As noted, claims 28 and 33 both depend from claim 27, which recites a method "for assisting the consumer to identify portions of the multimedia content that are to be filtered and to thereafter filter the identified portions."[105]

> 27. In a computerized system for enabling a consumer to filter multimedia content that is comprised of video content, audio content, or both … a method for assisting the consumer to identify portions of the multimedia content that are to be filtered and to thereafter filter the identified portions, the method comprising:
>
> > accessing a plurality of navigation objects, each defining a start position and a stop position and a specific filtering action to be performed on a portion of the multimedia content;
> >
> > *providing for disabling of one or more of the navigation objects such that the specific filtering action specified by the disabled navigation object is ignored*;
> >
> > . . .
> >
> > activating the filtering action assigned to the corresponding navigation object in order to filter the portion of the multimedia content defined by the corresponding navigation object; and
> >
> > *playing the multimedia content at the output device excluding the portion thereof which is filtered in accordance with the corresponding navigation object and ignoring the filtering action specified by any disabled navigation objects*.[106]

The method begins when the computerized system accesses navigation objects, and it ends when the system plays multimedia content in accordance with the navigation objects. In between, the claim requires several intermediate steps.[107]

---

[104] Jury Instructions at 43; Summary Judgment Order at 23-24.

[105] Trial Ex. 1 ('970 Patent) Claim 27, 23:29-58 (emphasis added).

[106] *Id.*

[107] *Id.*; *see generally Limelight Networks, Inc v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) ("A method patent claims a number of steps; under this Court's case law, the patent is not infringed unless all the steps are carried out . . . [A] patentee's rights extend only to the claimed combination of elements, and no further.") (internal citations omitted); *see Mformation*, 764 F.3d at 1398-1400 (affirming JMOL of noninfringement based on "an order-of-steps requirement" in method claim created by "the claim language, as a matter of logic and grammar" (quotation marks omitted)); *see also, e.g.*, *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1028-29 (Fed. Cir. 2019), *reh'g granted, opinion modified on other grounds*, 776 Fed. App'x 707 (Fed. Cir. 2019) (where method claim "logically requires a series of steps . . . be performed in sequence," accused product that did not follow that sequence did not infringe as a matter of law).

22

The first such step is "providing for disabling of one or more of the navigation objects."[108] Disabling a navigation object is a way to ensure "that the specific filtering action specified by the disabled navigation object is ignored."[109] That ignoring, in turn, takes place at the final "playback" step, when the system "ignor[es] the filtering action specified by any disabled navigation objects."[110] "Disabling" and "ignoring" are two different actions that must be performed at two different steps. As the court explained at summary judgment, the specification "provides insight for how disabling a navigation object may occur" before "its filtering action is ignored."[111] The specification describes one way of disabling a navigation object by "including an indication within the navigation objects that they should not be part of the filtering process" during subsequent playback, such that they are "eliminated from being used in filtering multimedia content."[112] Though "a specification cannot create an additional limitation for the Disabling Claims," the specification makes clear that the plain meaning of the Disabling Claims require some action to disable a navigation object.[113]

Another intermediate step in claim 27's method is "activating the filtering action" for at least one "navigation object in order to filter the portion of the multimedia content defined by the corresponding navigation object."[114] That filtering also does not take place until the final playback step: The system "exclud[es] the portion thereof which is filtered in accordance with

---

[108] Trial Ex. 1 ('970 Patent) 23:41.

[109] Trial Ex. 1 ('970 Patent) 23:42-43.

[110] Trial Ex. 1 ('970 Patent) 23:56-58.

[111] Summary Judgment Order at 23-24.

[112] *Id.* (quoting Trial Ex. 1 ('970 Patent) 18:64-19:4).

[113] *Id.*

[114] Trial Ex. 1 ('970 Patent) 23:50-53.

APPX00061

the corresponding navigation object."[115] The plain and ordinary meaning requires (a) "activating the filtering action assigned to the corresponding navigation object in order to filter the portion of the multimedia content defined by the corresponding navigation object" and (b) "playing the multimedia content at the output excluding the portion thereof which is filtered in accordance with the corresponding navigation object" while also (c) "ignoring the filtering action specified by any disabled navigation objects" during playback.[116] In other words, when the system ultimately begins "playing the multimedia content," it must *both* apply the filtering action specified by at least one navigation object *and* ignore the filtering action specified by any "disabled navigation objects."

As explained in the summary judgment decision, it is "[c]lear from the ordinary and customary meaning" of the Disabling Claims that "some action must be taken" at the "disabling" step to "disable *a navigation object*" specifically.[117] And disabling the entire filtering system by "disabling AutoHop functionality as a whole is broader than the Disabling Claims' limitations for disabling navigation objects."[118]

**B.      ClearPlay failed to present legally sufficient evidence of "providing for disabling the alleged navigation object such that the filtering action of the disabled navigation object is ignored" as required by the Disabling Claims of the '970 Patent**

First, there is no evidence of direct infringement of the Asserted Claims of the '970 Patent, sometimes referred to as the "Disabling Claims." For the '970 Patent claims,

---

[115] Trial Ex. 1 ('970 Patent) 23:54-56.

[116] *Id.* at 23:50-58.

[117] Summary Judgment Order at 24.

[118] *Id.*

ClearPlay accused a pair of segment bookmarks as the navigation object.[119] The issue for judgment as a matter of law regarding the '970 Patent is not whether ClearPlay has presented legally sufficient evidence of a navigation object in DISH's accused products. ClearPlay has presented evidence that DISH's segment bookmarks contain the required elements of a navigation object for the '970 Patent: a start position (the "pts" code of the segment end bookmark); a stop position (the "pts" code of the segment start bookmark); and a filtering action, albeit an implied filtering action (the "type" flag of the segment end bookmark). Rather, the issue for judgment as a matter of law in the '970 Patent is whether ClearPlay presented legally sufficient evidence that DISH's accused products meet the "providing for disabling" element of claim 27 of the '970 Patent.[120] ClearPlay's evidence demonstrates that DISH's accused products do not literally infringe the claim element of "providing for disabling the alleged navigation object such that the filtering action of the disabled navigation object is ignored."

As explained above, the ordinary and customary meaning of this "providing for disabling" limitation requires providing for an action that "directly disable[s] a navigation object so that its filtering action is ignored, as opposed to disabling something other than navigation object that results in the navigation object's filtering action being ignored."[121] In other words, the

---

[119] *Supra* III.B.1, ¶ 21 (citing ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶¶ 6-9; Feamster Demonstrative Slide 49 (citing Trial Ex. 37); Feamster Demonstratives Slide 28 (citing Trial Ex. 395 at DISH-CP-SC00197, Trial Ex. 33 at EchoStar_CP0000338)).

[120] DISH also argued its accused products do not contain the claimed "navigation objects," but judgment as a matter of law is not granted on that ground.

[121] Jury Instructions at 43. Contrary to ClearPlay's suggestion, ClearPlay's Supplemental Briefing Regarding Disabling at 9 n.30 (citing *Loggerhead Tools, LLC v. Sears Holding Corp.*, 328 F. Supp. 3d 885, 899 (N.D. Ill. 2018)) and ClearPlay's Response to Proposed Jury Instruction No. 31, docket no. 905, filed Mar. 8, 2023, it was made clear as early as summary judgment that "disabling" and "ignoring" are two different actions. *See* Summary Judgment Order at 24 ("Clear from the ordinary and customary meaning and scope of the Disabling Claims, and supported by the specification's language, is that some action must be taken to disable a navigation object so that its filtering action is ignored."). ClearPlay has been on notice since before trial that the "ordinary and customary meaning and scope of the Disabling Claims" requires both "disabling" and "ignoring," and the issuance of this express instruction during trial did not prejudice ClearPlay. *Cf. Pressure Prod. Med. Supplies, Inc. v. Greatbatch*

"action must directly disable" DISH's segment bookmarks rather than acting on or disabling something else that indirectly affects the segment bookmark or simply results in the segment bookmarks being ignored.[122] The plain meaning of the claims requires evidence that a segment bookmark, *itself*, must be disabled, and it must be disabled in such a way that its filtering action is ignored.[123] This construction is consistent with the disabling examples within the '970 Patent specification.[124] Although these specification examples are not limiting and do not define the actual requirements of the claim element, they are helpful to understanding the claim element.[125] Specifically, under the '970 Patent claims, terms, and language, the navigation object itself must be disabled such that its filtering action is ignored.

ClearPlay's statement in its supplemental briefing "that the claims never require that any navigation objects be disabled" is contrary to the requirements of this claim element.[126] And ClearPlay's statement in its supplemental briefing that the segment bookmarks "are directly disabled because the AutoHop software ignores the filtering action (skipping)" is the opposite of the requirements of this claim element.[127] The "providing for disabling" limitation is not *ignoring* a navigation object's filtering action so that the navigation object is disabled. It is

---

*Ltd.*, 599 F.3d 1308, 1315-16 (Fed. Cir. 2010) (concluding "that it was proper for the trial court to supplement" claim construction at trial). Additionally, while no claim constructions were revised after the close of ClearPlay's case-in-chief, the Federal Circuit recognizes that a district court may revisit claim construction, even during trial, "as its understanding of the technology evolves." *See, e.g., id.* at 1316; *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005).

[122] *See* Jury Instructions at 43.

[123] Summary Judgment Order at 24.

[124] Trial Ex. 1 ('970 Patent) 18:64-19:4, FIG. 6.

[125] *See, e.g., ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1339 (Fed. Cir. 2016) ("the specification does not limit the claimed invention").

[126] ClearPlay's Supplemental Briefing Regarding Disabling at 3.

[127] ClearPlay's Suppl. Brief at 16.

APPX00064

*disabling* a navigation object such that its filtering action is ignored.[128] Construing the providing for disabling element as ClearPlay argues would be contrary to the ordinary and customary meaning of the claim language and would greatly and unreasonably broaden the claimed invention. ClearPlay failed to present legally sufficient evidence from which a reasonable jury could determine that some action is taken on one or more of DISH's segment bookmarks (the alleged navigation objects) to disable them, as opposed to merely ignoring the entire segment bookmarks during playback conditions.[129] In fact, the evidence confirmed that no action is taken on the segment bookmarks under either of ClearPlay's two theories.

ClearPlay argued at trial that DISH's accused products perform the claimed disabling limitations in two different scenarios: (1) a "No Thanks" selection from the AutoHop pop-up message prior to playback, and (2) a fast-forwarding or rewinding into a commercial.[130] ClearPlay's own evidence establishes that DISH's accused products fail to directly disable the alleged navigation object, the segment bookmarks, as a matter of law.

### 1. The "No Thanks" pop-up message does not directly disable segment bookmarks

First, ClearPlay presented no evidence that selecting "No Thanks" provides for disabling segment bookmark pairs—the asserted "navigation objects"—rather than disabling AutoHop as a whole.[131] The undisputed evidence presented by ClearPlay demonstrates that AutoHop is

---

[128] Trial Ex. 1 ('970 Patent) 23:41-43.

[129] *See, e.g., supra* III.B.1, ¶ 22 (citing Tr. (Feamster – Direct) 578:10-579:13, 613:13-614:21; Trial Ex. 395 at DISH-CP-SC00197; Feamster Demonstratives Slide 11 (citing Trial Ex. 49 at DISH_CP00[00281])).

[130] *Supra* notes 60-61; *see also* Tr. (Feamster – Direct) 612:4-14; Tr. (Feamster – Cross) 811:17-18, 812:4-16. ClearPlay also presented multi-watch and a multi-viewing theories. However, these two theories fail for the same reasons. *Infra* note 142.

[131] *See supra* III.B.2, ¶ 26 (citing ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 1 (citing Tr. (Feamster – Direct) 610:17-621:4), Tr. (Feamster – Direct) 541:7-541:23, 617:16-618:6; Instruction Mar. 8, 2023); *see also* Feamster Demonstratives Slide 11 (citing Trial Ex. 49 at DISH_CP0027663) (displaying "Yes" or "No Thanks" options).

enabled for playback of a selected recording only by a "Yes" selection from the pop-up message prior to playback.[132] If the user does not make a selection of "Yes" or "No Thanks" from the pop-up message, the system will time out after a few minutes, and return to live TV.[133] Dr. Feamster testified contrary to this at trial, but the parties agreed to the correct statement of the function of the AutoHop interface, and the jury was instructed to disregard any evidence or statements to the contrary.[134]

The undisputed evidence based on the parties' stipulation also demonstrates that when "No Thanks" is selected on the pop-up message prior to playback, AutoHop is not enabled for playback of the selected recording. This is outside the claim language that requires the navigation object to be disabled, as was pointed out at summary judgment.[135] Dr. Feamster testified that the "███" variable is set to ███ by a "No Thanks" selection.[136] But ClearPlay's evidence establishes that the "███" variable affects AutoHop as a whole—not the alleged navigation objects, i.e., the segment bookmarks. Therefore, a "No Thanks" selection at the pop-up message does not disable the segment bookmarks for playback of the selected recording. Segment bookmarks are not disabled, but are rather bypassed or ignored because the whole of AutoHop is not enabled for the playback. ClearPlay and Dr. Feamster pointed to no code, command, or other process that would directly disable the segment bookmarks, as opposed to AutoHop as a whole, such as a command having some iteration or combination of the "███"

---

[132] *Supra* III.A, ¶ 14 (citing Tr. (Minnick – Cross) 432:24-16, 435:13-22, 439:6-20).

[133] Instruction Mar. 8, 2023.

[134] *Id.*

[135] Summary Judgment Order at 23-24.

[136] *See supra* III.B.2, ¶ 26 (citing Dkt. 912 (ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 1; Tr. (Feamster – Direct) 541:7-541:23, 616:17-618:15; Instruction Mar. 8, 2023; *supra* Figure 1, Figure 2; Tr. (Minnick – Direct) 395:17-22 (discussing Trial Ex. 32-0002)).

28

variable leading to disabling of a segment bookmark such as the SEGMENT_END flag being set to ██████.[137] There is no such evidence.

A user may rewatch the same media, or other media that may have AutoHop functionality, or may view media on a different output device, all of which are unaffected by the "No Thanks" selection for a selected recording playback.[138] But this does not mean that a "No Thanks" selection is directly disabling segment bookmarks. The "No Thanks" selection only causes AutoHop as a whole for the selected playback session to not be enabled. There is no action directly disabling the segment bookmarks. There is only an action to not enable AutoHop—*not* to disable the segment bookmarks—that indirectly affects the use made, or not made, of segment bookmarks.[139]

Second, a "No Thanks" selection does not meet the claim element of "playing the multimedia content at the output device excluding the portion thereof which is filtered in accordance with the corresponding navigation object and ignoring the filtering action specified

---

[137] *See supra* III.B.1, ¶ 22 (citing Tr. (Feamster – Direct) 578:10-579:13 (discussing Feamster Demonstratives Slide 26 showing AutoHop code that uses "a data structure" that "contains a lot of variables controlling the state of playback"), 613:13-614:21; *see also* Feamster Demonstratives Slide 11 (citing Trial Ex. 49 at DISH_CP00[00281]), Slide 28 (citing Trial Ex. 395 at DISH-CP-SC00197), ¶ 24 (citing Tr. (Feamster – Direct) 616:17-617:19 (discussing "███" variable setting to FALSE); Feamster Demonstratives Slide 57 (citing Trial Ex. 395 at DISH-CP-SC00236)), ¶ 25 (citing Tr. (Feamster – Direct) 616:17-618:15 (discussing "███" variable setting to FALSE); Feamster Demonstratives Slide 57 (citing Trial Ex. 395 at DISH-CP-SC00236); *compare* Trial Ex. 395 at DISH-CP-SC00262-266 (showing the variables within the ████████ data structure stored in the AutoHop software), *with* Trial Ex. 395 at DISH-CP-SC00197 (showing the variables within the ████ data structure stored in the ████); Tr. (Feamster – Direct) 578:23-579:13); *supra* IV.B.2, ¶ 29(citing Tr. (Feamster – Direct) 619:19-620:17; Trial Ex. 395 at DISH-CP-SC-00304), ¶ 30 (citing Tr. (Feamster – Direct) 578:23-579:13, 618:13-619:24; Trial Ex. 395 at DISH-CP-SC00262-266).

[138] *Supra* note 61 (citing Tr. (Feamster – Direct) 613:24-614:21 (discussing ClearPlay's multi-viewing and multi-device infringement theories); *see also* Tr. (Minnick – Redirect) 478:5-479:8; ClearPlay's Opposition at 3).

[139] *Supra* III.B.1, ¶ 22 (citing Tr. (Feamster – Direct) 578:10-579:13 (discussing Feamster Demonstratives Slide 26 showing AutoHop code that uses "a data structure" that "contains a lot of variables controlling the state of playback"), 613:13-614:21; *see also* Feamster Demonstratives Slide 11 (citing Trial Ex. 49 at DISH_CP00[00281]), Slide 28 (citing Trial Ex. 395 at DISH-CP-SC00197)).

29

by any disabled navigation objects."[140] DISH's system does not support both playing and ignoring, as required by the Disabling Claims.

The "No Thanks" AutoHop selection is binary, because the whole of AutoHop is thereby not enabled for the selected media playback.[141] Either all navigation object segment bookmarks are ignored or bypassed if "No Thanks" is selected or, if "Yes" is selected, all the alleged navigation objects are observed and implemented. There is no evidence that, during playback, DISH's accused products are both *filtering* some media designated by navigation objects and *ignoring* the alleged filtering action specified by any allegedly disabled navigation objects when a user selects "No Thanks." DISH's system and accused products do not support both (a) excluding some media due to a navigation object's filtering action and (b) ignoring other disabled navigation objects' filtering actions, as required by claim 27. Therefore, this infringement theory for the Disabling Claims fails.[142]

**2.    Fast-forwarding or rewinding into commercials does not disable segment bookmarks**

Regarding the "fast-forwarding or rewinding into a commercial" theory, ClearPlay's evidence again demonstrates that no action is taken to directly disable the alleged navigation object, *i.e.*, a pair of segment bookmarks. Fast-forwarding or rewinding into a commercial

---

[140] Trial Ex. 1 ('970 Patent) Claim 27, 23:54-58.

[141] *Supra* III.B.2, ¶ 27 (citing Tr. (Minnick – Direct) 440:1-5; Tr. (Feamster – Direct) 541:7-541:23, 616:17-618:15.).

[142] ClearPlay and Dr. Feamster proposed other versions of this infringement argument, all of which fail for the same reasons described above. For instance, Dr. Feamster testified that "another user in the house [may be] watching the same show" at a different time, Tr. (Feamster – Direct) 614:7-8, which ClearPlay has argued satisfies every step of the claimed method, ClearPlay's Supplemental Briefing Regarding Disabling at 6. But in such circumstances, there is still no direct disabling of the accused navigation objects—the segment bookmarks—and such circumstances cannot satisfy the Disabling Claims' limitation requiring "playing the multimedia content at the output device excluding the portion thereof which is filtered in accordance with the corresponding navigation object and ignoring the filtering action specified by any disabled navigation objects." Likewise, ClearPlay has argued that the capability of DISH's products to either turn on automatic skipping with AutoHop or leave it off demonstrates infringement, ClearPlay's Opposition at 3, but this argument fails for the same reasons.

bypasses or ignores segment bookmarks, but this does not meet the claim language requiring disabling a navigation object such that the disabled navigation object's filtering action is ignored.[143] Simply ignoring or bypassing a navigation object is different than disabling the navigation object such that the disabled navigation object's filtering action is ignored.

As described by Dr. Feamster, when a user fast-forwards or rewinds media during playback, the AutoHop software changes the playback state variable in the software, called the "███████," which would otherwise be set to "███████████," as shown in the following excerpt of AutoHop software in Figure 3.[144]

```
5808        /* should we send a auto skip msg */
5809        if((sendMsg == TRUE )                    &&
5810            (scb->avPvrCtrl.scrub == TRUE) &&
5811            (bmType == temp_end_type )        &&
5812            (direction == PVR_MOVING_FORWARD) &&
5813        ██████████████████████████████████████
5814        )
```

*Figure 3*[145]

When a user presses a fast forward or rewind button, however, the playback will not be in standard playback mode.[146] As an indirect consequence of not being in standard playback mode, the AutoHop software that uses a segment bookmark for skipping, which would be run when the media is in standard playback mode (*i.e.*, when the "███████" variable holds a value of

---

[143] Trial Ex. 1 ('970 Patent) 23:41-43.

[144] Tr. (Feamster – Direct) 618:16-619:24 ("the playback state variable indicates is that the set-top box is in play mode. In other words, not fast forwarding and not rewinding.") To determine whether standard AutoHop commercial skipping is enabled, the AutoHop software checks the "█████████████████████████████ in Figure 3 to see whether the show is in "█████████████████." Tr. (Feamster – Direct) 619:10-619:14; *see also* Tr. (Feamster – Direct) 578:23-579:13, 616:17-618:15; Feamster Demonstratives Slide 57 (citing Trial Ex. 395 at DISH-CP-SC00236); Trial Ex. 395 at DISH-CP-SC00262-266. When that variable is set to ███████████████, as in Figure 3 above, and the other conditions are also satisfied, AutoHop skips commercials.

[145] Feamster Demonstratives Slide 59 (Ex. 395 at DISH-CP-SC00304).

[146] *Supra* III.B.3, ¶ 31 (citing Tr. (Feamster – Direct) 618:16-619:24 (explaining that the ████████████████████████████, and instead "this variable would take on a different value," and "skipping would be disabled.")); *see also* Tr. (Feamster – Direct) 620:6-14; Ex. 395 at DISH-CP-SC-00304.

31

███████████ ), is ignored when the playback is fast-forwarded or rewound into a commercial.[147]

There is no evidence that pressing the fast-forward or rewind button directly disables a segment bookmark. The AutoHop software checks whether "the set-top box is in play mode" by looking at a variable stored in the AutoHop software—and *not* looking in the segment bookmarks within the segment bookmark file.[148] In other words, the AutoHop software merely verifies the set-top box mode—whether "it's playing" and is "not fast forwarding and not rewinding" based on a variable in the AutoHop software.[149] And Dr. Feamster agreed that the AutoHop software, *i.e.*, the source "code that executes" on the Hoppers, is separate and distinct from the announcement files and the segment bookmark files.[150] Critically, no change is made to disable the segment bookmarks, nor does Dr. Feamster identify anything other than ignoring the skip action that would have resulted. Indeed, as Mr. Minnick demonstrated, the AutoHop software used certain segment bookmarks during normal playback to AutoHop over a commercial,[151] the same segment bookmarks were ignored as he put playback into rewind, resumed play, and "when it hit the break, it did the AutoHop again."[152] This evidences that the segment bookmark has not changed or been disabled at all.

ClearPlay and Dr. Feamster pointed to no code or other process that disables *a segment bookmark* (the accused navigation object) itself as required by the "providing for disabling"

---

[147] *Supra* III.B.3, ¶ 31 (citing Tr. (Feamster – Direct) 618:16-619:24; Feamster Demonstratives Slide 59 (Ex. 395 at DISH-CP-SC00304); Dkt. 912 (ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 2 (citing Tr. (Feamster – Direct) 610:17-621:4).

[148] *Supra* III.B.3, ¶ 32 (citing Tr. (Feamster – Direct) 618:16-620:17; Trial Ex. 395 at DISH-CP-SC-00304).

[149] Tr. (Feamster – Direct) 619:13-14.

[150] *Supra* III.A, ¶ 19 (citing (Feamster – Recross) 864:16-865:5).

[151] Tr. (Minnick – Cross) 443:16-19 ("you can see it just did an AutoHop").

[152] Tr. (Minnick – Cross) 443:20-443:23.

limitation.[153] ClearPlay and Dr. Feamster pointed only to code that bypasses or ignores the

standard playback software, which thereby indirectly affects the use made of segment bookmarks

when the media is fast-forwarded or rewound into a commercial.[154]

Therefore, ClearPlay failed to present legally sufficient evidence that DISH's accused

products literally infringed the '970 Patent. Further, no evidence was offered of a doctrine of

equivalents infringement theory for the asserted claims of the '970 Patent.[155]

### C.    ClearPlay failed to present legally sufficient evidence of the "plurality of navigation objects" required by claim 12 of the '799 Patent

Regarding the '799 Patent, ClearPlay presented legally insufficient evidence of literal

infringement of claim 12 of the '799 Patent, which was often referred to as the "Configuration

Identifier Patent."[156] The issue for judgment as a matter of law regarding literal infringement of

claim 12 of the '799 Patent is whether ClearPlay presented sufficient evidence of a navigation

object.[157]

---

[153] Trial Ex. 1 ('970 Patent) 18:64-19:4; Tr. (Feamster – Direct) 615:7-620:14; *see also* Dish's Suppl. Brief at 8-10; *see supra* III.B.2, ¶ 27 (citing Tr. (Feamster – Direct) 620:6-14; Tr. (Feamster – Recross) 838:10-23.

[154] *Supra* III.B.3, ¶¶ 29-32 (citing Tr. (Feamster – Direct) 578:23-579:13, 618:16-620:17; Trial Ex. 395 at DISH-CP-SC00262-266, -00304).

[155] Tr. (Williams) 1529:23-1530:2; *compare also* Lodged Documents at 26-28, docket no. 909, filed March 10, 2023, *with id.* at 32-34 (showing ClearPlay dropped assertions of infringement of the Disabling Claims under the doctrine of equivalents).

[156] *See supra* III.C, ¶ 37 (citing Tr. (Feamster – Direct) 649:7-13 ("It's not substantially different"), 650:20-22 (similar); Jury Instructions at 42-43), ¶ 41 (citing ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 17 (citing Tr. (Feamster – Direct) 663:15-665:4, 745:7-20); *see also* Tr. (Feamster – Cross) 750:22-751:12, 801:17-24, 802:22-25, 804:3-805:3 ("that single element applies to each and every one of the navigation objects in this file. It is the same value for all of them")).

[157] DISH also argued its accused products do not contain the claimed "configuration identifier," which this court construed as "an identifier of the consumer system (including hardware and software) that is used to determine if the navigation objects apply to the particular consumer system." But judgment as a matter of law is not granted on that ground.

33

Under the court's claim construction, claim 12 of the '799 Patent requires that *each* navigation object must contain a start position, stop position, filtering action, and configuration identifier, as explained at length at summary judgment and in the jury instructions.[158]

### 1.    DISH's single-object "comparison" argument does not compel judgment as a matter of law

DISH argued that ClearPlay was presenting a multi-object "derived theory" that the segment bookmarks, derived from the announcement file, are used to determine whether the position code is at a start and stop position defined by an accused navigation object in the announcement file. DISH argued this violates the single-object construction by reading into claim 12 of the '799 Patent a limitation that requires comparison of the position code to the navigation object. Because the announcement file does not exist at the time of playback, it is DISH's position that the limitation cannot occur in the DISH system. However, DISH's reading and the comparison limitation is not consistent with the claim language of claim 12 of the '799 Patent. Unlike the claim language of other ClearPlay patents, such as claim 16 of the '970 Patent, claim 12 of the '799 Patent does not require the navigation objects to exist at the time of

---

[158] Summary Judgment Order at 10-15 ("It is clear from the Asserted Patents' language, as properly construed and consistent with this court's claim construction, that the single-object approach to navigation object is the only reasonable approach to navigation object. The multi-object approach is precluded by this court's claim construction and the ordinary and customary meaning of the Asserted Patents."), 21-23 ("The Configuration Identifier Claims require that the alleged configuration identifier must be contained within the alleged navigation object."); Jury Instructions at 42-43; *see also, e.g.*, Trial Ex. 4 ('799 Patent) FIGs. 3A-3C, 4A, 5A; Tr. (Jarman – Cross) 281:10-13 ("the navigation object includes the configuration identifier"); Tr. (Feamster – Cross) 744:24-745:5 (agreeing that claim 12 of the '799 Patent requires "that the navigation object not only contains start, stop, and filtering action, but also a configuration identifier"). Dr. Feamster disagreed with this court's construction for "navigation object" and asserted that each navigation object need not contain its own filtering action or its own configuration identifier. *Compare* Tr. (Feamster – Cross) 692:16-20 (emphasis added) *with* Jury Instructions at 42-43; Tr. (Feamster – Cross) 677:13-678:1.

monitoring or comparison of the stop and start positions with the running position code. This

non-issue is therefore ignored as contrary to the patent language.[159]

### 2.    DISH's announcement file cannot satisfy the "plurality of navigation objects" limitations in claim 12 of the '799 Patent

Judgment as a matter of law is granted on claim 12 of the '799 Patent because

ClearPlay's infringement theories require the alleged plurality of navigation objects to share a

single filtering action and a single configuration identifier.[160] This violates the single-object

approach required by the court's claim construction.[161]

The evidence ClearPlay presented establishes that the announcement file,[162] which under

ClearPlay's theory serves as (1) the object store; (2) the plurality of navigation objects; and

(3) each particular navigation object, does not read on claim 12 of the '799 Patent. Dr.

Feamster's testimony and opinions regarding the announcement file theory pointed to an alleged

filtering action (DISH's Show Metadata element), and an alleged configuration identifier

(DISH's model_targeting descriptor).[163] Dr. Feamster expressly acknowledged that these two

---

[159] DISH also argued that the announcement file is deleted before playback so that its accused filtering action—the 0x08 Show Metadata announcement file type—no longer exists and cannot satisfy the "*activating the filtering action assigned to the corresponding navigation object* in order to filter the portion of the multimedia content defined by the corresponding navigation object". But judgment as a matter of law is not granted on that ground.

[160] *Supra* III.C.1, ¶ 35, III.C.2, ¶¶ 40-41; *see also* Trial Ex. 31 at DISH_CP0027627; Tr. (Feamster – Direct) 663:17-664:24; Tr. (Feamster – Cross) 803:10-23, 804:3-804:13, 804:16-805:3.

[161] *Supra* II, ¶ 2 (citing Claim Construction Order at 17-18), ¶ 3 (citing Summary Judgment Order at 10-14); Jury Instructions at 42-43.

[162] *Supra* III.C.1, ¶ 34 (citing ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 4; Tr. (Feamster – Direct) 652:16-25; Tr. (Feamster – Cross) 677:13-678:1; Summary Judgment Order at 2, 22-23, 29).

[163] *Supra* III.C.1, ¶ 36 (citing ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 16 (citing Tr. (Feamster – Direct) 649:7-13, 650:19-652:6); Tr. (Feamster – Direct) 646:24-9; Tr. (Feamster – Cross) 752:10-15, 802:22-25, 803:10-23, 804:3-805:3, 809:21-810:3), III.C.2, ¶ 39 (citing ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶ 14 (citing Tr. (Minnick – Direct) 339:18-22; Tr. (Minnick – Cross) 470:17-21; Trial Ex. 36-0001, -0002; Tr. (Feamster – Direct) 656:16-659:2; Trial Ex. 31-0025); *see also* Tr. (Feamster – Direct) 662:15-663:12; Feamster Demonstrative Slide 96 (citing Trial Ex. 36 at 1-2). Dr. Feamster (1) admitted the end offset is only "used to generate the segment end bookmark" and "derive a start position" and (2) identified only the "Show Metadata type field" as "specifying" the filtering action. Tr. (Feamster – Direct) 632:9-633:14, 639:7-14; Tr. (Feamster – Cross) 750:22-751:3, 755:14-756:3, 795:24-796:8, 801:17-24; Feamster Demonstratives Slide 21.

elements are not contained in each particular navigation object in DISH's accused products. [164]

And this shared filtering action and shared configuration identifier theory is espoused in

ClearPlay's proposed findings of fact and conclusions of law regarding DISH's JMOL. [165]

ClearPlay's evidence demonstrates that the alleged navigation object—DISH's

announcement file—contains a plurality of alleged navigation objects only if each alleged

navigation object shares the single alleged filtering action and the single alleged configuration

identifier. This is contrary to the claim construction that each particular navigation object must

define its own start position, stop position, and filtering action, and contain its own configuration

identifier. [166] The parties agreed and the court construed navigation object as "plain and ordinary

meaning (as defined by the terms of the claims themselves)." [167] In the context of the Asserted

Patents, an object "is not an abstract and it is singular. It is not a formless assigning or specifying

of associated or linked information from multiple sources. It is a structured object. It is an object

that defines (assigns or specifies) [] specific elements used to filter portions of multimedia

content during playback. These elements must be contained within the navigation object.

Otherwise, the navigation object ceases to be *an object*." [168]

---

[164] Tr. (Feamster – Direct) 648:2-9, 650:19-652:6; Tr. (Feamster – Cross) 803:17-804:13; *see also* ClearPlay's Suppl. Brief ¶¶ 60, 65-72.

[165] ClearPlay's Opposition at 13; ClearPlay's Proposed Findings of Fact and Conclusions of Law ¶¶ 16-17; ClearPlay's Suppl. Brief at 25, 31-32 ("the ███████████ announcement file type specifies to skip and is shared among all the navigation objects in that announcement file. . . . Similarly, the "configuration identifier" limitation only appears once in the announcement files as part of the model_targeting_descriptor – however, it applies equally to and is shared by each of the navigation objects within the same file and therefore satisfies the single object, file, or data structure construction.").

[166] Jury Instructions at 42-43; *see also*, *e.g.*, Summary Judgment Order at 12 ("The plurality of navigation objects limitation has no meaningful purpose in the Asserted Patents if a navigation object does not contain all its elements.").

[167] Claim Construction Order at 5, 18.

[168] Summary Judgment Order at 11-12 (emphasis in original).

36

"The plurality of navigation objects limitation has no meaningful purpose in the Asserted

Patents if a navigation object does not contain all its elements. If a navigation object only assigns

or specifies elements from various sources [] to filter multimedia content, a single navigation

object would also be a plurality of navigation objects,"[169] which is precisely ClearPlay's theory

regarding the announcement file.[170] The "elements that a navigation object 'defines' [] are

contained within the same object, file, or data structure (that being the navigation object)."[171]

Therefore, as the jury was instructed, in all the Asserted Claims, the start, stop, and filter

elements that comprise the navigation object must be contained within the same object, file, or

data structure.[172]

        For claim 12 of the '799 Patent, the configuration identifier element must be contained

within the navigation object.[173] "Claim 12 of the '799 Patent . . . do[es] not expressly identify

what is 'assigning' a configuration identifier to the decoder. However, the language identifies

'the configuration identifier of the particular navigation object.' The term 'of' has an ordinary

and customary meaning that expresses a relationship between a *part* and a *whole*. For claim 12 of

the '799 Patent . . ., the *part* is a configuration identifier and the *whole* is the navigation object.

Therefore, claim 12 of the '799 Patent . . . require[s] the configuration identifier to be contained

within [each particular] navigation object."[174] ClearPlay's theory, in contrast, pointed to an

---

[169] Summary Judgment Order at 12.

[170] *See, e.g.*, ClearPlay's Opposition at 13; ClearPlay's Suppl. Brief ¶¶ 60, 65-72.

[171] Summary Judgment Order at 10.

[172] Jury Instructions at 42-43; *see also* Summary Judgment Order at 11.

[173] Jury Instructions at 43; Summary Judgment Order at 22; *see also* Trial Ex. 1 ('970 Patent) 11:63-12:10, 12:30-32 and 13:3-6 (discussing the contents of a navigation object including configuration identifier 329c), 14:22-36 (discussing retrieving "the next navigation object" if a configuration identifier does not match), FIGs. 3A-3C, 14:37-43 (discussing FIG. 4A), 5A.

[174] Summary Judgment Order at 21-22. That is also consistent with the specification. *See* Trial Ex. 4 ('799 Patent) 14:50-51, 12:6-16, FIGS. 3A, 3B, 3C.

alleged configuration identifier shared by multiple navigation objects and not contained within any of them.

Therefore, ClearPlay failed to present legally sufficient evidence that DISH's accused products literally infringe claim 12 of the '799 Patent.

> **D.      ClearPlay failed to present legally sufficient evidence of the "plurality of navigation objects" required by Claim 12 of the '799 Patent under the doctrine of equivalents**

ClearPlay also failed to present evidence of the alternative theory of infringement under the doctrine of equivalents for claim 12 of the '799 Patent.

> **1.      Dr. Feamster did not offer particularized testimony under either of the function-way-result or the insubstantial difference tests**

Infringement of claim 12 of the '799 Patent under the doctrine of equivalents turns first on whether Dr. Feamster offered "particularized testimony and linking argument" for each prong of the function-way-result test, or the insubstantial difference test,[175] for the navigation objects' shared configuration identifier and filtering action limitations. He failed to do so. The following excerpts are key to understanding the inadequacy of Dr. Feamster's testimony:

> Q:      I'm going to ask you some questions about the 0x08 announcement file that relates to this issue of -- it's called doctrine of equivalents. So bear with me. You believe that -- if the jury were to find that there is not literal infringement as it relates to the 0x08 file type being shared or assigned to each of the set of

---

[175] *See, e.g.*, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 493 F.3d 1368, 1377 (Fed. Cir. 2007); *Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc.*, 873 F.2d 1422, 1425-26 (Fed. Cir. 1989); *see also Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1336 (Fed. Cir. 2014) ("To survive summary judgment of noninfringement under the doctrine of equivalents, Augme had to present evidence of equivalence under each prong of the function-way-result test.") (citing *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 n.6 (Fed. Cir. 1987)); *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) (patentee must provide "particularized testimony and linking arguments as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process . . . on a limitation-by-limitation basis."). "To find infringement under the doctrine of equivalents, any differences between the claimed invention and the accused product must be insubstantial." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1322 (Fed. Cir. 2014) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)). For the function-way-result test, courts consider whether the accused product or process performs substantially the same function, in substantially the same way, to achieve substantially the same result as each element of each asserted claim. *Id.* For the insubstantial differences test, courts look at whether the differences between the accused product and the claimed invention are insubstantial. *Id.*

start and stop positions, then do you have an opinion whether this
arrangement is substantially different from the navigation object limitation of
the '799 Patent?

A:    It's not substantially different.[176]


Q:    You've described for us how the -- well, let's move on. Can you tell me
whether the 0x08 designation is -- whether it's substantially similar or not?

A:    I would say that it is not substantially different. I'd be happy to explain a little
bit more about why I think it achieves the same function in substantially the
same way, to achieve basically the same results.[177]


Q:    I'm struggling getting the right question out so I appreciate that.

A:    Remember, we talked about the object store, the object store containing a
plurality of navigation objects. And plurality meaning more than one. And
remember that the navigation object in this case has to have a start position, a
stop position, and a filtering action. So I think that the question at issue about
literal versus the doctrine of equivalents is whether -- there's only one 0x08
type on the file. Right? The 0x08 shows up once, but hang on, the file has --
it's supposed to have a plurality of these navigation objects. So the question I
think being asked is, well, it only shows up once. There's only one -- you've
said 0x08 is a filtering action, but it's only there once, so how could we have
a plurality of navigation objects? So I think we've talked about how that
occurs. But if that is the argument, then the question is: Well, do you need to
have it like every single time for every single navigation object in the
announcement file or -- but it's there only once. And what I'm asserting is
that you don't need it there every single time. Like anyone who is basically
writing code in the same way would recognize that to be an inefficient and
pretty bad way of writing the code. So putting it there once basically is
achieving the same function in the same way, to achieve the same result, as
just repeating the 0x08 for every single navigation object in the file.[178]


Q:    Just one moment. Back to these questions, I don't do well, but we'll see if I
get through it. If the jury were to find there's not literal infringement because
the model targeting descriptor in the AutoHop system is shared or assigned to
each of the sets of start and stop positions and navigation objects in the
announcement file, then do you have an opinion on whether this arrangement
-- whether or not this arrangement is substantially different from the
navigation object limitation in the -- or from the configuration identifier
limitation in the '799 Patent?

---

[176] Tr. (Feamster – Direct) 649:4-13.

[177] Tr. (Feamster – Direct) 650:19-25.

[178] Tr. (Feamster – Direct) 651:3-652:6.

A:      I do have an opinion. My opinion is that it's not substantially different. And my opinion is based on the same -- the same logic, same argument, that we used for the 0x08 announcement files. So remember in that case the question was, well, 0x08 only appears once and the file has this plurality of navigation objects. Doesn't it have to appear for every pair of start and end offsets? And remember I talked us through why my opinion was that it didn't need to do that to achieve the same function in the same way, to achieve the same results, which is doctrine of equivalents. It's the same argument here, just like there's only one 0x08, but you could achieve the same thing with one versus one for each pair. There's only one configuration identifier in the announcement file. There's only one model targeting descriptor. But we know you're sending it to the -- you're sending it to one set-top box. The set-top box that's received it, there's only one of them that's processing it at that time, it would be silly to check every pair of segment bookmarks to see, oh, does this one apply to me? Does this one apply to me? No, that would just be a ridiculous way to write your code. Like the better way to write it is to check it once, and then we know either all these apply or each and every one of them applies or none of them apply.

Q:      Okay. In your answer you said 'segment bookmarks' were –
A:      I'm sorry.

Q:      -- for '799, referring to the announcement file navigation objects?
A:      If I said that, I mean start and end offset pair.[179]

Q:      And you explained to the jury how it would be ridiculous for someone to write code in which there was a separate configuration identifier in every navigation object; right?
A:      I described a particular implementation there. I -- I was describing the announcement file. Okay. And as we talked about in that case, I matched the claim of configuration identifier to model target descriptor. And there's only one of those in the announcement file, which I think we all agree with. And I said it -- I don't know if I used the word "ridiculous," but something to that effect, like it wouldn't make any sense at all to repeat that value multiple times throughout the announcement file. And that it made absolute perfect sense to how I would implement it to have it only once in that file.[180]

Dr. Feamster did not provide legally sufficient testimony regarding infringement of claim

12 of the '799 Patent under the doctrine of equivalents. Dr. Feamster's testimony above was

---

[179] Tr. (Feamster – Direct) 663:15-665:4.

[180] Tr. (Feamster – Cross) 745:7-20.

APPX00078

conclusory, not particularized, and did not link to the function, way, and result of each limitation, or explain how the components are not substantially different from the claim language.[181]

Additionally, whether something is "inefficient"[182] or "a ridiculous way" of writing code[183] is not the relevant inquiry. The relevant inquiry is what the claim limitations require, and whether the accused products' features read on those limitations by performing the same function, in the same way, to achieve the same result, or are insubstantially different.[184] Dr. Feamster's testimony does not come close to being legally sufficient particularized testimony for the relevant inquiry. In fact, he established substantial differences.[185] By testifying that including the filtering actions and configuration identifiers *within each* navigation object, as is literally claimed, would be so inefficient as to be ridiculous, Dr. Feamster "conceded that [DISH's] products differed from the patented invention."[186] In light of that concession, the question is whether Dr. Feamster "presented evidence that this conceded advantage is an 'insubstantial

---

[181] *See, e.g.*, *Festo*, 493 F.3d at 1377; *Lear Siegler*, 873 F.2d at 1425-26; *Augme*, 755 F.3d at 1336; *Tex. Instruments*, 90 F.3d at 1567.

[182] Tr. (Feamster – Direct) 650:19-652:6.

[183] *See* Tr. (Feamster – Direct) 663:15-664:24; Tr. (Feamster – Cross) 745:7-20.

[184] *See, e.g.*, *Festo*, 493 F.3d at 1377; *Lear Siegler*, 873 F.2d at 1425-26; *Augme*, 755 F.3d at 1336; *Tex. Instruments*, 90 F.3d at 1567.

[185] *Supra* III.C.1, ¶ 38, III.C.2, ¶ 43; *see Amgen*, 923 F.3d at 1029 (finding no infringement "under the doctrine of equivalents because [accused infringer's] one-step, one-solution purification process works in a substantially different way from the claimed three-step, three-solution process"); *Bid for Position, LLC v. AOL, LLC*, 601 F.3d 1311, 1319 (Fed. Cir. 2010) (finding difference in the way "is sufficiently fundamental" that no infringement under DOE); *Perkin-Elmer*, 822 F.2d at 1532 n.6 ("That a claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result *in a substantially different way*.") (emphasis added); *Sealed Air Corp. v. U. S. Int'l Trade Comm'n*, 645 F.2d 976, 984 (C.C.P.A. 1981) (finding no equivalents when accused process did not operate in substantially same way); *B-K Lighting, Inc. v. Vision3 Lighting*, 930 F. Supp. 2d 1102, 1141-42 (C.D. Cal. 2013) ("The Federal Circuit has held that a patent that 'claims a precise arrangement of structural elements that cooperate in a particular way to achieve a certain result' is not infringed by an accused product that achieves the same result 'by a different arrangement of elements.'") (quoting *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423-25 (Fed. Cir. 1997)).

[186] *Plastic Omnium Advanced Innovation & Rsch. v. Donghee Am., Inc.*, 943 F.3d 929, 938 (Fed. Cir. 2019).

41

difference.'"[187] Dr. Feamster's testimony was conclusory[188] and legally insufficient to prove

DISH's implementation was insubstantially different from the claim language.[189]

 As a point of comparison to what particularized testimony regarding the doctrine of

equivalents should be, one need only look to Dr. Goldberg's doctrine of equivalents testimony

and opinions on March 7 and 8, transcript pages 1589 to 1598.[190] This reference to Dr. Goldberg

does not mean that this Memorandum Decision and Order depends in any way on the substance

of Dr. Goldberg's testimony. The court is not relying on or weighing his testimony. Rather, this

reference highlights the insufficiency and conclusory nature of Dr. Feamster's testimony on

equivalents by comparison to Dr. Goldberg's testimony.

 Because Dr. Feamster failed to offer particularized testimony of the function-way-result

test, or the insubstantial difference test, for the navigation objects' shared configuration identifier

---

[187] *Id.* (citations omitted).

[188] Tr. (Feamster – Direct) 649:7-13 ("It's not substantially different"), 650:20-22 (similar), 663:17-664:3 (similar).

[189] *See, e.g., Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1364-65 (Fed. Cir. 2007) (finding expert declaration on DOE conclusory when he did not explain either operation or how the differences were insubstantial); *Tex. Instruments*, 90 F.3d at 1567-68 (affirming JMOL because the plaintiff "failed to present sufficient evidence to support a finding of infringement under the doctrine of equivalents," including an expert's testimony that was not particularized and did "not support a finding that the differences were 'insubstantial'"); *Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, No. 06CV2433 DMS (CAB), 2007 WL 7757969, at *6 (S.D. Cal. July 10, 2007), *aff'd*, 651 F.3d 1318 (Fed. Cir. 2011) (granting summary judgment when an expert's "statements are conclusory and generalized, and they fail to provide particularized testimony or evidence going to a material fact"); *see also N5 Techs. LLC v. Capital One N.A.*, 56 F. Supp. 3d 755, 763–64 (E.D. Va. 2014) (granting summary judgment because "the differences between two systems are insubstantial requires particularized testimony and linking argument explaining *how* and *why* the differences are insubstantial; *conclusory statements or evidence submitted for other purposes will not suffice.*") (second emphasis added).

[190] Tr. (Goldberg – Direct) 1589:2-1598:14; *compare* Tr. (Feamster – Direct) 650:20-25 ("I think it achieves the same function in substantially the same way, to achieve basically the same results."), 652:1-6 (similar), 664:8-24 (similar) *with* Tr. (Goldberg – Direct) 1592:2-21 (explaining the "function for the claimed filtering action" differs from the function of the "Type 8 indicator"), 1592:22-1593:22 (explaining the way the claimed filtering action is used requires "a separate filtering action for each navigation object," which differs from the way DISH's AutoHop system uses the information in the announcement file), 1593:23-1594:7 (explaining that the claimed filtering action supports filtering that is "just not possible in the DISH system") 1594:22-1595:11 (explaining the function of the claimed configuration identifier), 1595:12-20 (explaining the way the claimed configuration identifier is used by putting "that configuration identifier in the navigation object for each portion to be filtered"), 1595:21-1596:6 (explaining the result of the claimed configuration identifier implementation supports "further customization based on the different kinds of players you can have"), 1596:7-1598:14 (explaining the how the function-way-result of the claimed configuration identifier differ from the model targeting descriptor used in DISH's announcement files).

42

and filtering action limitations, ClearPlay's evidence of infringement of claim 12 of the

'799 Patent under the doctrine of equivalents is legally insufficient.

### 2. ClearPlay's evidence for the "navigation object" limitation is legally insufficient for infringement under the doctrine of equivalents

Additionally, ClearPlay's evidence of infringement of claim 12 of the '799 Patent under

the doctrine of equivalents is legally insufficient due to structural variants. Legally, the multi-

object structure cannot be an equivalent of the single-object structure.[191] "The concept of

equivalency cannot embrace a structure that is specifically excluded from the scope of the

claims."[192] "While [the Federal Circuit has] recognized that a literal failure to meet a claim

limitation does not necessarily constitute a specific exclusion, [it has] found specific exclusion

where the patentee seeks to encompass [by equivalents] a structural feature that is the opposite

of, or inconsistent with, the recited limitation."[193] Because the ClearPlay patents made clear that

they claim only a single structure navigation object,[194] a multi-object equivalent cannot possess

---

[191] *B-K Lighting*, 930 F. Supp. 2d at 1141-42 ("The Federal Circuit has held that a patent that 'claims a precise arrangement of structural elements that cooperate in a particular way to achieve a certain result' is not infringed by an accused product that achieves the same result 'by a different arrangement of elements.'") (quoting *Sage Prods.*, 126 F.3d at 1423-25); *see also Perkin-Elmer,* 822 F.2d at 1532 n.6 ("That a claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result *in a substantially different way.")* (emphasis added); Summary Judgment Order at 11 ("The multi-object approach is precluded by this court's claim construction and the ordinary and customary meaning of the Asserted Patents.").

[192] *Augme*, 755 F.3d at 1335 (concluding the court's construction precluded a finding of equivalence) (quoting *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 400 (Fed. Cir. 1994)) (internal quotations and citations omitted).

[193] *Augme*, 755 F.3d at 1335 (citing to *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1346-47 (Fed. Cir. 2001); *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1317 (Fed. Cir. 1998)).

[194] *See, e.g.*, Trial Ex. 1 ('970 Patent) Abstract ("Each navigation object defines a start position, a stop position, and an filtering action to perform on the portion of the multimedia content that begins at the start position and ends at the stop position."); *see also id.* at 4:49-52, 4:62-67, 11:63-12:10, FIGs. 3A-3C, FIGs. 4A-4B, FIGs. 5A-B.

only insubstantial differences.[195] For this other reason, ClearPlay's shared filtering action and configuration identifier theory fail under the doctrine of equivalents as a matter of law.

## V.    SUMMARY

ClearPlay's claims for infringement, induced infringement, and willful infringement fail as a matter of law because the accused products do not practice the methods of the Asserted Claims of the '970 and '799 Patents and do not literally, or under the doctrine of equivalents, infringe the Asserted Claims. DISH's JMOL[196] is GRANTED and final judgment will enter accordingly. DISH may seek costs as the prevailing party pursuant to Federal Rule of Civil Procedure 54(d)(1).

In light of this ruling of noninfringement pursuant to Rule 50(a), the other issues raised in DISH's motions for judgment as a matter of law, including DISH's motion for judgment as a matter of law regarding damages (and its oral motions made at the close of all evidence),[197] are denied as MOOT. ClearPlay's oral motion for judgment as a matter of law on validity made at the close of evidence[198] is also denied as MOOT.

This resolution of DISH's JMOL may also render moot forthcoming motions by the parties on other issues, such as issues that may be raised under Rule 50(b), 52, and 59, though no

---

[195] *See, e.g.*, Trial Ex. 1 ('970 Patent) Abstract ("Each navigation object defines a start position, a stop position, and an filtering action to perform on the portion of the multimedia content that begins at the start position and ends at the stop position."); *see also id.* at 4:49-52, 4:62-67, 11:63-12:10, FIGs. 3A-3C, FIGs. 4A-4B, FIGs. 5A-B.

[196] Docket no. 862, filed Mar. 3, 2023.

[197] Defendants' Motion for Judgment as a Matter of Law Under Rule 50(a), docket no. 880, filed Mar. 7, 2023; Minute Entry for Proceedings Held Before Judge David Nuffer, docket no. 954, filed Mar. 21, 2023; Tr. (Lynn) 1912:6-1913:13; *Cave Consulting Grp., LLC v. OptumInsight, Inc.*, 725 Fed. App'x 988, 992 (Fed. Cir. 2018); *Cardinal Chem. Co. v. Morton Int'l Inc.*, 508 U.S. 83, 99-102 (1993); *see also, e.g.*, *SSI Techs., LLC v. Dongguan Zhengyang Elec. Mechanical Ltd.*, 59 F.4th 1328, 1338-39 (Fed. Cir. 2023); *AstraZeneca LP v. Breath Ltd.*, 542 F. App'x 971, 982 (Fed. Cir. 2013).

[198] Tr. (Jordan) 1911:23-1912:4; *Cave Consulting*, 725 Fed. App'x at 992; *Cardinal Chem.*, 508 U.S. at 99-102; *SSI Techs.*, 59 F.4th at 1338-39; *AstraZeneca*, 542 Fed. App'x at 982.

44

position is taken in this Memorandum Decision and Order on the necessity or futility of filing

such motions.

**VI.    ORDER**

IT IS HEREBY ORDERED that DISH's JMOL[199] is GRANTED.

IT IS FURTHER ORDERED that DISH's motion for judgment as a matter of law

regarding damages[200] and DISH's oral motions made at the close of all evidence[201] are denied as

MOOT, and ClearPlay's oral motion for judgment as a matter of law on validity made at the

close of evidence[202] is denied as MOOT.

The Clerk is directed to close the case.

Signed June 2, 2023

BY THE COURT

David Nuffer
United States District Judge

---

[199] Docket no. 862, filed Mar. 3, 2023.

[200] Docket no. 880, filed Mar. 7, 2023

[201] Tr. (Lynn) 1912:6-1913:13.

[202] Tr. (Jordan) 1911:23-1912:4.

APPX00083

United States District Court
for the
District of Utah
June 2, 2023

******MAILING CERTIFICATE OF THE CLERK******

RE:   ClearPlay v. Dish Network LLC et al
      2:14cv191 DN-CMR

Daniel Joseph Anderson
ERNST BROWN & DRAPER PLLC
1930 S ALMA SCHOOL RD STE A200
MESA, AZ 85210

David J. Jordan
FOLEY & LARDNER LLP
95 S STATE ST STE 2500
SALT LAKE CITY, UT 84111

James T. Burton
KIRTON MCCONKIE
PO BOX 45120
SALT LAKE CITY, UT 84145-0120

L. Richard Williams
BEUS GILBERT PLLC
701 N 44TH ST
PHOENIX, AZ 85044

Michael K. Erickson
RAY QUINNEY & NEBEKER PC
PO BOX 45385
SALT LAKE CITY, UT 84145-0385

Abigail M. Terhune
1911 UNION ST
CHARLOTTE, NC 28205

Ali Nooruddin Dhanani
BAKER BOTTS LLP
910 LOUISIANA
ONE SHELL PLAZA
HOUSTON, TX 77002-4995

Brent O. Hatch
HATCH LAW GROUP
22 E 100 S STE 400
SALT LAKE CITY, UT 84111

G Hopkins Guy , III
BAKER BOTTS LLP
1001 PAGE MILL RD BLDG 1 STE 200
PALO ALTO, CA 94304

Jamie Roy Lynn
BAKER BOTTS LLP
700 K ST NW
WASHINGTON, DC 20001-5692

Kurt Pankratz
BAKER BOTTS LLP
2001 ROSS AVE STE 900
DALLAS, TX 75201

Robert L. Maier
BAKER BOTTS LLP
30 ROCKEFELLER PLAZA
NEW YORK, NY 10112-4498

Aimee Trujillo

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CLEARPLAY, INC.,<br><br>           Plaintiff,<br><br>v.<br><br>DISH NETWORK, LLC, and ECHOSTAR<br>TECHNOLOGIES, LLC,<br><br>           Defendants. | **MEMORANDUM DECISION<br>AND ORDER DENYING<br>CLEARPLAY'S RULE 59 MOTION**<br><br><br>Case No. 2:14-cv-00191-DN<br><br>District Judge David Nuffer |

Judgment of noninfringement was entered in favor of Defendants Dish Network, LLC and EchoStar Technologies, LLC ("DISH") on all of Plaintiff ClearPlay, Inc.'s ("ClearPlay") causes of action.[1] It was determined as a matter of law that DISH's accused devices do not practice the methods of the asserted claims in ClearPlay's asserted patents, and do not literally or under the doctrine of equivalents infringe the asserted claims.[2] ClearPlay seeks to alter or amend the judgment under Rule 59 ("Motion").[3]

"Motions to alter or amend a judgment are appropriate where they involve reconsideration of matters properly encompassed in the decision on the merits."[4] "A Rule 59(e)

---

[1] Judgment in a Civil Case, docket no. 976, filed June 2, 2023.

[2] Memorandum Decision and Order Granting Dish's Motion for Judgment as a Matter of Law ("Order Granting JMOL"), docket no. 974, filed June 2, 2023, docket no. 975, filed under seal June 2, 2023.

[3] ClearPlay's Rule 59 Motion to Alter or Amend the Judgment ("Motion"), docket no. 996, filed June 30, 2023, docket no. 998, filed under seal June 30, 2023. ClearPlay asserts that its Motion is brought under FED. R. CIV. P. 59(b). *Id.* at 4. However, Rule 59(b) relates to motions seeking a new trial. FED. R. CIV. P. 59(b). ClearPlay does not seek a new trial. Motion at 4, 42. It seeks to alter or amend the judgment and reinstate the jury verdict. *Id.* Therefore, ClearPlay's Motion is construed as a Rule 59(e) motion to alter or amend judgment.

[4] *Pound v. Airosol Co., Inc.*, 368 F. Supp. 2d 1158, 1159 (D. Kan. 2004) (citing *White v. N.H. Dep't of Employment Sec.*, 455 U.S. 445, 451 (1982)).

motion to alter or amend judgment is essentially a motion for reconsideration."[5] "Grounds

warranting a motion to reconsider include (1) an intervening change in controlling law, (2) new

evidence previously unavailable, and (3) the need to correct clear error or prevent manifest

injustice."[6] "[A] party cannot involve Rule 59(e) to raise arguments or present evidence that

should have been set forth in the first instance or to rehash arguments previously considered and

rejected by the court."[7]

ClearPlay argues in its Motion that legal error and untimeliness in claim construction

deprived it the opportunity to be fully heard on infringement.[8] These arguments rely on a lengthy

"Background" section,[9] which recites an incorrect narrative of the procedural history and law of

the case based on conjured revisionist history.

ClearPlay's "Background" fails to give full and accurate context to the case's procedural

history. ClearPlay cherry-picks events, language within orders, and record evidence to perpetuate

its already rejected misreading and contortion of pretrial orders and directives regarding claim

construction. ClearPlay disregards clear orders made in advance of trial, as well as clarifying

orders and directives made in advance of trial and during trial. And ClearPlay ignores its role in

making arguments in briefing and eliciting testimony at trial, which flouted pretrial orders and

necessitated the clarifying orders regarding claim language made during trial.

---

[5] *Id*. (citing *Henry v. Office of Thrift Supervision*, 1993 WL 545195, *1 (D. Kan. Dec. 28, 1993) (citing *Hilst v. Bowen*, 874 F.2d 727, 726 (10th Cir. 1989), aff'd, 43 F.3d 507 (10th Cir. 1994)).

[6] *Id*. (quoting *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).

[7] *Id*. (citing *Federated Mut. Ins. Co. v. Botkin Grain Co.*, 856 F. Supp. 607, 609 (D. Kan. 1994)).

[8] Motion at 30-42.

[9] *Id*. at 4-30.

2

This is not the first time ClearPlay has raised the same or similar arguments and advocated its alternate reality of claim construction. It did so at summary judgment[10] and in its *Daubert* motions.[11] In did so in responding to a motion in limine.[12] It did so at the final pretrial conference.[13] It did so in the revision and finalization of jury instructions.[14] And it did so in responding to DISH's motion for judgment as a matter of law and in objecting to the proposed order granting judgment as a matter of law.[15] In each instance, ClearPlay's assertions, arguments, and false narrative regarding claim construction were thoroughly considered and ultimately rejected.[16]

---

[10] Plaintiff's Motion for Summary Judgment 11-14, 69-75, docket no. 408, filed July 21, 2022, docket no. 414, filed under seal July 21, 2022; Plaintiff ClearPlay, Inc.'s Opposition to Defendant Dish Network's Motion for Summary Judgment at 1-4, 29-37, 40-42, docket no. 451, filed Aug. 25, 2022; docket no. 454, filed under seal Aug. 25, 2022.

[11] Plaintiff's Motion to Exclude in Part the Testimony of Clifford Reader on Invalidity at 6, 10-11, docket no. 426, filed Aug. 1, 2022; Plaintiff's Motion to Exclude the Testimony of Benjamin Goldberg at 14-18, docket no. 427, filed Aug. 1, 2022, docket no. 429, filed Aug. 1, 2022; Plaintiff's Motion to Exclude Clifford Reader's Damages-Related Opinions at 8-9, docket no. 430, filed Aug. 1, 2022, docket no. 432, filed under seal Aug. 1, 2022; Plaintiff's Motion to Exclude the Testimony of Stuart Lipoff and Robert Flavin at 8-9, docket no. 439, filed Aug. 1, 2022.

[12] ClearPlay's Opposition to Defendants' Supplemental Briefing in Support of MIL No. 2 at 3-4, 6-10, docket no. 826, filed Feb. 21, 2023, docket no. 829, filed Feb. 21, 2023.

[13] Final Pretrial Hearing (Feb. 13, 2023) Transcript ("FPT Tr.") at 84:16-85:8, docket no .790, filed Feb. 15, 2023.

[14] Amended Objections to Dish's Proposed Jury Instructions and Proposed Verdict Forms at 12-16, docket no. 754, filed Feb. 9, 2023; ClearPlay's Response to Proposed Jury Instruction No. 31, docket no. 905, filed Mar. 8, 2023.

[15] ClearPlay's Opposition to Defendants' Motion for Judgment as a Matter of Law Under Rule 50(a), docket no. 863, filed Mar. 5, 2023; ClearPlay's Supplemental Briefing Regarding Disabling, docket no. 884, filed Mar. 7, 2023, docket no. 886, filed under seal Mar. 7, 2023; ClearPlay's Proposed Findings of Fact and Conclusions of Law, docket no. 910, filed Mar. 10, 2023, docket no. 912, filed under seal Mar. 10, 2023; ClearPlay's Supplemental Memorandum in Opposition to Dish's Motion for Judgment as a Matter of Law Under Rule 50(a), docket no. 945, filed Mar. 16, 2023, docket no. 949, filed under seal Mar. 16, 2023; ClearPlay's Objections to Dish's Proposed Order Granting Dish's Motion for Judgment as a Matter of Law and Proposed Judgment, docket no. 969-1, , filed May 1, 2023, docket no. 971, filed under seal May 1, 2023; Plaintiff's Notice of Errata to Dkt. 969-1, Exhibit A to ClearPlay's Objections to Dish's Proposed Order Granting Dish's Motion for Judgment as a Matter of Law and Proposed Judgment, docket no. 973, filed May 22, 2023.

[16] Memorandum Decision and Order Re: ClearPlay's *Daubert* Motions ("Daubert Order") at 7-9, 11, 15-16, docket no. 605, filed Jan. 6, 2023; Memorandum Decision and Order Denying ClearPlay's Motion for Summary Judgment ("First SJ Order") at 3-4, 6-8, docket no. 618, filed Jan. 24, 2023; Memorandum Decision and Order Granting in part and Denying in part Dish's Motion for Summary Judgment ("Second SJ Order") at 1-2, 10-25, docket no. 652, filed Jan. 31, 2023, docket no. 653, filed Jan. 31, 2023; Docket Text Order Granting 637 Motion in Limine, docket no. 845, filed Feb. 24, 2023; FPT Tr. at 85:9-19; Jury Instructions, docket no. 924, filed Mar. 15, 2023; Status Conference (Mar. 21, 2023) Transcript, docket no. 956, filed Mar. 30, 2023; Order Granting JMOL.

3

ClearPlay's argument that claim construction continued during trial and after it concluded its case-if-chief is wrong. The claim language on which ClearPlay's Motion is based was construed well in advance of trial.[17] The construction remained consistent throughout the litigation, and it did not change at trial. Rather, because ClearPlay insisted on making arguments in its briefing and eliciting testimony at trial which contradicted the claim construction and prior orders, it became necessary that the jury instructions include clarifying language regarding the meaning and construction of claim terms.

The clarifying language included in the jury instructions (as well as the language used in the order granting judgment of noninfringement as a matter of law) did not alter the claim construction. And ClearPlay's ability to be fully heard on infringement was not prejudiced. ClearPlay had notice of the claim construction well in advance of trial, which ClearPlay acknowledged.[18] ClearPlay chose to either disregard the clear claim construction, or attempted to contort the claim construction to mean something it clearly did not mean and was clearly not intended to mean. And ClearPlay continues to do so in its Motion.

ClearPlay fails to present a sufficient basis to reconsider the prior orders regarding claim construction, including the order granting judgment of noninfringement as a matter of law. ClearPlay's assertions are contextually and factually wrong. And ClearPlay's legal arguments lack merit. Therefore, ClearPlay fails to present a sufficient basis to alter or amend the judgment of noninfringement.

---

[17] Memorandum Decision and Order Regarding Claim Construction, docket no. 309, filed Aug. 26, 2019; Memorandum Decision and Order Denying Motion Regarding Supplemental Claim Construction, docket no. 367, filed Mar. 1, 2022; Daubert Order at 7-9,11,15-16; First SJ Order at 3-4, 6-8; Second SJ Order at 1-2, 10-25; Docket Text Order Granting 637 Motion in Limine; FPT Tr. at 85:9-19.

[18] ClearPlay's Response to Defendants' Motion in Limine No. 2 to Preclude ClearPlay from Contradicting the Court's Claim Construction at 2, docket no. 661, filed Feb. 3, 2023; FPT Tr. 85:20-21.

4

**ORDER**

IT IS HEREBY ORDERED that ClearPlay's Motion[19] is DENIED.

Signed December 12, 2023.

BY THE COURT

David Nuffer
United States District Judge

---

[19] Docket no. 996, filed June 30, 2023; docket no. 998, filed under seal June 30, 2023.

APPX00089



6337476

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

January 23, 2023

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *7,577,970*
ISSUE DATE: *August 18, 2009*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Curtis Goffe
Certifying Officer

**EXHIBIT**
**1**



US007577970B2

(12) **United States Patent**
    Jarman

(10) **Patent No.:**    **US 7,577,970 B2**
(45) **Date of Patent:**    *Aug. 18, 2009

(54) **MULTIMEDIA CONTENT NAVIGATION AND PLAYBACK**

(75) Inventor: **Matthew T. Jarman**, Salt Lake City, UT (US)

(73) Assignee: **Clearplay Inc.**, Salt Lake City, UT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 689 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/074,908**

(22) Filed: **Mar. 7, 2005**

(65) **Prior Publication Data**

US 2005/0166234 A1    Jul. 28, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 09/694,873, filed on Oct. 23, 2000, now Pat. No. 6,898,799.

(51) **Int. Cl.**
    H04N 7/16    (2006.01)
    H04N 7/173    (2006.01)
    H04N 9/00    (2006.01)
    H04N 11/00    (2006.01)
    H04N 7/00    (2006.01)

(52) **U.S. Cl.** ........................ **725/25**; 725/141; 725/142; 725/133; 725/134; 386/1; 386/46

(58) **Field of Classification Search** .................. 725/25, 725/28, 30, 46, 47, 50, 52, 58, 131–134, 725/139–142, 151–153; 386/1, 4, 6–8, 46, 386/52, 55, 64, 65, 68–70, 125
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,581,029 A    5/1971    Noiles

(Continued)

FOREIGN PATENT DOCUMENTS

EP    0240794    10/1987

(Continued)

OTHER PUBLICATIONS

Akimoto et al., "Pixel-Selected Ray Tracing", IEEE Computer Graphics & Applications, pp. 14-22, Jul. 1991.

(Continued)

*Primary Examiner*—John W. Miller
*Assistant Examiner*—John Schnurr
(74) *Attorney, Agent, or Firm*—Dorsey & Whitney LLP

(57)    **ABSTRACT**

In accordance with the present invention, a filtering process is based on the output side of a multimedia decoder. A navigator monitors the current play position of the multimedia content and compares that position with navigation objects. Each navigation object defines a start position, a stop position, and an filtering action to perform on the portion of the multimedia content that begins at the start position and ends at the stop position. When the current play position falls within the portion of multimedia content defined by a particular navigation object, the navigator activates the filtering action that was assigned to the navigation object. Filtering actions include skipping, muting, reframing, etc., the portion of multimedia content defined by a navigation object. A variety of systems may be used to implement the present invention, such as computer systems (consumer and server), television systems, and audio systems.

**43 Claims, 11 Drawing Sheets**



EX0001-0002

**US 7,577,970 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,012,583 A | 3/1977 | Kramer |
| 4,081,754 A | 3/1978 | Jackson |
| 4,085,422 A | 4/1978 | Niwata et al. |
| 4,229,765 A | 10/1980 | Sanger |
| 4,246,495 A | 1/1981 | Pressman |
| 4,305,131 A | 12/1981 | Best |
| 4,348,696 A | 9/1982 | Beier |
| 4,386,436 A | 5/1983 | Kocher et al. |
| 4,449,198 A | 5/1984 | Kroon et al. |
| 4,475,132 A | 10/1984 | Rodesch |
| 4,506,387 A | 3/1985 | Walter |
| 4,520,404 A | 5/1985 | Von Kohorn |
| 4,538,188 A | 8/1985 | Barker et al. |
| 4,554,584 A | 11/1985 | Elam et al. |
| 4,566,033 A | 1/1986 | Reidenouer |
| 4,569,026 A | 2/1986 | Best |
| 4,570,192 A | 2/1986 | Hori |
| 4,591,248 A | 5/1986 | Freeman |
| 4,605,964 A | 8/1986 | Chard |
| 4,605,973 A | 8/1986 | Von Kohorn |
| 4,644,515 A | 2/1987 | Allebest et al. |
| 4,685,003 A | 8/1987 | Westland |
| 4,685,131 A | 8/1987 | Horne |
| 4,689,619 A | 8/1987 | O'Brien, Jr. |
| 4,701,896 A | 10/1987 | Allebest et al. |
| 4,729,044 A | 3/1988 | Kiesel |
| 4,744,070 A | 5/1988 | Takemura et al. |
| 4,750,213 A | 6/1988 | Novak |
| 4,754,342 A | 6/1988 | Duffy |
| 4,766,541 A | 8/1988 | Bleich et al. |
| 4,775,935 A | 10/1988 | Yourick |
| 4,782,402 A | 11/1988 | Kanamaru |
| 4,789,894 A | 12/1988 | Cooper |
| 4,871,903 A | 10/1989 | Carrell |
| 4,872,151 A | 10/1989 | Smith |
| 4,873,585 A | 10/1989 | Blanton et al. |
| 4,888,796 A | 12/1989 | Olivo, Jr. |
| 4,891,694 A | 1/1990 | Way |
| 4,930,158 A | 5/1990 | Vogel |
| 4,930,160 A | 5/1990 | Vogel |
| 4,947,244 A | 8/1990 | Fenwick et al. |
| 4,949,187 A | 8/1990 | Cohen |
| 4,956,825 A | 9/1990 | Wilts et al. |
| 4,964,004 A | 10/1990 | Barker |
| 4,972,396 A | 11/1990 | Rafner |
| 4,979,050 A | 12/1990 | Westland et al. |
| 4,995,078 A | 2/1991 | Monslow et al. |
| 5,046,157 A | 9/1991 | Smith et al. |
| 5,051,837 A | 9/1991 | McJunkin |
| 5,057,932 A | 10/1991 | Lang |
| 5,060,068 A | 10/1991 | Lindstrom |
| 5,097,249 A | 3/1992 | Yamamoto |
| 5,101,364 A | 3/1992 | Davenport et al. |
| 5,107,343 A | 4/1992 | Kawai |
| 5,109,482 A | 4/1992 | Bohrman |
| 5,122,886 A | 6/1992 | Tanaka |
| 5,130,792 A | 7/1992 | Tindell et al. |
| 5,132,953 A | 7/1992 | Matsubayashi |
| 5,172,111 A | 12/1992 | Olivo, Jr. |
| 5,175,631 A | 12/1992 | Juri et al. |
| 5,195,135 A | 3/1993 | Palmer |
| 5,199,077 A | 3/1993 | Wilcox et al. |
| 5,206,929 A | 4/1993 | Langford et al. |
| 5,210,611 A | 5/1993 | Yee et al. |
| 5,218,672 A | 6/1993 | Morgan et al. |
| 5,223,924 A | 6/1993 | Strubbe |
| 5,231,310 A | 7/1993 | Oh |
| 5,253,066 A | 10/1993 | Vogel |
| 5,253,275 A | 10/1993 | Yurt et al. |
| 5,267,351 A | 11/1993 | Reber et al. |
| 5,274,463 A | 12/1993 | Matsumoto et al. |

| | | | |
|---|---|---|---|
| 5,280,462 A | 1/1994 | Yokogawa | |
| 5,296,931 A | 3/1994 | Na | |
| 5,313,297 A | 5/1994 | Fukui et al. | |
| 5,331,353 A | 7/1994 | Levenson et al. | |
| 5,333,091 A | 7/1994 | Iggulden et al. | |
| 5,335,079 A | 8/1994 | Yuen et al. | |
| 5,353,121 A | 10/1994 | Young et al. | |
| 5,367,510 A | 11/1994 | Ando | |
| 5,371,795 A | 12/1994 | Vogel | |
| 5,387,942 A | 2/1995 | Lemelson | |
| 5,434,678 A | 7/1995 | Abecassis | |
| 5,465,113 A | 11/1995 | Gilboy | |
| 5,477,277 A | 12/1995 | Shimoyanagida et al. | |
| 5,477,527 A | 12/1995 | Tsuchiya et al. | |
| 5,479,303 A | 12/1995 | Suzuki et al. | |
| 5,481,296 A | 1/1996 | Cragun et al. | |
| 5,521,900 A | 5/1996 | Ando et al. | |
| 5,532,732 A | 7/1996 | Yuen et al. | |
| 5,535,186 A | 7/1996 | Ishizawa | |
| 5,543,851 A | 8/1996 | Chang | |
| 5,546,365 A | 8/1996 | Roth | |
| 5,561,457 A | 10/1996 | Cragun et al. | |
| 5,572,260 A | 11/1996 | Onishi et al. | |
| 5,574,567 A | 11/1996 | Cookson et al. | |
| 5,583,576 A | 12/1996 | Perlman et al. | |
| 5,589,945 A | 12/1996 | Abecassis | |
| 5,598,276 A | 1/1997 | Cookson et al. | |
| 5,610,653 A | 3/1997 | Abecassis | |
| 5,634,849 A | 6/1997 | Abecassis | |
| 5,659,366 A | 8/1997 | Kerman | |
| 5,664,046 A | 9/1997 | Abecassis | |
| 5,673,089 A | 9/1997 | Yuen et al. | |
| 5,682,501 A | 10/1997 | Sharman | |
| 5,684,918 A | 11/1997 | Abecassis | |
| 5,696,866 A | 12/1997 | Iggulden et al. | |
| 5,696,869 A | 12/1997 | Abecassis | |
| 5,699,472 A | 12/1997 | Ueda | |
| 5,703,655 A | 12/1997 | Corey et al. | |
| 5,717,814 A | 2/1998 | Abecassis | |
| 5,724,091 A | 3/1998 | Freeman et al. | |
| 5,724,472 A | 3/1998 | Abecassis | |
| 5,751,335 A | 5/1998 | Shintani | |
| 5,757,417 A | 5/1998 | Aras et al. | |
| 5,778,135 A | 7/1998 | Ottesen et al. | |
| 5,809,471 A | 9/1998 | Brodsky | |
| 5,828,402 A | 10/1998 | Collings | |
| 5,832,212 A | 11/1998 | Cragun et al. | |
| 5,835,722 A | 11/1998 | Bradshaw et al. | |
| 5,870,708 A | 2/1999 | Stewart | |
| 5,872,588 A | 2/1999 | Aras et al. | |
| 5,886,746 A | 3/1999 | Yuen et al. | |
| 5,913,013 A | 6/1999 | Abecassis | |
| 5,953,485 A | 9/1999 | Abecassis | |
| 5,987,210 A | 11/1999 | Iggulden et al. | |
| 5,987,211 A | 11/1999 | Abecassis | |
| 5,999,689 A | 12/1999 | Iggulden | |
| 6,002,443 A | 12/1999 | Iggulden | |
| 6,002,833 A | 12/1999 | Abecassis | |
| 6,005,603 A * | 12/1999 | Flavin | 725/32 |
| 6,009,433 A | 12/1999 | Kurano et al. | |
| 6,011,895 A | 1/2000 | Abecassis | |
| 6,038,367 A | 3/2000 | Abecassis | |
| 6,061,680 A | 5/2000 | Scherf et al. | |
| 6,067,401 A | 5/2000 | Abecassis | |
| 6,072,520 A | 6/2000 | Yuen et al. | |
| 6,072,934 A | 6/2000 | Abecassis | |
| 6,075,550 A | 6/2000 | Lapierre | |
| 6,091,886 A | 7/2000 | Abecassis | |
| 6,100,916 A | 8/2000 | August et al. | |
| 6,115,057 A | 9/2000 | Kwoh et al. | |
| 6,137,486 A | 10/2000 | Yoshida et al. | |
| 6,151,444 A | 11/2000 | Abecassis | |
| 6,154,207 A | 11/2000 | Farris et al. | |

US 7,577,970 B2
Page 3

| | | | |
|---|---|---|---|
| 6,166,780 | A | 12/2000 | Bray |
| 6,181,364 | B1 | 1/2001 | Ford |
| 6,192,340 | B1 | 2/2001 | Abecassis |
| 6,208,805 | B1 | 3/2001 | Abecassis |
| 6,243,676 | B1 | 6/2001 | Witteman |
| 6,262,775 | B1 | 7/2001 | Kim |
| 6,263,505 | B1 | 7/2001 | Walker et al. |
| 6,269,216 | B1 | 7/2001 | Abecassis |
| 6,289,165 | B1 | 9/2001 | Abecassis |
| 6,304,715 | B1 | 10/2001 | Abecassis |
| 6,351,596 | B1 | 2/2002 | Ostrover |
| 6,385,388 | B1 | 5/2002 | Lewis et al. |
| 6,393,202 | B1 | 5/2002 | Yamauchi et al. |
| 6,408,128 | B1 | 6/2002 | Abecassis |
| 6,463,207 | B1 | 10/2002 | Abecassis |
| 6,477,705 | B1 | 11/2002 | Yuen et al. |
| 6,504,990 | B1 | 1/2003 | Abecassis |
| 6,553,178 | B2 | 4/2003 | Abecassis |
| 6,553,566 | B1 | 4/2003 | Grant et al. |
| 6,571,209 | B1 | 5/2003 | Cohen et al. |
| 6,701,523 | B1 | 3/2004 | Hancock et al. |
| 6,714,723 | B2 | 3/2004 | Abecassis |
| 6,732,367 | B1 | 5/2004 | Ellis et al. |
| 6,756,997 | B1 | 6/2004 | Ward, III et al. |
| 6,771,885 | B1 | 8/2004 | Agnihotri et al. |
| 6,889,383 | B1 | 5/2005 | Jarman |
| 6,898,799 | B1 | 5/2005 | Jarman |
| 6,963,890 | B2 | 11/2005 | Dutta et al. |
| 6,972,802 | B2 | 12/2005 | Bray |
| 7,035,526 | B2 | 4/2006 | Green |
| 7,139,031 | B1 | 11/2006 | Bray |
| 7,249,366 | B1 | 7/2007 | Flavin |
| 7,302,161 | B2 | 11/2007 | Hisatomi et al. |
| 7,356,247 | B2 | 4/2008 | Hamasaka et al. |
| 7,441,020 | B2 | 10/2008 | Dideriksen et al. |
| 2002/0126983 | A1 | 9/2002 | Sato et al. |
| 2003/0040962 | A1 | 2/2003 | Lewis |
| 2003/0194211 | A1 | 10/2003 | Abecassis |
| 2004/0006767 | A1 | 1/2004 | Robson et al. |
| 2004/0128681 | A1 | 7/2004 | Hancock et al. |
| 2004/0133657 | A1 | 7/2004 | Smith et al. |
| 2004/0226035 | A1 | 11/2004 | Hauser, Jr. |
| 2004/0261099 | A1 | 12/2004 | Durden et al. |
| 2004/0263914 | A1 | 12/2004 | Yule et al. |
| 2005/0013589 | A1 | 1/2005 | Shah et al. |
| 2005/0066357 | A1 | 3/2005 | Ryal |
| 2005/0086705 | A1 | 4/2005 | Jarman et al. |
| 2005/0223013 | A1 | 10/2005 | Jarman et al. |
| 2006/0031870 | A1 | 2/2006 | Jarman |
| 2006/0095262 | A1 | 5/2006 | Danieli |
| 2006/0101487 | A1 | 5/2006 | Jarman |
| 2006/0177198 | A1 | 8/2006 | Jarman et al. |
| 2006/0236220 | A1 | 10/2006 | Jarman |
| 2006/0277564 | A1 | 12/2006 | Jarman |
| 2007/0168853 | A1 | 7/2007 | Jarman |
| 2007/0180463 | A1 | 8/2007 | Jarman |
| 2007/0186235 | A1 | 8/2007 | Jarman |
| 2007/0186236 | A1 | 8/2007 | Jarman |
| 2007/0288516 | A1 | 12/2007 | Jarman |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0259666 | 3/1988 |
| EP | 0443676 | 8/1991 |
| GB | 2041586 | 9/1980 |
| GB | 2179771 | 3/1987 |
| WO | WO97/23996 | 8/1986 |
| WO | WO99/34598 | 7/1999 |

OTHER PUBLICATIONS

Allen, Christina, "The Use of Video in Organizational Studies", SIGCHI Bulletin, vol. 21, No. 2, pp. 115-117, Oct. 1989.

Allen, James F., "Maintaining Knowledge about Temporal Intervals", Communications of the ACM, vol. 26, No. 11, pp. 832-843, Nov. 1983.

Anderson et al., "A Continuous Media I/O Server and Its Synchronization Mechanism", IEEE, pp. 51-57, Oct. 1991.

Armstrong, Herbert B., "Improving Aviation Accident Research Through the Use of Video", SIGCHI Bulletin, vol. 21, No. 2, pp. 54-56, Oct. 1989.

Ashenhurst, Robert L., "ACM Forum—Letters", Communications of the ACM, vol. 32, No. 7, pp. 789-792, Jul. 1989.

Author Unknown, "Bibliography of Recent Publications on Computer Communication", ACM SIGCOMM, pp. 132-145, date unknown.

Author Unknown, "News Track", Communications of the ACM, vol. 32, No. 7, pp. 777-778, Jul. 1989.

Banerjee, Sanjay, Effects on Moral Rights in renting altered films and in supplying DVD altering software on-line: An analysis of the outcome of possible lawsuits in the US, UK and France, Dissertation for the University of Strathclyde, 68 pages, Sep. 12, 2003.

Billingsley, Pat, "The Standards Factor", SIGCHI Bulletin, vol. 21, No. 2, pp. 13-16, Oct. 1989.

Blinn, James F., "A Trip Down the Graphics Pipeline: Pixel Coordinates", IEEE Computer Graphics and Applications, pp. 81-85, Jul. 1991.

Brunhoff, Todd, "Vex Your Hardware: VEX Version 5.6", Tek Laboratories, Tektronix, Inc., 8 pages, date unknown.

Carey, Tom, "Draft for ACM Self-Assessment Procedure on Human-Computer Interaction", SIGCHI Bulletin, vol. 21, No. 2, pp. 17-24, Oct. 1989.

Carey, Tom, "Video Reviews", SIGCHI Bulletin, vol. 21, No. 2, pp. 128-130, Oct. 1989.

Chow, Mark D., "The Role of the Video Professional in a Research Environment", SIGCHI Bulletin, vol. 21, No. 2, pp. 83-87, Oct. 1989.

Clark, David R., "The Demise of Multimedia", IEEE Computer Graphics and Applications, pp. 75-80, Jul. 1991.

Crane, Gregory. "Hypermedia and the Study of Ancient Culture", IEEE Computer Graphics and Applications, pp. 45-51, Jul. 1991.

Crawford, Diane, "Two Bills Equal Forewarning", Communications of the ACM, vol. 32, No. 7, pp. 780-782, Jul. 1989.

Davenport et al., "Cinematic Primitives for Multimedia", IEEE Computer Graphics and Applications, pp. 67-74, Jul. 1991.

Davenport et al., "Numbers—A Medium That Counts", IEEE Computer Graphics and Applications, pp. 39-44, Jul. 1991.

DeFanti et al., "Basic Zgrass—A Sophisticated Graphics Language for the Bally Home Library Computer", pp. 33-37, date unknown.

Dixon, Douglas F., "Life Before the Chips: Simulating Digital Video Interactive Technology", Communications of the ACM, vol. 32, No. 7, pp. 824-831, Jul. 1989.

Feiner et al., "Automating the Generation of Coordinated Multimedia Explanations", IEEE, pp. 33-41, Oct. 1991.

Fox, Edward A., "Advances in Interactive Digital Multimedia Systems", IEEE, pp. 9-21, Oct. 1991.

Fox, Edward A., "The Coming Revolution", Communications of the ACM, vol. 32, No. 7, pp. 794-801, Jul. 1989.

Frenkel, Karen A., "The Next Generation of Interactive Technologies", Communications of the ACM, vol. 32, No. 7, pp. 872-881, Jul. 1989.

Greif et al., "Computer-Supported Cooperative Work: A Book of Readings", SIGCHI Bulletin, vol. 21, No. 2, pp. 125-128, Oct. 1989.

Grudin, Jonathan, "MCC Human Interface Laboratory Technical Reports", SIGCHI Bulletin, vol. 21, No. 2, pp. 131-137, Oct. 1989.

Halliday, Mark David, "Digital Cinema: An Environment for Multithreaded Stories", Dissertation, Massachusetts Institute of Technology, 93 pages, 1985.

Harrison et al., "Video: A Design Medium", SIGCHI Bulletin, vol. 21, No. 2, pp. 62-66, Oct. 1989.

Henderson, Austin, "Video and Design", SIGCHI Bulletin, vol. 21, No. 2, pp. 104-107, Oct. 1989.

Horton et al., "Video as an Enabling Technology for Cumputer-Supported Cooperative Work", vol. 21, No. 2, Oct. 1989.

Kennedy, Sue, "Using Video in the BNR Usability Lab", SIGCHI Bulletin, vol. 21, No. 2, pp. 92-95, Oct. 1989.

**US 7,577,970 B2**

Page 4

Kocher, Bryan, "President's Letter", Communications of the ACM, vol. 32, No. 7, p. 779, Jul. 1989.

Kodali, Nagi, "3D Scene on 2D Screen: The Visualcad Connection", SIGCHI Bulletin, vol. 21, No. 2, pp. 52-53, Oct. 1989.

Lippman et al., "Coding Image Sequences for Interactive Retrieval", Communications of the ACM, vol. 32, No. 7, pp. 852-859, Jul. 1989.

Little, Thomas D.C., "Spatio-Temporal Composition of Distributed Multimedia Objects for Value-Added Networks", IEEE, pp. 42-50, Oct. 1991.

Mackay, Wendy, "EVA: An Experimental Video Annotator for Symbolic Analysis of Video Data", SIGCHI Bulletin, vol. 21, No. 2, pp. 68-71, Oct. 1989.

Mackay et al., "Introduction to the Special Issue on Video as a Research and Design Tool", SIGCHI Bulletin, vol. 21, No. 2, pp. 48-50, Oct. 1989.

Malone et al., "Intelligent Information-Sharing Systems", Communications of the ACM, vol. 30, No. 5, pp. 390-402, May 1987.

Meghini et al., "Conceptual Modeling of Multimedia Documents", IEEE, pp. 23-30, Oct. 1991.

Michon, Brian, "Integrating Motion Video Into Computational Environments", SIGCHI Bulletin, vol. 21, No. 2, pp. 80-82, Oct. 1989.

Nam et al., "Audio-Visual Content-Based Violent Scene Characterization", Department of Electrical and Computer Engineering, University of Minnesota, 4 pages, date unknown.

Neal, Lisa, "The Use of Video in Empirical Research", SIGCHI Bulletin, vol. 21, No. 2, pp. 100-102, Oct. 1989.

Nielsen, Jakob, "Hypertext II", SIGCHI Bulletin, vol. 21, No. 2, pp. 41-47, Oct. 1989.

Palaniappan et al., "InternetExpress: An Inter-Desktop Multimedia Data-Transfer Service", IEEE, pp. 58-67, Oct. 1991.

Pea, Roy D., "Learning through Multimedia", IEEE Computer Graphics and Applications, pp. 58-66, Jul. 1991.

Press, Larry, "Thoughts and Observations at the Microsoft CD-ROM Conference", Communications of the ACM, vol. 32, No. 7, pp. 784-788, Jul. 1989.

Reisman, Sandy, "Developing Multimedia Applications", IEEE Computer Graphics and Applications, pp. 52-57, Jul. 1991.

Ripley, G. David, "DVI—A Digital Multimedia Technology", Communications of the ACM, vol. 32, No. 7, pp. 811-822, Jul. 1989.

Roske-Hofstrand, Renate J., "Video in Applied Cognitive Research for Human-Centered Design", SIGCHI Bulletin, vol. 21, No. 2, pp. 75-77, Oct. 1989.

Rubin, Benjamin, "Constraint-Based Cinematic Editing", Dissertation, Massachusetts Institute of Technology, 67 pages, Jun. 1989.

Rubin et al., "Structured Content Modeling for Cinematic Information", SIGCHI Bulletin, vol. 21, No. 2, pp. 78-79, Oct. 1989.

Schuette, Lawerence C., "Acoustic Holography", IEEE Computer Graphics and Applications, pp. 12-13, Jul. 1991.

Segall, Ricki Goldman, "Thick Descriptions: A Tool for Designing Ethnographic Interactive Videodiscs", SIGCHI Bulletin, vol. 21, No. 2, pp. 118-122, Oct. 1989.

Shaffer, Margaret T., "Use of the EVTA Process in the Evaluation of Human/System Interaction and Performance", SIGCHI Bulletin, vol. 21, No. 2, pp. 89-91, Oct. 1989.

Stevens, Scott M., "Intelligent Interactive Video Simulation of Code Inspection", Communications of the ACM, vol. 32, No. 7, pp. 832-843, Jul. 1989.

Tatar, Deborah, "Using Video-Based Observation to Shape the Design of a New Technology", SIGCHI Bulletin, vol. 21, No. 2, pp. 108-111, Oct. 1989.

Tinker, Michael, "DVI Parallel Image Compression", Communications of the ACM, vol. 32, No. 7, pp. 844-851, Jul. 1989.

Trigg, Randall H., "Computer Support for Transcribing Recorded Activity", SIGCHI Bulletin, vol. 21, No. 2, pp. 72-74, Oct. 1989.

Vertelney, Laurie, "Using Video to Prototype User Interfaces", SIGCHI Bulletin, vol. 21, No. 2, pp. 57-61, Oct. 1989.

Vin et al., "Multimedia Conferencing in the Etherphone Environment", IEEE, pp. 69-79, Oct. 1991.

Wolff et al., "Mars Navigator: An Interactive, Multimedia Exploration of the Red Planet", Computer Graphics, vol. 25, No. 3, pp. 145-146, Jul. 1991.

Woolsey, Kristina Hooper, "Multimedia Scouting", IEEE Computer Graphics and Applications, pp. 26-38, Jul. 1991.

Yu et al., "Efficient Placement of Audio Data on Optical Disks for Real-Time Applications", Communications of the ACM, vol. 32, No. 7, pp. 862-871, Jul. 1989.

Author Unknown, "Impression Delivery Aquires Prime Cut Entertainment, Broadening its Media Base Into the Video Cassette Distribution Business", PR Newswire Association, Inc., Dec. 1, 1992.

Author Unknown, "Closed Captioning Fundamentals", Link Electronics, Inc., http://www.linkelectronics.com/htm/techcc.htm, 7 pages, date unknown.

Author Unknown, "News Releases", http://www.tvguardian.com/html/movies.html, 1 page, 1999.

Author Unknown, "Principle Solutions, Inc.", http://www.tvguardian.com/html/about_us.htm, 1 page, 1999.

Author Unknown, "Purchase TVGuardian", http://www.tvguardian.com/html/sales.html, 1999.

Author Unknown, "QuickTime Video-Editing Software—Adobe Premiere 2.0", MacWorld, Jan. 1993.

Author Unknown, "Season Pass", Tivo, http://www.tivo.com/1.2.1.asp, 1 page, date unknown.

Author Unknown, "TheFreeDictionary.com—Closed Caption", http://encyclopedia.thefreedictionary.com/Closed%20caption, 3 pages, date unknown.

Author Unknown, "TVGuardian Home—The Foul Language Filter", http://www.tvguardian.com/, 1 page, 1999.

Author Unknown, "TVGuardian In the News", http://www.tvguardian.com/html/in_the_news.html, 1 page, 1999.

Aguirre-Smith et al., "Parsing Movies in Context", MIT Media Lab, pp. 157-167, Summer 1991.

Bray, Rick, "Inventor's Comments", http://www.tvguardian.com/html/information.html, 1997.

Bruno, Richard, "Making compact disks interactive", IEEE Spectrum, pp. 40-45, Nov. 1987.

Coleman, Murray, "Dad of Teens Invents TV Filter for Foul Language", http://store.dove.org/Hardware/TVGuardian/ArDemGaz.htm, Little Rock Newspapers, Inc., 1 page, 1997.

Cudlitz, Stuart, "Star Quality", MacWorld, pp. 117-123, Jun. 1989.

Davidow, Bernard T., "Black box filters dirty words from TV shows", The Hartford Courant, 1 page, date unknown.

Mackay et al., "Virtual Video Editing in Interactive Multimedia Applications", Communications of the ACM, pp. 802-810, Jul. 1989.

Sasnett, "Reconfigurable Video", Massachusetts Institute of Technology, Feb. 1986.

Kavaler et al., "A Dynamic-Time-Warp Integrated Circuit for a 1000-Word Speech Recognition System", IEE Journal of Solid-State Circuits, vol. SC-22, No. 1, pp. 3-14, Feb. 1987.

Staehli et al., "Constrained-Latency Storage Access: A Survey of Application Requirements and Storage System Design Approaches", Oregon Graduate Institute, 26 pages, Oct. 10, 1991.

Yelick, Edward, "The Authoring of Optical Videodiscs with Digital Data", Massachusetts Institute of Technology, 57 pages, 1982.

* cited by examiner



FIG. 1



FIG. 2

| 321a | 323a | 325a | 327a | 329a |
|------|------|------|------|------|
| START | STOP | ACTION | DESCRIPTION | CONFIGURATION |
| (HH:MM:SS:FF) | (HH:MM:SS:FF) | (SKIP OR MUTE) | (TEXT) | (IDENTIFIER) |
| 00:30:10:15 | 00:30:15:00 | SKIP | SCENE OF BLOODSHED | 2.1 |

320a

NAVIGATION SOFTWARE 312a

OBJECT STORE 316a

NAVIGATOR 310a

314a

356a

VENDOR INDEPENDENT INTERFACE 352a

AUDIO & VIDEO DECODERS 350a

VIDEO CONTENT

AUDIO CONTENT

372a
VIDEO DISPLAY

374a
GRAPHICS ADAPTER

378a
SPEAKERS

376a
AUDIO ADAPTER

370a
OUTPUT DEVICE

334a

330a
CONTENT SOURCE

DVD DRIVE

332a
DVD

CONSUMER SYSTEM 380a

FIG. 3A



FIG. 3B

| START ~321c | STOP ~323c | ACTION ~325c | DESCRIPTION ~327c | CONFIGURATION ~329c |
|---|---|---|---|---|
| (HH:MM:SS:FF) | (HH:MM:SS:FF) | (SKIP OR MUTE) | (TEXT) | (IDENTIFIER) |
| 00:30:10:15 | 00:30:15:00 | SKIP | SCENE OF BLOODSHED | 2.1 |

FIG. 3C



FIG. 4A



FIG. 4B

EX0001-0012



FIG. 5A



FIG. 5B



FIG. 6

EX0001-0015



FIG. 7

US 7,577,970 B2

1

## MULTIMEDIA CONTENT NAVIGATION AND PLAYBACK

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of and claims priority to co-pending U.S. patent application Ser. No. 09/694,873 filed Oct. 23, 2000, and entitled "Multimedia Content Navigation and Playback", the disclosure of which is hereby incorporated by reference herein.

### BACKGROUND

1. The Field of the Invention

The present invention relates to filtering multimedia content. More specifically, the present invention relates to methods, systems, and computer program products for automatically identifying and filtering portions of multimedia content during the decoding process.

2. The Prior State of the Art

Often, movies and other multimedia content contain scenes or language that are unsuitable for viewers of some ages. To help consumers determine whether a particular movie is appropriate for an audience of a given age, the Motion Picture Association of America ("MPAA") has developed the now familiar NC-17/R/PG-13/PG/G rating system. Other organizations have developed similar rating systems for other types of multimedia content, such as television programming, computer software, video games, and music.

Both the quantity and context of potentially objectionable material are significant factors in assigning multimedia content a rating. However, a relatively small amount of mature-focused subject matter may be sufficient to remove multimedia content from a rating category recommended for younger children. For example, in a motion picture setting, a single scene of particularly explicit violence, sexuality, or language may require an "R" rating for what would otherwise be a "PG" or "PG-13" movie. As a result, even if an "R" rated motion picture has a general public appeal, individuals trying to avoid "R" rated content, and teenagers restricted by the "R" rating, may choose not to view a motion picture that they would otherwise desire to view if it were not for the inclusion of the explicit scene.

Many consumers may prefer an alternate version of the multimedia content, such as a version that has been modified to make the content more suitable for all ages. To provide modified versions of multimedia works, the prior art has focused on manipulating the multimedia source. The details of how multimedia content is modified depends largely on the type of access the source media supports. For linear access media, such as videotape or audiotape, undesired content is edited from the tape and the remaining ends are spliced back together. The process is repeated for each portion of undesired content the multimedia source contains. Due to the need for specialized tools and expertise, it is impractical for individual consumers to perform this type of editing. While third parties could perform this editing to modify content on a consumer's behalf, the process is highly inefficient because it requires physically handling and repeating the editing for each individual tape.

Modifying direct access media, such as DVD, also has focused on modifying the multimedia source. Unlike linear media, direct access media allows for accessing any arbitrary portion of the multimedia content in roughly the same amount of time as any other arbitrary portion of the multimedia content. Direct access media allows for the creation and distri-

2

bution of multiple versions of multimedia content, including versions that may be suitable to most ages, and storing the versions on a single medium. The decoding process creates various continuous multimedia streams by identifying, selecting, retrieving and transmitting content segments from a number of available segments stored on the content source.

To help in explaining the prior art for creating multiple versions of a multimedia work on a single source, a high-level description of the basic components found in a system for presenting multimedia content may be useful. Typically, such systems include a multimedia source, a decoder, and an output device. The decoder is a translator between the format used to store or transmit the multimedia content and the format used for intermediate processing and ultimately presenting the multimedia content at the output device. For example, multimedia content may be encrypted to prevent piracy and compressed to conserve storage space or bandwidth. Prior to presentation, the multimedia content must be decrypted and/or uncompressed, operations usually performed by the decoder.

The prior art teaches creation and distribution of multiple versions of a direct access multimedia work on a single storage medium by breaking the multimedia content into various segments and including alternate interchangeable segments where appropriate. Each individually accessible segment is rated and labeled based on the content it contains, considering such factors as subject matter, context, and explicitness. One or more indexes of the segments are created for presenting each of the multiple versions of the multimedia content. For example, one index may reference segments that would be considered a "PG" version of the multimedia whereas another index may reference segments that would be considered an "R" version of the content. Alternatively, the segments themselves or a single index may include a rating that is compared to a rating selected by a user.

There are a variety of benefits to the prior art's indexing of interchangeable segments to provide for multiple versions of a multimedia work on a single storage medium. Use of storage space can be optimized because segments common to the multiple versions need only be stored once. Consumers may be given the option of setting their own level of tolerance for specific subject matter and the different multimedia versions may contain alternate segments with varying levels of explicitness. The inclusion of segment indexing on the content source also enables the seamless playback of selected segments (i.e., without gaps and pauses) when used in conjunction with a buffer. Seamless playback is achieved by providing the segment index on the content source, thus governing the selection and ordering of the interchangeable segments prior to the data entering the buffer.

The use of a buffer compensates for latency that may be experienced in reading from different physical areas of direct access media. While read mechanisms are moved from one disc location to another, no reading of the requested content from the direct access media occurs. This is a problem because, as a general rule, the playback rate for multimedia content exceeds the access rate by a fairly significant margin. For example, a playback rate of 30 frames per second is common for multimedia content. Therefore, a random access must take less than 1/30th of a second (approximately 33 milliseconds) or the random access will result in a pause during playback while the reading mechanism moves to the next start point. A typical 16×DVD drive for a personal computer, however, has an average access rate of approximately 95 milliseconds, nearly three times the 33 milliseconds allowed for seamless playback. Moreover, according to a standard of the National Television Standards Committee

US 7,577,970 B2

3

("NTSC"), only 5 to 6 milliseconds are allowed between painting the last pixel of one frame and painting the first pixel of the next frame. Those of skill in the art will recognize that the above calculations are exemplary of the time constraints involved in reading multimedia content from direct access media for output to a PC or television, even though no time is allotted to decoding the multimedia content after it has been read, time that would need to be added to the access time for more precise latency calculations.

Once access occurs, DVD drives are capable of reading multimedia content from a DVD at a rate that exceeds the playback rate. To address access latency, the DVD specification teaches reading multimedia content into a track buffer. The track buffer size and amount of multimedia content that must be read into the track buffer depend on several factors, including the factors described above, such as access time, decoding time, playback rate, etc. When stored on a DVD, a segment index, as taught in the prior art, identifies and orders the content segments to be read into the track buffer, enabling seamless playback of multiple version of the multimedia content. However, segment indexes that are external to the content source are unable to completely control the navigation commands within the initial segment identification/selection/retrieval process since external indexes can interact with position codes only available at the end of the decoding process. As a result, external segment indexes may be unable to use the DVD track buffer in addressing access latency as taught in the prior art.

As an alternative to buffering, segments from separate versions of multimedia content may be interlaced. This allows for essentially sequential reading of the media, with unwanted segments being read and discarded or skipped. The skips, however, represent relatively small movements of the read mechanism. Generally, small movements involve a much shorter access time than large movements and therefore introduce only minimal latency.

Nevertheless, the prior art for including multiple versions of a multimedia work on a single direct access media suffers from several practical limitations that prevent it from widespread use. One significant problem is that content producers must be willing to create and broadly distribute multiple versions of the multimedia work and accommodate any additional production efforts in organizing and labeling the content segments, including interchangeable segments, for use with the segment indexes or maps. The indexes, in combination with the corresponding segments, define a work and are stored directly on the source media at the time the media is produced. In short, while the prior art offers a tool for authoring multiple versions of a multimedia work, that tool is not useful in and of itself to consumers.

A further problem in the prior art is that existing encoding technologies must be licensed in order to integrate segment indexes on a direct access storage medium and decoding technologies must be licensed to create a decoder that uses the segment indexes on a multimedia work to seamlessly playback multiple versions stored on the direct access medium. In the case of DVD, the Motion Pictures Entertainment Group ("MPEG") controls the compression technology for encoding and decoding multimedia files. Furthermore, because producers of multimedia content generally want to prevent unauthorized copies of their multimedia work, they also employ copy protection technologies. The most common copy protection technologies for DVD media are controlled by the DVD Copy Control Association ("DVD CCA"), which controls the licensing of their Content Scramble System technology ("CSS"). Decoder developers license the relevant MPEG

4

and CSS technology under fairly strict agreements that dictate how the technology may be used. In short, the time and cost associated with licensing existing compression and copy protection technologies or developing proprietary compression and copy protection technologies may be significant costs, prohibitive to the wide-spread use of the prior art's segment indexing for providing multiple versions of a multimedia work on a single direct access storage medium.

Additionally, the teachings of the prior art do not provide a solution for filtering direct access multimedia content that has already been duplicated and distributed without regard to presenting the content in a manner that is more suitable for most ages. At the time of filing this patent application, over 5000 multimedia titles have been released on DVD without using the multiple version technology of the prior art to provide customers the ability to view and hear alternate versions of the content in a manner that is more suitable for most ages.

The prior art also has taught that audio portions of multimedia content may be identified and filtered during the decoding process by examining the closed caption information for the audio stream and muting the volume during segments of the stream that contain words matching with a predetermined set of words that are considered unsuitable for most ages. This art is limited in its application since it cannot identify and filter video segments and since it can only function with audio streams that contain closed captioning information. Furthermore, filtering audio content based on closed captioning information is imprecise due to poor synchronization between closed captioning information and the corresponding audio content.

## SUMMARY OF THE INVENTION

These and other problems with the prior art are overcome by the present invention, which is directed toward automatically identifying and filtering portions of multimedia content during the decoding process. As taught in the prior state of the art, the technology for presenting original multimedia content that is suitable for most ages has been concentrated on altering the multimedia at its source. Unlike the prior art's control of the input or source side of a decoder, the present invention permits filtering multimedia content at the output side of a decoder. As a result, the present invention may be practiced without necessarily imposing any particular requirements on the source of the multimedia content.

The present invention includes the creation of navigation objects to define portions of the multimedia content that should be filtered. Each navigation object contains a start position, a stop position, and a filtering action to be performed on the portion of the multimedia content that is defined by the start position and stop position. The navigation objects are placed in an object store. There is no particular limitation on the format of the navigation objects and the object store. For example, the object store may be a file, such as a database and the navigation objects may be records within the database.

Navigator software reads navigation objects from the object store and monitors the decoder for the current position code of the multimedia as the multimedia content is being decoded. For DVD multimedia, the position code may be a time code that identifies portions of the multimedia content by hours, minutes, seconds, and frame number. The position code is compared against the start and stop positions defined in each navigation object. When playback reaches a portion of the multimedia defined by a particular navigation object, the navigator activates the editing action assigned to that navigation object.

EX0001-0018

US 7,577,970 B2

5

For example, one type of filtering action is a skip. When the navigator determines that the time code for the multimedia content currently being decoded has reached the start position of a navigation object with a skip filtering action, the navigator instructs the decoder to discontinue decoding at the current multimedia position and to resume decoding at the stop position of the navigation object. By discontinuing the decoding process at the start position of the navigation object and resuming the decoding process at the stop position of the navigation object, the portion of the multimedia content defined by the start and stop positions of the multimedia content is never decoded and as a result is never transferred to a multimedia output device, such as a video display. In some cases, the navigator may not begin accessing the stop position to resume the decoding process until after determining that the start position for discontinuing decoding has been accessed, preventing the Navigator from using a read buffer to compensate for the access time required in moving the read mechanism from the start position to the stop position where decoding will resume.

Mute is another type of filtering action. When the navigator determines that the time code for the multimedia content currently being decoded has reached the start position of a navigation object with a mute filtering action, the navigator suppresses the audio decoding. Suppressing audio decoding may be accomplished by setting the volume of the multimedia content to be inaudible. Muting continues until the navigator determines that the time code for the multimedia content then being decoded reaches the stop position defined in the navigation object. Once the stop position has been reached, the volume is returned the level in effect prior to the navigator activating the mute filtering action. Unlike the skip action, the muted portion of the multimedia content is decoded and may be transferred to an output device such as speaker, but with the volume set to be inaudible or with the audio decoding suppressed in some other way, the muted portion is effectively filtered from the multimedia content.

A further type of filtering action is a reframe. In cases where the visual information presented to the viewer only contains unsuitable material in a certain physical area of a scene, the multimedia content can be enlarged if needed and then positioned in the viewing frame in a manner that effectively crops the objectionable information from view. The sizing and framing can be adjusted during the reframe action to continually crop the objectionable material from view. When the navigator determines that the position code for the multimedia content currently being decoded has reached the end position of a reframe navigation object, the navigator instructs the current multimedia to resume to the original framing. For example, if the multimedia includes a head to toe shot of a person with a bloody leg wound, the content can be resized and reframed to show only a head to waist shot.

Depending on the multimedia content, some editing actions may produce more noticeable discontinuities, irregularities, or artifacts than others. To reduce a user's perception of potential artifacts, incremental editing actions or editing actions with an incremental component provide for gradual transitions before and/or after an editing action. For example, the display of video content may fade from normal to blank prior to a skip editing action and, after the editing action, from blank back to normal. Similarly, muting actions may fade audio volume in and out to insure smooth transitions for editing actions. As used in this application, editing actions should be interpreted broadly to encompass all types of actions that may be useful in editing multimedia content, including incremental editing actions that are either separate from or combined with other editing actions.

6

Depending on the multimedia content, some filtering actions may produce more noticeable discontinuities, irregularities, or artifacts than others. To reduce a user's perception of potential artifacts, incremental filtering actions or filtering actions with an incremental component provide for gradual transitions before and/or during a filtering action. For example, the display of video content may fade from normal to blank prior to a skip filtering action and, after the filtering action, from blank back to normal. Similarly, muting actions may fade audio volume in and out to insure smooth transitions for filtering actions. As used in this application, filtering actions should be interpreted broadly to encompass all types of actions that may be useful in filtering multimedia content, including incremental filtering actions that are either separate from or combined with other filtering actions.

The present invention may be practiced in a variety of computerized systems, including servers, personal computers, television systems, and audio systems. A typical system for a personal computer includes a DVD drive with decoding hardware and/or software, navigator software with navigation objects for a particular DVD title, a computer display for video output, and speakers for audio output. For television systems with a conventional DVD player and television set, the navigator software and navigation objects may be stored in a remote control device that communicates with the DVD player and television set over a traditional infrared channel. Alternatively, the television system may include a DVD player that includes the navigator software and navigation object store.

Additional features and advantages of the invention will be set forth in the description which follows, and in part will be obvious from the description, or may be learned by the practice of the invention. The features and advantages of the invention may be realized and obtained by means of the instruments and combinations particularly pointed out in the appended claims. These and other features of the present invention will become more fully apparent from the following description and appended claims, or may be learned by the practice of the invention as set forth hereinafter.

BRIEF DESCRIPTION OF THE DRAWINGS

In order to describe the manner in which the above-recited and other advantages and features of the invention can be obtained, a more particular description of the invention briefly described above will be rendered by reference to specific embodiments thereof which are illustrated in the appended drawings. Understanding that these drawings depict only typical embodiments of the invention and are not therefore to be considered to be limiting of its scope, the invention will be described and explained with additional specificity and detail through the use of the accompanying drawings in which:

FIG. 1 illustrates an exemplary system that provides a suitable operating environment for the present invention;

FIG. 2 is high-level block diagram showing the basic components of a system embodying the present invention;

FIGS. 3A, 3B, and 3C, are block diagrams of three systems that provide greater detail for the basic components shown in FIG. 2;

FIGS. 4A, 5A, and 7, are flowcharts depicting exemplary methods for editing multimedia content according to the present invention;

FIGS. 4B and 5B illustrate navigation objects in relation to mocked-up position codes for multimedia content; and

FIG. 6 is a flowchart portraying a method used in customizing the editing of multimedia content.

US 7,577,970 B2

| 7 | 8 |

DETAILED DESCRIPTION OF EMBODIMENTS
OF THE INVENTION

The present invention extends to methods, systems, and computer program products for automatically identifying and filtering portions of multimedia content during the decoding process. The embodiments of the present invention may comprise a special purpose or general purpose computer including various computer hardware, a television system, an audio system, and/or combinations of the foregoing. These embodiments are discussed in greater detail below. However, in all cases, the described embodiments should be viewed as exemplary of the present invention rather than as limiting it's scope.

Embodiments within the scope of the present invention also include computer-readable media for carrying or having computer-executable instructions or data structures stored thereon. Such computer-readable media may be any available media that can be accessed by a general purpose or special purpose computer. By way of example, and not limitation, such computer-readable media can comprise RAM, ROM, EEPROM, CD-ROM or other optical disk storage, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to carry or store desired program code means in the form of computer-executable instructions or data structures and which can be accessed by a general purpose or special purpose computer. When information is transferred or provided over a network or another communications link or connection (either hardwired, wireless, or a combination of hardwired or wireless) to a computer, the computer properly views the connection as a computer-readable medium. Thus, any such connection is properly termed a computer-readable medium. Combinations of the above should also be included within the scope of computer-readable media. Computer-executable instructions comprise, for example, instructions and data which cause a general purpose computer, special purpose computer, or special purpose processing device to perform a certain function or group of functions.

FIG. 1 and the following discussion are intended to provide a brief, general description of a suitable computing environment in which the invention may be implemented. Although not required, the invention will be described in the general context of computer-executable instructions, such as program modules, being executed by computers in network environments. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. Computer-executable instructions, associated data structures, and program modules represent examples of the program code means for executing steps of the methods disclosed herein. The particular sequence of such executable instructions or associated data structures represent examples of corresponding acts for implementing the functions described in such steps. Furthermore, program code means being executed by a processing unit provides one example of a processor means.

Those skilled in the art will appreciate that the invention may be practiced in network computing environments with many types of computer system configurations, including personal computers, hand-held devices, multi-processor systems, microprocessor-based or programmable consumer electronics, network PCs, minicomputers, mainframe computers, and the like. The invention may also be practiced in distributed computing environments where tasks are performed by local and remote processing devices that are linked (either by hardwired links, wireless links, or by a combination of hardwired or wireless links) through a communications network. In a distributed computing environment, program modules may be located in both local and remote memory storage devices.

With reference to FIG. 1, an exemplary system for implementing the invention includes a general purpose computing device in the form of a conventional computer 120, including a processing unit 121, a system memory 122, and a system bus 123 that couples various system components including the system memory 122 to the processing unit 121. The system bus 123 may be any of several types of bus structures including a memory bus or memory controller, a peripheral bus, and a local bus using any of a variety of bus architectures. The system memory includes read only memory (ROM) 124 and random access memory (RAM) 125. A basic input/output system (BIOS) 126, containing the basic routines that help transfer information between elements within the computer 120, such as during start-up, may be stored in ROM 124.

The computer 120 may also include a magnetic hard disk drive 127 for reading from and writing to a magnetic hard disk 139, a magnetic disk drive 128 for reading from or writing to a removable magnetic disk 129, and an optical disk drive 130 for reading from or writing to removable optical disk 131 such as a CD-ROM or other optical media. The magnetic hard disk drive 127, magnetic disk drive 128, and optical disk drive 130 are connected to the system bus 123 by a hard disk drive interface 132, a magnetic disk drive-interface 133, and an optical drive interface 134, respectively. The drives and their associated computer-readable media provide nonvolatile storage of computer-executable instructions, data structures, program modules and other data for the computer 120. Although the exemplary environment described herein employs a magnetic hard disk 139, a removable magnetic disk 129 and a removable optical disk 131, other types of computer readable media for storing data can be used, including magnetic cassettes, flash memory cards, digital video disks, Bernoulli cartridges, RAMs, ROMs, and the like.

Program code means comprising one or more program modules may be stored on the hard disk 139, magnetic disk 129, optical disk 131, ROM 124 or RAM 125, including an operating system 135, one or more application programs 136, other program modules 137, and program data 138. A user may enter commands and information into the computer 120 through keyboard 140, pointing device 142, or other input devices (not shown), such as a microphone, joy stick, game pad, satellite dish, scanner, or the like. These and other input devices are often connected to the processing unit 121 through a serial port interface 146 coupled to system bus 123. Alternatively, the input devices may be connected by other interfaces, such as a parallel port, a game port or a universal serial bus (USB). A monitor 147 or another display device is also connected to system bus 123 via an interface, such as video adapter 148. In addition to the monitor, personal computers typically include other peripheral output devices (not shown), such as speakers and printers.

The computer 120 may operate in a networked environment using logical connections to one or more remote computers, such as remote computers 149a and 149b. Remote computers 49a and 49b may each be another personal computer, a server, a router, a network PC, a peer device or other common network node, and typically include many or all of the elements described above relative to the computer 120, although only memory storage devices 150a and 150b and their associated application programs 136a and 136b have been illustrated in FIG. 1. The logical connections depicted in FIG. 1 include a local area network (LAN) 151 and a wide area network (WAN) 152 that are presented here by way of

9 | 10

example and not limitation. Such networking environments are commonplace in office-wide or enterprise-wide computer networks, intranets and the Internet.

When used in a LAN networking environment, the computer **120** is connected to the local network **151** through a network interface or adapter **153**. When used in a WAN networking environment, the computer **120** may include a modem **154**, a wireless link, or other means for establishing communications over the wide area network **152**, such as the Internet. The modem **154**, which may be internal or external, is connected to the system bus **123** via the serial port interface **146**. In a networked environment, program modules depicted relative to the computer **120**, or portions thereof, may be stored in the remote memory storage device. It will be appreciated that the network connections shown are exemplary and other means of establishing communications over wide area network **152** may be used.

Turning next to FIG. 2, a high-level block diagram identifying the basic components of a system for filtering multimedia content are shown. The basic components include content source **230**, decoders **250**, navigator **210**, and output device **270**. Content source **230** provides multimedia to decoder **250** for decoding, navigator **210** controls decoder **250** so that filtered content does not reach output device **270**, and output device **270** plays the multimedia content it receives. As used in this application, the term "multimedia" should be interpreted broadly to include audio content, video content, or both.

The present invention does not require a particular content source **230**. Any data source that is capable of providing multimedia content, such as a DVD, a CD, a memory, a hard disk, a removable disk, a tape cartridge, and virtually all other types of magnetic or optical media may operate as content source **230**. Those of skill in the art will recognize that the above media includes read-only, read/write, and write-once varieties, whether stored in an analog or digital format. All necessary hardware and software for accessing these media types are also part of content source **230**. Content source **230** as described above provides an example of multimedia source means.

Multimedia source **230** generally provides encoded content. Encoding represents a difference in the formats that are typically used for storing or transmitting multimedia content and the formats used for intermediate processing of the multimedia content. Decoders **250** translate between the storage and intermediate formats. For example, stored MPEG content is both compressed and encrypted. Prior to being played at an output device, the stored MPEG content is decrypted and uncompressed by decoders **250**. Decoders **250** may comprise hardware, software, or some combination of hardware and software. Due to the large amount of data involved in playing multimedia content, decoders **250** frequently have some mechanism for transferring data directly to output device **270**. Decoders **250** are an exemplary embodiment of decoder means.

Output device **270** provides an example of output means for playing multimedia content and should be interpreted to include any device that is capable of playing multimedia content so that the content may be perceived. For a computer system, like the one described with reference to FIG. 1, output device **270** may include a video card, a video display, an audio card, and speakers. Alternatively, output device **270** may be a television or audio system. Television systems and audio systems cover a wide range of equipment. A simple audio system may comprise little more than an amplifier and speakers. Likewise, a simple television system may be a conventional television that includes one or more speakers and a television screen. More sophisticated television and audio systems may include audio and video receivers that perform sophisticated processing of audio and video content to improve sound and picture quality.

Output device **270** may comprise combinations of computer, television, and audio systems. For example, home theaters represent a combination audio and television systems. These systems typically include multiple content sources, such as components for videotape, audiotape, DVD, CD, cable and satellite connections, etc. Audio and/or television systems also may be combined with computer systems. Therefore, output device **270** should be construed as including the foregoing audio, television, and computer systems operating either individually, or in some combination. Furthermore, when used in this application, computer system (whether for a consumer or operating as a server), television system, and audio system may identify a system's capabilities rather than its primary or ordinary use. These capabilities are not necessarily exclusive of one another. For example, a television playing music through its speakers is properly considered an audio system because it is capable of operating as an audio system. That the television ordinarily operates as part of a television system does not preclude it from operating as an audio system. As a result, terms like consumer system, server system, television system, and audio system, should be given their broadest possible interpretation to include any system capable of operating in the identified capacity.

Navigator **210** is software and/or hardware that control the decoders **250** by determining if the content being decoded needs to be filtered. Navigator **210** is one example of multimedia navigation means. It should be emphasized that content source **230**, decoders **250**, output device **270**, and navigator **210** have been drawn separately only to aid in their description. Some embodiments may combine content source **230**, decoders **250**, and navigator **210** into a single set-top box for use with a television and/or audio system. Similarly, a computer system may combine portions of decoder **250** with output device **270** and portions of decoder **250** with content source **230**. Many other embodiments are possible, and therefore, the present invention imposes no requirement that these four components must exist separately from each other. As such, the corresponding multimedia source means, decoder means, output means, and multimedia navigation means also need not exist separately from each other and may be combined together as is appropriate for a given embodiment of the present invention. It is also possible for content source **230**, decoders **250**, output device **270**, and/or navigator **210** to be located remotely from each other and linked together with a communication link.

As noted previously, FIGS. 3A, 3B, and 3C, are block diagrams of three exemplary systems that provide greater detail for the basic components shown in FIG. 2. However, the present invention is not limited to any particular physical organization of the components shown in FIG. 2. Those of skill in the art will recognize that these basic components are subject to a wide-range of embodiments, including a single physical device or several physical devices. Therefore, FIG. 2 and all other figures should be viewed as exemplary of embodiments according to the present invention, rather than as restrictions on the present invention's scope.

Similar to FIG. 2, FIG. 3A includes navigator **310a**, content source **330a**, audio and video decoders **350a**, and output device **370a**, all located at consumer system **380a**. Content source **330a** includes DVD **332a** and DVD drive **334a**. The bidirectional arrow between content source **330a** and audio and video decoders **350a** indicates that content source **330** provides multimedia content to audio and video decoders

11

12

350a and that audio and video decoders 350a send commands to content source 330a when performing filtering operations.

Navigator 310a monitors decoders 350a by continuously updating the time code of the multimedia content being decoded. (Time codes are an example of positions used in identifying portions of multimedia content. In the case of time codes, positioning is based on an elapsed playing time from the start of the content. For other applications, positions may relate to physical quantities, such as the length of tape moving from one spool to another in a videotape or audiotape. The present invention does not necessarily require any particular type of positioning for identifying portions of multimedia content.) In one embodiment, the time code updates occur every 1/10th of a second, but the present invention does not require any particular update interval. (The description of FIGS. 4B and 5B provides some insight regarding factors that should be considered in selecting an appropriate update interval.)

Communication between Navigator 310a and audio and video decoders 350a occurs through a vendor independent interface 352a. The vendor independent interface 352a allows navigator 310a to use the same commands for a number of different content sources. Microsoft's® DirectX® is a set of application programming interfaces that provides a vendor independent interface for content sources 330a in computer systems running a variety of Microsoft operating systems. Audio and video decoders 350a receive commands through vendor independent interface 352a and issue the proper commands for the specific content source 330a.

Audio and video decoders 350a provide audio content and video content to output device 370a. Output device 370a includes graphics adapter 374a, video display 372a, audio adaptor 376a, and speakers 378a. Video display 372a may be any device capable of displaying video content, regardless of format, including a computer display device, a television screen, etc.

Usually, graphics adaptors and audio adaptors employ some decoding technology so that the amount of data moving between content source 330a and output device 370a is minimized. Graphics adaptors and audio adaptors also provide additional processing for translating multimedia content from the intermediate processing format to a format more suitable for display and audio playback. For example, many graphics adaptors offer video acceleration technology to enhance display speeds by offloading processing tasks from other system components. In the case of graphics and audio adaptors, the actual transition between decoders 350a and output device 370a may be a somewhat fuzzy. To the extent graphics adaptor 374a and audio adapter 376a perform decoding, portions of those adaptors may be properly construed as part of decoders 350a.

Navigator 310a includes navigation software 312a and object store 316a. Bi-directional arrow 314a indicates the flow of data between navigation software 312a and object store 316a. Object store 316a contains a plurality of navigation objects 320a. Within object store 316a, navigation objects may be stored as individual files that are specific to particular multimedia content, they may be stored in one or more common databases, or some other data management system may be used. The present invention does not impose any limitation on how navigation objects are stored in object store 316a.

Each navigation object 320a defines when (start 321a and stop 323a) an filtering action (325a) should occur for a particular system (329a) and provides a description (327a) of why the navigation object was created. Start and stop positions (321a and 323a) are stored as time codes, in hours:

minutes:seconds:frame format; actions may be either skip or mute (325a); the description is a text field (327a); and configuration is an identifier (329a) used to determine if navigation object 320a applies to a particular consumer system 380b. The values indicate that the start position 321a is 00:30:10:15; stop position 323a is 00:30:15:00; the filtering action 325a is skip; the description 327a is "scene of bloodshed" and the configuration 329a is 2.1. More detail regarding navigation objects, such as navigation object 320a, will be provided with reference to FIGS. 4B and 5B.

As navigator 310a monitors audio and video decoders 350a for the time code of the multimedia content currently being decoded, the time code is compared to the navigation objects in object store 316a. When the position code falls within the start and stop positions defined by a navigation object, navigator 310a activates the filtering action assigned to the navigation object. For navigation object 320a, a time code within the approximately four-second range of 00:30:10:15-00:30:15:00 result in navigator 310a issuing a command to audio and video decoders 350a to skip to the end of the range so that the multimedia content within the range is not decoded and is not given to output device 370a. The process of filtering multimedia content will be described in more detail with reference to FIGS. 4A, 5A, 6, and 7.

As in FIG. 3A, FIG. 3B includes a content source 330b, audio and video decoders 350b, and output device 370b. In FIG. 3B, however, object store 316b is located at server system 390b, and all other components are located at consumer system 380b. As shown by start 321b, stop 323b, action 325b, description 327b, and configuration 329b, the contents of navigation object 320b remain unchanged.

Content source 330b, including DVD drive 334b and DVD 332b, have been combined with audio and video decoders 350b, vendor independent interface 352b, and navigation software 312b into a single device. Communication between navigation software 312b and object store 316b occurs over communication link 314b. Communication link 314b is an example of communication means and should be interpreted to include any communication link for exchanging data between computerized systems. The particular communication protocols for implementing communication link 314b will vary from one embodiment to another. In FIG. 3B, at least a portion of communication link 314b may include the Internet.

Output device 370b includes a television 372b with video input 374b and an audio receiver 377b with an audio input 376b. Audio receiver 377b is connected to speakers 378b. As noted earlier, the sophistication and complexity of output device 370b depends on the implementation of a particular embodiment. As shown, output device 370b is relatively simple, but a variety of components, such as video and audio receivers, amplifiers, additional speakers, etc., may be added without departing from the present invention. Furthermore, it is not necessary that output device 370b include both video and audio components. If multimedia content includes only audio content, the video components are not needed. Likewise, if the multimedia content includes only video data, the audio components of output device 370b may be eliminated.

Moving next to FIG. 3C, navigator 310c, content source 330c, audio and video decoders 350c, and output device 370c are all present. Like FIG. 3B, FIG. 3C includes a server/remote system 390c and a consumer system 380c. For the embodiment shown in FIG. 3C, navigator 310C is located at server/remote system 390c and content source 330c, audio and video decoders 350c, and output device 370c are located at the consumer system 380c.

US 7,577,970 B2

13

Navigator 310c includes server navigation software 312c and object store 316c, with data being exchanged as bi-directional arrow 314c indicates. Start 321c, stop 323c, action 325c, description 327c, and configuration 329c, show that the contents of navigation object 320c remain unchanged from navigation objects 320b and 320a (FIGS. 3B and 3A). Content source 330c includes DVD drive 334c and DVD 332c, and output device 370c includes graphics adaptor 374c, video display 372c, audio adapter 376c, and speakers 378c. Because content source 330c and output device 370c are identical to the corresponding elements in FIG. 3A, their descriptions will not be repeated here.

In contrast to FIG. 3A, client navigator software 354c had been added to audio and video decoders 350c and vendor independent interface 352c. Client navigator software 354c supports communication between navigation software 312c and vendor independent interface 352c through communication link 356c. In some embodiments, no client navigator software 354c will be necessary whereas in other embodiments, some type of communication interface supporting communication link 356c may be necessary. For example, suppose consumer system 380c is a personal computer, server/remote system 390c is a server computer, and at least a portion of communication link 356c includes the Internet. Client navigator software 354c may be helpful in establishing communication link 356c and in passing information between consumer system 380c and server/remote system 390c.

Now, suppose content source 330c and audio and video decoders 350c are combined as in a conventional DVD player. Server/remote system 390c may be embodied in a remote control unit that controls the operation of the DVD player over an infrared or other communication channel. Neither client navigator software 354c nor vendor independent interface 352c may be needed for this case because server/remote system 390c is capable of direct communication with the DVD player and the DVD player assumes responsibility for controlling audio and video decoders 350c.

Several exemplary methods of operation for the present invention will be described with reference to the flowcharts illustrated in FIGS. 4A, 5A, 6, and 7, in connection with the mocked-up position codes and navigation objects presented in FIGS. 4B and 5B. FIG. 4A shows a sample method for filtering multimedia content according to the present invention. Although FIGS. 4A, 5A, 6, and 7 show the method as a sequence of events, the present invention is not necessarily limited to any particular ordering. Because the methods may be practiced in both consumer and server systems, parentheses have been used to identify information that is usually specific to a server.

Beginning with a consumer system, such as the one shown in FIG. 3A, an object store may be part of a larger data storage. For example, a separate object store may exist for multimedia content stored on individual DVD titles. Because many object stores have been created, at block 412 the multimedia content title is retrieved from the content source. Alternatively, a single object store may contain navigation objects corresponding to more than one DVD title. At block 414, with the title identifier, the object store and corresponding navigation objects that are specific to a particular DVD title are selected. (Receive fee, block 416, will be described later, with reference to a server system.) At block 422, the first navigation object for the DVD title identified at 412 is retrieved.

Turning briefly to FIG. 4B, a navigation object is shown in the context of multimedia content. Content positions 480 identify various positions, labeled $P4_1$, $P4_2$, $P4_3$, $P4_4$, $P4_5$,

14

$P4_6$, and $P4_7$, that are associated with the multimedia content. The navigation object portion 490 of the content begins at start 491 ($P4_2$) and ends at stop 493 ($P4_6$). Skip 495 is the filtering action assigned to the navigation object and scene of bloodshed 497 is a text description of the navigation object portion 490 of the multimedia content. Configuration 499 identifies the hardware and software configuration of a consumer system to which the navigation object applies. For example, configuration 499 may include the make, model, and software revisions for the consumer's computer, DVD drive, graphics card, sound card, and may further identify the DVD decoder and the consumer computer's motherboard.

The motivation behind configuration 499 is that different consumer systems may introduce variations in how navigation objects are processed. As those variations are identified, navigation objects may be customized for a particular consumer system without impacting other consumer systems. The configuration identifier may be generated according to any scheme for tracking versions of objects. In FIG. 4B, the configuration identifier includes a major and minor revision, separated by a period.

Returning now to FIG. 4A, a navigation object as described above has been retrieved at block 422. Decision block 424 determines whether the configuration identifier of the navigation object matches the configuration of the consumer system. Matching does not necessarily require exact equality between the configuration identifier and the consumer system. For example, if major and minor revisions are used, a match may only require equality of the major revision. Alternatively, the configuration identifier of a navigation object may match all consumer configurations. Configuration identifiers potentially may include expressions with wildcard characters for matching one or more characters, numeric operators for determining the matching conditions, and the like. If no match occurs, returning to block 422 retrieves the next navigation object.

Retrieving a content identifier (412), selecting navigation objects (414), retrieving a navigation object (422), and determining whether the configuration identifier matches the consumer system configuration (424) have been enclosed within a dashed line to indicate that they are all examples of acts that may occur within a step for providing an object store having navigation objects.

With a navigation object identified, the decoders begin decoding the multimedia content (432) received from the DVD. Once decoded, the content is transferred (434) to the output device where in can be played for a consumer. While decoding the multimedia content, the position code is updated continuously (436). The acts of decoding (432), transferring (434), and continuously updating the position code (436) have been enclosed in a dashed line to indicate that they are examples of acts that are included within a step for using a decoder to determine when multimedia content is within a navigation object (430).

A step for filtering multimedia content (440) includes the acts of comparing the updated position code to the navigation object identified in block 422 to determine if the updated position code lies within the navigation object and the act of activating an filtering action (444) when appropriate. If the updated position code is not within the navigation object, decoding continues at block 432. But if the updated position code is within the navigation object, the filtering action is activated (444). Following activation of the filtering action, the next navigation object is retrieved at block 422.

Using the navigation object illustrated in FIG. 4B, the method of FIG. 4A will be described in greater detail. The navigation object is retrieved in block 422 and passes the

EX0001-0023

15

configuration match test of block **424**. After the multimedia content is decoded at block **432** and transferred to the output device at block **434**, the position code is updated at block **436**. P4₁ corresponds to the updated position code. Because P4₁ is not within the start and stop positions (**491** and **493**), more multimedia content is decoded (**432**), transferred to the output device (**434**), and the position code is updated again (**436**).

The updated position code is now P4₂. P4₂ also marks the beginning of the navigation object portion **490** of the multimedia content defined by the start and stop positions (**491** and **493**) of the navigation object. The video filtering action, skip **495** is activated in block **444**. Activating the video filtering action sends a command to the decoder to discontinue decoding immediately and resume decoding at stop position **493**. The content shown between P4₂ and P4₆ is skipped. Following the skip, the next navigation object is retrieved at block **422** and the acts describe above are repeated.

Abruptly discontinuing and resuming the decoding may lead to noticeable artifacts that detract from the experience intended by the multimedia content. To diminish the potential for artifacts, filtering actions may be incrementally activated or separate incremental filtering action may be used. For example, a fade out (e.g., normal to blank display) filtering action may precede a skip filtering action and a fade in (e.g., blank to normal display) filtering action may follow a skip filtering action. Alternatively, the fading out and fading in may be included as part of the skip filtering acting itself, with the start and stop positions being adjusted accordingly. The length of fade out and fade in may be set explicitly or use an appropriately determined default value. Incremental filtering actions need not be limited to a specific amount of change, such as normal to blank display, but rather should be interpreted to include any given change, such as normal to one-half intensity, over some interval. Furthermore, incremental filtering actions may be used to adjust virtually any characteristic of multimedia content.

Where multimedia content includes visual information being presented to a viewer, it is possible that unsuitable material may be localized to only a certain physical area of the scene as it is presented. In these cases one or more navigation objects with reframe filtering actions may be appropriate. The entire scene need not be skipped because the viewing frame may be positioned to avoid showing the unsuitable material and the remaining content may be enlarged to provide a full-size display. By continually adjusting the framing and sizing of multimedia content during a scene, the unsuitable material is effectively cropped from view.

Each reframe navigation object is capable of performing a number of reframe/resize actions, including the ability to reframe and resize on a frame-by-frame basis. Therefore, the number of reframe navigation objects used in cropping a particular scene depends on a variety of factors, including how the scene changes with time. A single navigation object may be sufficient to filter a relatively static scene, whereas more dynamic scenes will likely require multiple navigation objects. For example, one navigation object may be adequate to reframe a scene showing an essentially static, full-body, view of a person with a severe leg wound to a scene that includes only the person's head and torso. However, for more dynamic scenes, such as a scene where the person with the severe leg wound is involved in a violent struggle or altercation with another person, multiple reframe navigation objects may be required for improved results.

Positions P4₁, P4₂, P4₃, P4₄, P4₅, P4₆, and P4₇ are separated by the update interval. Those of skill in the art will recognize that a shorter update interval will allow for more precise filtering. For example, if start **491** were shortly after

16

position P4₂, multimedia decoding and output would continue until position P4₃, showing nearly ¼ of the multimedia content that was to be filtered. With an update interval occurring ten times each second, only a minimal amount of multimedia content that should be filtered (e.g., less than ¹⁄₁₀th of a second) will be displayed at the output device. As has been implied by the description of configuration identifier **499**, it is reasonable to expect some variability in consumer systems and the invention should not be interpreted as requiring exact precision in filtering multimedia content. Variations on the order of a few seconds may be tolerated and accounted for by expanding the portion of content defined by a navigation object, although the variations will reduce the quality of filtering as perceived by a consumer because scenes may be terminated prior to being completely displayed.

The differences enclosed in parentheses for server operation are relatively minor and those of skill in the art will recognize that a consumer and server may cooperate, each performing a portion of the processing that is needed. FIG. **3B** provides an exemplary system where processing is shared between a server system and a consumer system. Nevertheless, the following will describe the processing as it would occur at a server system, similar to the one shown in FIG. **3C**, but with only the output device located at the consumer system.

At block **412**, the server receives the DVD title identifier so that the proper navigation objects can be selected in block **414**. The server receives a fee from the consumer system, in block **416**, for allowing the consumer system access to the navigation objects. The fee may be a subscription for a particular time period, a specific number of accesses, etc. The first navigation object for the DVD title identified at **412** is retrieved in block **422** and checked for a configuration match in block **424**. Because the configuration match is checked at the server, the consumer system supplies its configuration information or identifier. As described above, receiving a content identifier (**412**), selecting navigation objects (**414**), receiving a fee (**416**), retrieving a navigation object (**422**), and determining whether the configuration identifier matches the consumer system configuration (**424**) have been enclosed within a dashed line to indicate that they are all examples of acts that may occur within a step for the server system providing an object store having navigation objects.

Decoding the multimedia content (**432**) may occur at either the consumer system or the server system. However, sending decoded multimedia from a server system to a consumer system requires substantial communication bandwidth. At block **434**, the multimedia content is transferred to the output device. The server system then queries (**436**) the client system decoder to update the position code. Alternatively, if the decoding occurred at the server system, the position code may be updated (**436**) without making a request to the consumer system. The acts of decoding (**432**), transferring (**434**), and continuously updating or querying for the position code (**436**) have been enclosed in a dashed line to indicate that they are examples of acts that are included within a step for the server system using a decoder to determine when multimedia content is within a navigation object (**430**).

The server system performing a step for filtering multimedia content (**440**) includes the acts of (i) comparing the updated position code to the navigation object identified in block **422** to determine if the updated position code lies within the navigation object, and (ii) activating or sending an filtering action (**444**) at the proper time. Decoding continues at block **432** for updated position codes that are not within the navigation object. Otherwise, the filtering action is activated or sent (**444**) for updated position codes within the navigation

US 7,577,970 B2

17                                                    18

object. Activating occurs when the decoder is located at the consumer system, but if the decoder is located at the consumer system, the filtering action must be sent to the consumer system for processing. The next navigation object is retrieved at block 422 following activation of the filtering action, and processing continues as described above. The analysis of FIG. 4B will not be repeated for a server system because the server operation is substantially identical to the description provided above for a consumer system.

FIG. 5A illustrates a sample method for filtering audio content, possibly included with video content, according to the present invention. The steps for providing 510 and using 530, including the acts shown in processing blocks 512, 514, 516, 522, 524, 532, 534, and 536 are virtually identical to the corresponding steps and acts described with reference to FIGS. 4A. Therefore, the description of FIG. 5A begins with a step for filtering (540) multimedia content.

Decision block 542 determines if an updated or queried position code (536) is within the navigation object identified in blocks 522 and 524. If so, decision block 552 determines whether or not an filtering action is active. For portions of multimedia content within a navigation object where the filtering action is active or has been sent (in the case of server systems), decoding can continue at block 532. If the filtering action is not active or has not been sent, block 544 activates or sends the filtering action and then continues decoding at block 532.

If decision block 542 determines that the updated or queried position code (536) is not within the navigation object, decision block 556 determines whether or not an filtering action is active or has been sent. If no filtering action is active or has been sent, decoding continues at block 532. However, if an filtering action has been activated or sent and the updated position code is no longer within the navigation object, block 546 activates or sends and end action and continues by identifying the next navigation object in blocks 522 and 524.

In general, some filtering may be accomplished with one action, like the video action of FIG. 4B, while others require ongoing actions, like the audio action of FIG. 5B. The mocked-up position codes and audio navigation object shown in FIG. 5B help explain the differences between single action filtering of multimedia content and continuous or ongoing filtering of multimedia content. Content positions 580 identify various positions, labeled $P5_1$, $P5_2$, $P5_3$, $P5_4$, $P5_5$, $P5_6$, and $P5_7$, that are associated with the multimedia content. The navigation object portion 590 of the content begins at start 591 ($P5_2$) and ends at stop 593 ($P5_6$). Mute 595 is the filtering action assigned to the navigation object and "F" word 597 is a text description of the navigation object portion 590 of the multimedia content. Like configuration 499 of FIG. 4B, configuration 599 identifies the hardware and software configuration of a consumer system to which the navigation object applies.

After the multimedia content is decoded at block 532 and transferred to the output device at block 534, the position code is updated at block 536. $P5_1$ corresponds to the updated position code. Because $P5_1$ is not within (542) the start position 591 and stop position 593 and no filtering action is active or sent (556), more multimedia content is decoded (532), transferred to the output device (534), and the position code is updated again (536).

The updated position code is now $P5_2$. $P5_2$ also marks the beginning of the navigation object portion 590 of the multimedia content defined by the start and stop positions (591 and 593) of the navigation object, as determined in decision block 542. Because not action is active or sent, decision block 552 continues by activating or sending (544) the filtering action

assigned to the navigation object to mute audio content, and once again, content is decoded (532), transferred to the output device (534), and the position code is updated or queried (536).

Muting, in its most simple form, involves setting the volume level of the audio content to be inaudible. Therefore, a mute command may be sent to the output device without using the decoders. Alternatively, a mute command sent to the decoder may eliminate or suppress the audio content. Those of skill in the art will recognize that audio content may include one or more channels and that muting may apply to one or more of those channels.

Now, the updated or queried position code (536) is $P5_3$. Decision block 542 determines that the updated or queried position code (536) is within the navigation object, but an filtering action is active or has been sent (552), so block 532 decodes content, block 524 transfers content to the output device, and block 536 updates or queries the position code. The audio content continues to be decoded and the muting action continues to be activated.

At this point, the updated or queried position code (536) is $P5_4$. Now decision block 542 determines that the updated or queried position code (536) is no longer within the navigation object, but decision block 556 indicates that the muting action is active or has been sent. Block 546 activates or sends and end action to end the muting of the audio content and the decoding continues at block 532. For DVD content, the result would be that the video content is played at the output device, but the portion of the audio content containing an obscenity, as defined by the navigation object, is filtered out and not played at the output device.

Abruptly altering multimedia content may lead to noticeable artifacts that detract from the experience intended by the multimedia content. To diminish the potential for artifacts, filtering actions may be incrementally activated or separate incremental filtering action may be used. For example, a fade out (e.g., normal to no volume) filtering action may precede a mute filtering action and a fade in (e.g., no volume to normal) filtering action may follow a mute filtering action. Alternatively, the fading out and fading in may be included as part of the mute filtering acting itself, with the start and stop positions being adjusted accordingly. The length of fade out and fade in may be set explicitly or use an appropriately determined default value. Incremental filtering actions are not limited to any particular amount of change, such as normal to no volume, but rather should be interpreted to include any change, such as normal to one-half volume, over some interval. Furthermore, incremental filtering actions may adjust virtually any characteristic of multimedia content.

Like the method shown in FIG. 4A, the method shown in FIG. 5A may be practiced at both client systems and server system. However, the methods will not be described in a server system because the distinctions between a consumer system and a server system have been adequately identified in the description of FIGS. 4A and 4B.

FIG. 6 is a flowchart illustrating a method used in customizing the filtering of multimedia content. At block 610, a password is received to authorize disabling the navigation objects. A representation of the navigation objects is displayed on or sent to (for server systems) the consumer system in block 620. Next, as shown in block 630, a response is received that identifies any navigation objects to disable and, in block 640, the identified navigation objects are disabled.

Navigation objects may be disabled by including an indication within the navigation objects that they should not be part of the filtering process. The act of retrieving navigation objects, as shown in blocks 422 and 522 of FIGS. 4A and 5A,

EX0001-0025

US 7,577,970 B2

19

may ignore navigation objects that have been marked as disabled so they are not retrieved. Alternatively, a separate act could be performed to eliminate disabled navigation objects from being used in filtering multimedia content.

The acts of receiving a password (610), displaying or sending a representation of the navigation objects (620), receiving a response identifying navigation objects to disable (630), and disabling navigation objects (640), have been enclosed in a dashed line to indicate that they are examples of acts that are included within a step for deactivating navigation objects (660). As with the exemplary methods previously described, deactivating navigation objects may be practiced in either a consumer system or a server system.

FIG. 7 illustrates an exemplary method for assisting a consumer system in automatically identifying and filtering portions of multimedia content. A step for providing an object store (710) includes the acts of creating navigation objects (712), creating an object store (714), and placing the navigation objects in the object store 716. A step for providing navigation objects (720) follows. The step for providing navigation objects (720) includes the acts of receiving a content identifier (722), such as a title, and receiving a request for the corresponding navigation objects (726).

In the step for charging (730) for access to the navigation objects, block 732 identifies the act of determining if a user has an established account. For example, if a user is a current subscriber then no charge occurs. Alternatively, the charge could be taken from a prepaid account without prompting the user (not shown). If no established account exists, the user is prompted for the fee, such as entering a credit card number or some other form of electronic currency, at block 734 and the fee is received at block 736. A step for providing navigation objects (740) follows that includes the act of retrieving the navigation objects (742) and sending the navigation objects to the consumer system (744). The act of downloading free navigation software that makes use of the navigation objects also may be included an inducement for the fee-based service of accessing navigation objects.

The present invention may be embodied in other specific forms without departing from its spirit or essential characteristics. The described embodiments are to be considered in all respects only as illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

The invention claimed is:

1. In a computerized system for enabling a consumer to filter multimedia content that is comprised of video content, audio content, or both, and wherein a consumer computer system includes a processor, a memory, a decoder, and an output device for playing the multimedia content, a method for assisting the consumer to automatically identify portions of the multimedia content that are to be filtered and to thereafter automatically filter the identified portions, the method comprising:

loading a plurality of navigation objects into the memory of the consumer computer system, each of which defines a portion of the multimedia content that is to be filtered by defining a start position and a duration from the start position and a filtering action to be performed on the portion of the multimedia content defined by the start and the duration from the start position for that portion;

updating a position code in association with decoding the multimedia content on the consumer computer system;

comparing the position code with a particular navigation object to determine whether the position code corre-

20

sponding to the multimedia content falls within the start and duration from the start position defined by the particular navigation object;

when the position code is determined to fall within the start and duration from the start position defined by the particular navigation object, activating the filtering action assigned to the particular navigation object;

playing the multimedia content at the output device in accordance with the filtering action of the particular navigation object;

providing for displaying a representation of the plurality of navigation objects, the representation including a description of each of the plurality of navigation objects;

providing for receiving a response to the representation of the plurality of navigation objects, the response identifying the at least one of the plurality of navigation objects to be disabled; and

providing for disabling the at least one of the plurality of navigation objects such that the specific filtering action specified by the at least one of the plurality of navigation objects is ignored.

2. A method as recited in claim 1 wherein the filtering action is skipping the portion of the multimedia content defined by the particular navigation object.

3. A method as recited in claim 1 wherein the filtering action is reframing the portion of the multimedia content defined by the particular navigation object.

4. A method as recited in claim 3 wherein the duration from the start position comprises a stop position.

5. A method as recited in claim 2 wherein skipping comprises:

terminating the decoding of the multimedia content at the start position of the particular navigation object;

advancing to the duration from the start position of the particular navigation object; and

resuming the decoding of the multimedia content at the duration from the start position of the particular navigation object.

6. A method as recited in claim 1 wherein the multimedia content is comprised of one or more channels of audio content and the filtering action assigned to the particular navigation object is muting at least one channel of the audio content for the portion of the audio content defined by the particular navigation object.

7. A method as recited in claim 1 wherein the decoder includes a vendor independent interface and wherein interaction with the decoder occurs through the vendor independent interface.

8. A method as recited in claim 1 wherein the consumer computer system comprises one of (i) components of a personal computer, (ii) components of television system, and (iii) components of an audio system.

9. A method as recited in claim 1 further comprising:

an object store which can be loaded into a memory of the consumer computer system, the object store including the plurality of navigation objects.

10. A method as recited in claim 9 wherein a plurality of object stores are available, the method further comprising the acts of:

retrieving a title of the multimedia content from the decoder; and

selecting the object store from the plurality of object stores based on the title of the multimedia content retrieved from the decoder.

11. A method as recited in claim 1 wherein the consumer's computer system includes a source of the multimedia content

EX0001-0026

US 7,577,970 B2

**21**

comprising one of a DVD, a CD, a random access memory, a hard drive, a removable disk storage medium, and a tape storage medium.

**12.** A method as recited in claim **1** wherein the position codes are time codes.

**13.** A method as recited in claim **1** wherein the plurality of navigation objects are based at least in part on the age appropriateness of the portions of the multimedia content defined by the plurality of navigation objects, age appropriateness being determined according to either industry or community standards.

**14.** A method as recited in claim **8** wherein the object store at least initially is located at a remote system, and wherein the consumer's computer system and the remote system are interconnected through a communication link, the method further comprising the act of accessing the object store over the communication link.

**15.** A method as recited in claim **1** wherein the consumer computer system comprises a DVD player.

**16.** In a computerized system for enabling a consumer to filter multimedia content that is comprised of video content, audio content, or both, and wherein a consumer computer system includes a processor, a memory, a decoder, and an output device for playing the multimedia content, a method for assisting the consumer to identify portions of the multi-media content that are to be filtered and to thereafter filter the identified portions, the method comprising the acts of:

loading a plurality of navigation objects into the memory of the consumer computer system, each of which defines a portion of the multimedia content that is to be filtered by defining a start position and a stop position and a specific filtering action to be performed on the portion of the multimedia content defined by the start and stop positions for that portion;

updating a position code in association with decoding the multimedia content on the consumer computer system;

comparing the position code with a navigation object to determine whether the position code corresponding to the multimedia content falls within start and stop positions defined by one of the navigation objects;

when the position code is determined to fall within the start and stop position defined by a particular navigation object, activating the filtering action assigned to the particular navigation object in order to filter the multi-media content for that portion of the multimedia content defined by the particular navigation object;

transferring the multimedia content to an output device, whereby the multimedia content is played at the output device excluding each portion thereof which is filtered in accordance with the plurality of navigation objects;

assigning a configuration identifier to the decoder;

comparing the configuration identifier of the particular navigation object with the configuration identifier of the decoder to determine if the particular navigation object applies to the decoder; and

determining that the particular navigation object applies to the decoder based on the configuration identifier of the particular navigation object matching the configuration identifier of the decoder.

**17.** In a computerized system for enabling a consumer to filter multimedia content that is comprised of video content, audio content, or both, and wherein a consumer computer system includes a processor, a memory, a decoder, and an output device for playing the multimedia content, a computer program product for implementing a method of assisting the

**22**

consumer to identify portions of the multimedia content that are to be filtered and to thereafter filter the identified portions, comprising:

a computer readable medium for carrying machine-executable instructions for implementing the method; and

wherein said method is comprised of machine-executable instructions for performing the acts of:

loading a plurality of navigation objects into the memory of the consumer computer system, each of which defines a portion of the multimedia content that is to be filtered by defining a start position and a duration from the start position and a filtering action to be performed on the portion of the multimedia content defined by the start and the duration from the start position for that portion;

updating a position code in association with decoding the multimedia content on the consumer computer system;

comparing the position code with a particular navigation object to determine whether the position code corresponding to the multimedia content falls within the start and duration from the start position defined by the particular navigation object;

when the position code is determined to fall within the start and duration from the start position defined by a particular navigation object, activating the filtering action of the particular navigation object in order to filter the portion of the multimedia content defined by the particular navigation object;

playing the multimedia content at the output device in accordance with the filtering action of the particular navigation object;

providing for displaying a representation of the plurality of navigation objects, the representation including a description of each of the plurality of navigation objects;

providing for receiving a response to the representation of the plurality of navigation objects, the response identifying the at least one of the plurality of navigation objects to be disabled; and

providing for disabling the at least one of the plurality of navigation objects such that the specific filtering action specified by the at least one of the plurality of navigation objects is ignored.

**18.** A computer program product as recited in claim **17** wherein the position codes are time codes.

**19.** A computer program product as recited in claim **17** wherein the duration from the start position comprises a stop position.

**20.** A computer program product as recited in claim **19** wherein the filtering action is skipping the portion of the multimedia content defined by the particular navigation object, the method comprised further of machine-executable instructions for performing the acts of:

terminating the decoding of the multimedia content at the start position of the particular navigation object;

advancing to the stop position of the particular navigation object; and

resuming the decoding of the multimedia content at the stop position of the particular navigation object.

**21.** A computer program product as recited in claim **17** wherein the multimedia content is comprised of one or more channels of audio content and the filtering action assigned to the particular navigation object is muting, the method comprised further of machine-executable instructions for performing the act of muting at least one channel of the audio content for the portion of the audio content defined by the particular navigation object.

**22.** A computer program product as recited in claim **17** wherein the decoder includes a vendor independent software

US 7,577,970 B2

<table>
<tr><td>23</td><td>24</td></tr>
</table>

interface and wherein the method is comprised further of machine-executable instructions for performing the act of interacting with the decoder through the vendor independent software interface.

**23.** A computer program product as recited in claim **17** wherein the method is comprised further of machine-executable instructions for performing the act of:

retrieving the title of the multimedia content from the decoder; and

selecting the plurality of navigation objects based on the title of the multimedia content retrieved from the decoder.

**24.** A computer program product as recited in claim **17** further comprising:

an object store which can be loaded into a memory of the consumer computer system, the object store including the plurality of navigation objects.

**25.** A computer program product as recited in claim **24** wherein the object store at least initially is located at a remote system, and wherein the consumer computer system and the remote system are interconnected through a communication link, the method comprised further of machine-executable instructions for performing act of accessing the object store over the communication link.

**26.** A computer program product as recited in claim **17** wherein the consumer computer system comprises a DVD player.

**27.** In a computerized system for enabling a consumer to filter multimedia content that is comprised of video content, audio content, or both, and wherein a consumer computer system includes a processor, a memory, a decoder, and an output device for playing the multimedia content, a method for assisting the consumer to identify portions of the multimedia content that are to be filtered and to thereafter filter the identified portions, the method comprising:

accessing a plurality of navigation objects, each defining a start position and a stop position and a specific filtering action to be performed on a portion of the multimedia content;

providing for disabling of one or more of the navigation objects such that the specific filtering action specified by the disabled navigation object is ignored;

updating a position code in association with decoding the multimedia content on the consumer computer system;

comparing the position code with the navigation objects to determine whether the position code corresponding to the multimedia content falls within the start and stop position defined by one of the navigation objects;

activating the filtering action assigned to the corresponding navigation object in order to filter the portion of the multimedia content defined by the corresponding navigation object; and

playing the multimedia content at the output device excluding the portion thereof which is filtered in accordance with the corresponding navigation object and ignoring the filtering action specified by any disabled navigation objects.

**28.** A method as recited in claim **27** wherein the filtering action is skipping the portion of the multimedia content defined by the particular navigation object.

**29.** A method as recited in claim **28** wherein the filtering action is reframing the portion of the multimedia content defined by the particular navigation project.

**30.** A method as recited in claim **27** wherein the stop position defines a duration from the start position.

**31.** A method as recited in claim **27** wherein the start position defines a location in the multimedia content where playback stops.

**32.** A method as recited in claim **27** wherein the stop position defines a jump to a position in the multimedia content where playback resumes.

**33.** A method as recited in claim **28** wherein skipping further comprises:

terminating the decoding of the multimedia content at the start position of the particular navigation object;

advancing to the stop position of the particular navigation object; and

resuming the decoding of the multimedia content at the stop position of the particular navigation object.

**34.** A method as recited in claim **27** wherein the multimedia content is comprised of one or more channels of audio content and the filtering action assigned to the particular navigation object is muting at least one channel of the audio content for the portion of the audio content defined by the particular navigation object.

**35.** A method as recited in claim **27** wherein the decoder includes a vendor independent interface and wherein interaction with the decoder occurs through the vendor independent interface.

**36.** A method as recited in claim **27** wherein the consumer computer system comprises one of (i) components of a personal computer, (ii) components of television system, and (iii) components of an audio system.

**37.** A method as recited in claim **27** further comprising:

an object store which can be loaded into a memory of the consumer computer system, the object store including the plurality of navigation objects.

**38.** A method as recited in claim **27** wherein a plurality of object stores are available, the method further comprising the acts of:

retrieving a title of the multimedia content from the decoder; and

selecting the object store from the plurality of object stores based on the title of the multimedia content retrieved from the decoder.

**39.** A method as recited in claim **27** wherein the consumer's computer system includes a source of the multimedia content comprising one of a DVD, a CD, a random access memory, a hard drive, a removable disk storage medium, and a tape storage medium.

**40.** A method as recited in claim **27** wherein the position codes are time codes.

**41.** A method as recited in claim **27** wherein the plurality of navigation objects are based at least in part on the age appropriateness of the portions of the multimedia content defined by the plurality of navigation objects, age appropriateness being determined according to either industry or community standards.

**42.** A method as recited in claim **37** wherein the object store at least initially is located at a remote system, and wherein the consumer's computer system and the remote system are interconnected through a communication link, the method further comprising the act of accessing the object store over the communication link.

**43.** A method as recited in claim **27** wherein the consumer computer system comprises a DVD player.

\* \* \* \* \*



US007577970C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (11874th)

## United States Patent
### Jarman

(10) **Number:** US 7,577,970 C1
(45) **Certificate Issued:** *Jul. 7, 2021

(54) **MULTIMEDIA CONTENT NAVIGATION AND PLAYBACK**

(75) Inventor: **Matthew T. Jarman**, Salt Lake City, UT (US)

(73) Assignee: **CLEARPLAY, INC.**, Salt Lake City, UT (US)

**Reexamination Request:**
No. 90/014,605, Nov. 9, 2020

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | 7,577,970 |
| Issued: | **Aug. 18, 2009** |
| Appl. No.: | 11/074,908 |
| Filed: | **Mar. 7, 2005** |

( * ) Notice: This patent is subject to a terminal disclaimer.

**Related U.S. Application Data**

(63) Continuation of application No. 09/694,873, filed on Oct. 23, 2000, now Pat. No. 6,898,799.

(51) Int. Cl.

| | |
|---|---|
| *H04N 7/16* | (2011.01) |
| *H04N 7/00* | (2011.01) |
| *H04N 7/173* | (2011.01) |
| *H04N 9/00* | (2006.01) |
| *H04N 11/00* | (2006.01) |
| *H04N 21/439* | (2011.01) |
| *H04N 5/85* | (2006.01) |
| *H04N 21/426* | (2011.01) |
| *H04N 21/432* | (2011.01) |
| *H04N 21/433* | (2011.01) |
| *H04N 21/4402* | (2011.01) |
| *H04N 21/45* | (2011.01) |
| *H04N 21/454* | (2011.01) |
| *H04N 21/4545* | (2011.01) |
| *H04N 21/84* | (2011.01) |
| *H04N 21/845* | (2011.01) |

(52) **U.S. Cl.**
CPC .......... *H04N 21/4396* (2013.01); *H04N 5/85* (2013.01); *H04N 7/16* (2013.01); *H04N 7/163* (2013.01); *H04N 21/42646* (2013.01); *H04N 21/433* (2013.01); *H04N 21/4325* (2013.01); *H04N 21/4402* (2013.01); *H04N 21/440281* (2013.01); *H04N 21/4532* (2013.01); *H04N 21/4542* (2013.01); *H04N 21/45455* (2013.01); *H04N 21/84* (2013.01); *H04N 21/8456* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/014,605, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Adam L Basehoar

(57) **ABSTRACT**

In accordance with the present invention, a filtering process is based on the output side of a multimedia decoder. A navigator monitors the current play position of the multimedia content and compares that position with navigation objects. Each navigation object defines a start position, a stop position, and an filtering action to perform on the portion of the multimedia content that begins at the start position and ends at the stop position. When the current play position falls within the portion of multimedia content defined by a particular navigation object, the navigator activates the filtering action that was assigned to the navigation object. Filtering actions include skipping, muting, reframing, etc., the portion of multimedia content defined by a navigation object. A variety of systems may be used to implement the present invention, such as computer systems (consumer and server), television systems, and audio systems.



US 7,577,970 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **16, 17, 24, 27, 28, 31-33** and
**37** is confirmed.

Claims **1-15, 18-23, 25, 26, 29, 30, 34-36** and **38-43** were
not reexamined.

\* \* \* \* \*

**2**

EX0001-0030



US007577970C2

## (12) EX PARTE REEXAMINATION CERTIFICATE (12210th)

# United States Patent
### Jarman

(10) **Number:**  US 7,577,970 C2

(45) **Certificate Issued:**  *Jan. 19, 2023

(54) **MULTIMEDIA CONTENT NAVIGATION AND PLAYBACK**

(75) Inventor: **Matthew T. Jarman**, Salt Lake City, UT (US)

(73) Assignee: **CLEARPLAY, INC.**, Salt Lake City, UT (US)

**Reexamination Request:**
No. 90/019,028, Nov. 5, 2021

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **7,577,970** |
| Issued: | **Aug. 18, 2009** |
| Appl. No.: | **11/074,908** |
| Filed: | **Mar. 7, 2005** |

Reexamination Certificate C1 7,577,970 issued Jul. 7, 2021

( * ) Notice: This patent is subject to a terminal disclaimer.

### Related U.S. Application Data

(63) Continuation of application No. 09/694,873, filed on Oct. 23, 2000, now Pat. No. 6,898,799.

(51) **Int. Cl.**

| | |
|---|---|
| *H04N 21/439* | (2011.01) |
| *H04N 5/85* | (2006.01) |
| *H04N 7/16* | (2011.01) |
| *H04N 21/426* | (2011.01) |
| *H04N 21/432* | (2011.01) |
| *H04N 21/433* | (2011.01) |
| *H04N 21/4402* | (2011.01) |
| *H04N 21/45* | (2011.01) |
| *H04N 21/454* | (2011.01) |
| *H04N 21/4545* | (2011.01) |
| *H04N 21/84* | (2011.01) |
| *H04N 21/845* | (2011.01) |

(52) **U.S. Cl.**
CPC ......... *H04N 21/4396* (2013.01); *H04N 5/85* (2013.01); *H04N 7/16* (2013.01); *H04N 7/163* (2013.01); *H04N 21/42646* (2013.01); *H04N 21/433* (2013.01); *H04N 21/4325* (2013.01); *H04N 21/4402* (2013.01); *H04N 21/440281* (2013.01); *H04N 21/4532* (2013.01); *H04N 21/4542* (2013.01); *H04N 21/45455* (2013.01); *H04N 21/84* (2013.01); *H04N 21/8456* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/019,028, please refer to the USPTO's Patent Electronic System.

*Primary Examiner* — Cameron Saadat

(57) **ABSTRACT**

In accordance with the present invention, a filtering process is based on the output side of a multimedia decoder. A navigator monitors the current play position of the multimedia content and compares that position with navigation objects. Each navigation object defines a start position, a stop position, and an filtering action to perform on the portion of the multimedia content that begins at the start position and ends at the stop position. When the current play position falls within the portion of multimedia content defined by a particular navigation object, the navigator activates the filtering action that was assigned to the navigation object. Filtering actions include skipping, muting, reframing, etc., the portion of multimedia content defined by a navigation object. A variety of systems may be used to implement the present invention, such as computer systems (consumer and server), television systems, and audio systems.



EX0001-0031

US 7,577,970 C2

1

# EX PARTE
# REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **16, 17, 24, 27, 28, 31-33** and **37** is confirmed.

Claims **1-15**, **18-23**, **25**, **26**, **29**, **30**, **34-36** and **38-43** were not reexamined.

\* \* \* \* \*

2

EX0001-0032

(12) **INTER PARTES REVIEW CERTIFICATE** (82nd)

**United States Patent**
Jarman

(10) **Number:**     **US 7,577,970 K1**
(45) **Certificate Issued:**    **May 18, 2015**

(54) **MULTIMEDIA CONTENT NAVIGATION AND PLAYBACK**

(75) Inventor: **Matthew T. Jarman**

(73) Assignees: **Peter B. Schulze; Alejandro Magana**

**Trial Number:**

    IPR2013-00484 filed Aug. 1, 2013

**Petitioner:**     CUSTOMPLAY, LLC

**Patent Owner:** CLEARPLAY, INC.

**Inter Partes Review Certificate for:**

    Patent No.:   **7,577,970**
    Issued:      **Aug. 18, 2009**
    Appl. No.:    **11/074,908**
    PCT Filed:   **Mar. 7, 2005**

The results of IPR2013-00484 are reflected in this inter partes review certificate under 35 U.S.C. 318(b).

EX0001-0033

**INTER PARTES REVIEW CERTIFICATE**
**U.S. Patent 7,577,970 K1**
**Trial No. IPR2013-00484**
**Certificate Issued May 18, 2015**

1

2

AS A RESULT OF THE INTER PARTES REVIEW
PROCEEDING, IT HAS BEEN DETERMINED
THAT:

Claims **16**, **27**, **28**, **30-34** and **40** are found patentable.

\* \* \* \* \*

EX0001-0034



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

January 13, 2023

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *6,898,799*
ISSUE DATE: *May 24, 2005*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

*M. Tarver*
Miguel Tarver
Certifying Officer

EXHIBIT
4



US006898799B1

(12) **United States Patent** 　　　　　(10) **Patent No.:** 　**US 6,898,799 B1**
Jarman 　　　　　　　　　　　　　　　　　(45) **Date of Patent:** 　　　　**May 24, 2005**

(54) **MULTIMEDIA CONTENT NAVIGATION AND PLAYBACK**

(75) Inventor: **Matthew Jarman**, Salt Lake City, UT (US)

(73) Assignee: **Clearplay, Inc.**, Salt Lake City, UT (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 895 days.

(21) Appl. No.: **09/694,873**

(22) Filed: **Oct. 23, 2000**

(51) Int. Cl.7 ................................................. **H04N 7/16**

(52) U.S. Cl. ............................... **725/25**; 386/1; 386/46; 725/141; 725/142; 725/133; 725/134; 725/153

(58) Field of Search ............................. 725/46, 47, 50, 725/52, 53, 58, 30, 28, 131–134, 139–142, 151–153, 25; 386/46, 52, 125, 1, 4, 6–8, 55, 64, 65, 68–70; 345/721–723; 358/908

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,581,029 A | 5/1971 | Noiles |
| 4,012,583 A | 3/1977 | Kramer |
| 4,081,754 A | 3/1978 | Jackson |
| 4,085,422 A | 4/1978 | Niwata et al. |
| 4,229,765 A | 10/1980 | Sanger |
| 4,246,495 A | 1/1981 | Pressman |
| 4,305,131 A | 12/1981 | Best |
| 4,348,696 A | 9/1982 | Beier |
| 4,386,436 A | 5/1983 | Kocher et al. |
| 4,449,198 A | 5/1984 | Kroon et al. |
| 4,475,132 A | 10/1984 | Rodesch |
| 4,506,387 A | 3/1985 | Walter |
| 4,520,404 A | 5/1985 | Von Kohorn |
| 4,538,188 A | 8/1985 | Barker et al. |
| 4,554,584 A | 11/1985 | Elam et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0240794 | 10/1987 |
| EP | 0259666 | 3/1988 |
| EP | 0443676 | 8/1991 |
| GB | 2041586 | 9/1980 |
| GB | 2179771 | 3/1987 |

OTHER PUBLICATIONS

Author Unknown, "Impression Delivery Aquires Prime Cut Entertainment, Broadening its Media Base Into the Video Cassette Distribution Business", PR Newswire Association, Inc., Dec. 1, 1992.

Author Unknown, "Closed Captioning Fundamentals", Link Electronics, Inc. http://www.linkelectronics.com/htm/techcc.htm, 7 pages, date unknown.

(Continued)

*Primary Examiner*—Ngoc Vu

(74) *Attorney, Agent, or Firm*—Dorsey & Whitney LLP

(57) 　　　　　　　**ABSTRACT**

In accordance with the present invention, a filtering process is based on the output side of a multimedia decoder. A navigator monitors the current play position of the multimedia content and compares that position with navigation objects. Each navigation object defines a start position, a stop position, and an filtering action to perform on the portion of the multimedia content that begins at the start position and ends at the stop position. When the current play position falls within the portion of multimedia content defined by a particular navigation object, the navigator activates the filtering action that was assigned to the navigation object. Filtering actions include skipping, muting, reframing, etc., the portion of multimedia content defined by a navigation object. A variety of systems may be used to implement the present invention, such as computer systems (consumer and server), television systems, and audio systems.

**28 Claims, 11 Drawing Sheets**



EX0004-0002

**US 6,898,799 B1**

Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,566,033 A | 1/1986 | Reidenouer |
| 4,569,026 A | 2/1986 | Best |
| 4,570,192 A | 2/1986 | Hori |
| 4,605,964 A | 8/1986 | Chard |
| 4,644,515 A | 2/1987 | Allebest et al. |
| 4,685,003 A | 8/1987 | Westland |
| 4,685,131 A | 8/1987 | Horne |
| 4,689,619 A | 8/1987 | O'Brien, Jr. |
| 4,701,896 A | 10/1987 | Allebest et al. |
| 4,729,044 A | 3/1988 | Kiesel |
| 4,744,070 A | 5/1988 | Takemura et al. |
| 4,750,213 A | 6/1988 | Novak |
| 4,754,342 A | 6/1988 | Duffy |
| 4,766,541 A | 8/1988 | Bleich et al. |
| 4,775,935 A | 10/1988 | Yourick |
| 4,782,402 A | 11/1988 | Kanamaru |
| 4,789,894 A | 12/1988 | Cooper |
| 4,871,903 A | 10/1989 | Carrell |
| 4,872,151 A | 10/1989 | Smith |
| 4,873,585 A | 10/1989 | Blanton et al. |
| 4,888,796 A | 12/1989 | Olivo, Jr. |
| 4,891,694 A | 1/1990 | Way |
| 4,930,158 A | 5/1990 | Vogel |
| 4,930,160 A | 5/1990 | Vogel |
| 4,947,244 A | 8/1990 | Fenwick et al. |
| 4,949,187 A | * 8/1990 | Cohen |
| 4,956,825 A | 9/1990 | Wilts et al. |
| 4,964,004 A | 10/1990 | Barker |
| 4,972,396 A | 11/1990 | Rafner |
| 4,979,050 A | 12/1990 | Westland et al. |
| 4,995,078 A | 2/1991 | Monslow et al. |
| 5,046,157 A | 9/1991 | Smith et al. |
| 5,051,837 A | 9/1991 | McJunkin |
| 5,057,932 A | 10/1991 | Lang |
| 5,060,068 A | 10/1991 | Lindstrom |
| 5,097,249 A | 3/1992 | Yamamoto |
| 5,101,364 A | 3/1992 | Davenport et al. |
| 5,107,343 A | 4/1992 | Kawai |
| 5,109,482 A | 4/1992 | Bohrman |
| 5,122,886 A | 6/1992 | Tanaka |
| 5,130,792 A | 7/1992 | Tindell et al. |
| 5,132,953 A | 7/1992 | Matsubayashi |
| 5,172,111 A | 12/1992 | Olivo, Jr. |
| 5,175,631 A | 12/1992 | Juri et al. |
| 5,195,135 A | 3/1993 | Palmer |
| 5,199,077 A | 3/1993 | Wilcox et al. |
| 5,206,929 A | 4/1993 | Langford et al. |
| 5,210,611 A | 5/1993 | Yee et al. |
| 5,218,672 A | 6/1993 | Morgan et al. |
| 5,223,924 A | 6/1993 | Strubbe |
| 5,231,310 A | 7/1993 | Oh |
| 5,253,066 A | 10/1993 | Vogel |
| 5,253,275 A | 10/1993 | Yurt et al. |
| 5,267,351 A | 11/1993 | Reber et al. |
| 5,274,463 A | 12/1993 | Matsumoto et al. |
| 5,280,462 A | 1/1994 | Yokogawa |
| 5,296,931 A | 3/1994 | Na |
| 5,313,297 A | 5/1994 | Fukui et al. |
| 5,331,353 A | 7/1994 | Levenson et al. |
| 5,333,091 A | * 7/1994 | Iggulden et al. ............... 386/55 |
| 5,335,079 A | 8/1994 | Yuen et al. |
| 5,353,121 A | 10/1994 | Young et al. |
| 5,367,510 A | 11/1994 | Ando |
| 5,371,795 A | 12/1994 | Vogel |
| 5,387,942 A | 2/1995 | Lemelson ............ 348/474 |
| 5,434,678 A | 7/1995 | Abecassis ............ 358/342 |
| 5,477,277 A | 12/1995 | Shimoyanagida et al. |
| 5,477,527 A | 12/1995 | Tsuchiya et al. |
| 5,479,303 A | 12/1995 | Suzuki et al. |
| 5,481,296 A | 1/1996 | Cragun et al. |

| | | |
|---|---|---|
| 5,521,900 A | 5/1996 | Ando et al. |
| 5,532,732 A | 7/1996 | Yuen et al. |
| 5,535,186 A | 7/1996 | Ishizawa |
| 5,543,851 A | 8/1996 | Chang |
| 5,546,365 A | 8/1996 | Roth |
| 5,561,457 A | 10/1996 | Cragun et al. |
| 5,572,260 A | 11/1996 | Onishi et al. |
| 5,574,567 A | 11/1996 | Cookson et al. |
| 5,583,576 A | 12/1996 | Perlman et al. |
| 5,589,945 A | 12/1996 | Abecassis |
| 5,598,276 A | 1/1997 | Cookson et al. |
| 5,634,849 A | 6/1997 | Abecassis |
| 5,659,366 A | 8/1997 | Kerman |
| 5,673,089 A | 9/1997 | Yuen et al. |
| 5,684,918 A | 11/1997 | Abecassis ............ 386/83 |
| 5,699,472 A | * 12/1997 | Ueda ............ 386/46 |
| 5,703,655 A | 12/1997 | Corey et al. |
| 5,724,091 A | 3/1998 | Freeman et al. |
| 5,724,472 A | 3/1998 | Abecassis |
| 5,751,335 A | 5/1998 | Shintani |
| 5,809,471 A | 9/1998 | Brodsky |
| 5,828,402 A | 10/1998 | Collings |
| 5,835,722 A | 11/1998 | Bradshaw et al. |
| 5,872,588 A | 2/1999 | Aras et al. |
| 5,886,746 A | 3/1999 | Yuen et al. |
| 5,913,013 A | 6/1999 | Abecassis |
| 5,953,485 A | 9/1999 | Abecassis ............ 386/68 |
| 6,002,443 A | * 12/1999 | Iggulden ............ 348/553 |
| 6,011,895 A | 1/2000 | Abecassis ............ 386/69 |
| 6,038,367 A | 3/2000 | Abecassis ............ 386/46 |
| 6,067,401 A | 5/2000 | Abecassis |
| 6,072,520 A | 6/2000 | Yuen et al. |
| 6,072,934 A | 6/2000 | Abecassis |
| 6,075,550 A | 6/2000 | Lapierre ............ 348/5.5 |
| 6,091,886 A | 7/2000 | Abecassis ............ 386/125 |
| 6,100,916 A | * 8/2000 | August et al. ............ 725/28 |
| 6,115,057 A | 9/2000 | Kwoh et al. ............ 348/5.5 |
| 6,151,444 A | 11/2000 | Abecassis |
| 6,154,207 A | 11/2000 | Farris et al. |
| 6,166,780 A | 12/2000 | Bray |
| 6,181,364 B1 | 1/2001 | Ford ............ 348/5.5 |
| 6,208,805 B1 | 3/2001 | Abecassis |
| 6,262,775 B1 | 7/2001 | Kim |
| 6,351,596 B1 | * 2/2002 | Ostrover ............ 386/46 |
| 6,477,705 B1 | 11/2002 | Yuen et al. |
| 6,756,997 B1 | 6/2004 | Ward, III et al. |
| 6,771,885 B1 | 8/2004 | Agnihotri et al. |
| 2004/0128681 A1 | 7/2004 | Hancock et al. |

## OTHER PUBLICATIONS

Author Unknown, "News Releases", http://www.tvguardian.com/html/movies.html, 1 page, 1999.

Author Unknown, "Principle Solutions, Inc.", http://www.tvguardian.com/html/about_us.htm, 1 page, 1999.

Author Unknown, "Purchase TVGuardian", http://www.tvguardian.com/html/sales.html, 1999.

Author Unknown, "QuickTime Video–Editing Software—Adobe Premiere 2.0", MacWorld, Jan. 1993.

Author Unknown, "Season Pass", Tivo, http://www.tivo.com/1.2.1.asp, 1 page, date unknown.

Author Unknown, "TheFreeDictionary.com—Closed Caption", http://encyclopedia.thefreedictionary.com/Closed%20caption, 3 pages, date unknown.

Author Unknown, "TVGuardian Home—The Foul Language Filter", http://www.tvguardian.com/, 1 page, 1999.

Author Unknown, "TVGuardian In the News", http://www.tvguardian.com/html/in_the_news.html, 1 page, 1999.

Bray, Rick, "Inventor's Comments", http://www.tvguardian.com/html/information.html, 1997.
Bruno, Richard, "Making compact disks interactive", IEEE Spectrum, pp. 40–45, Nov. 1987.
Coleman, Murray, "Dad of Teens Invents TV Filter for Foul Language", http://store.dove.org/hardware/TVGuardian/ArDemGaz.htm, Little Rock Newspapers, Inc., 1 page, 1997.
Cudlitz, Stuart, "Star Quality", MacWorld, pp. 117–123, Jun. 1989.
Davidow, Bernard T., "Black box filters dirty words from TV shows", The Hartford Courant, 1 page, date unknown.

Aguirre–Smith et al., "Parsing Movies in Context", MIT Media Lab, pp. 157–167, Summer 1991.

Mackay et al., "Virtual Video Editing in Interactive Multimedia Applications", Communications of the ACM, pp. 802–810, Jul. 1989.

Sasnett, "Reconfigurable Video", Massachusetts Institute of Technology, Feb. 1986.

* cited by examiner

EX0004-0004



FIG. 1



FIG. 2

EX0004-0006



| START (HH:MM:SS:FF) 321a | STOP (HH:MM:SS:FF) 323a | ACTION 325a | DESCRIPTION (TEXT) 327a | CONFIGURATION (IDENTIFIER) 329a |
|---|---|---|---|---|
| 00:30:10:15 | 00:30:15:00 | SKIP (SKIP OR MUTE) | SCENE OF BLOODSHED | 2.1 |

FIG. 3A



FIG. 3B

EX0004-0008



FIG. 3C



FIG. 4A



FIG. 4B

EX0004-0011



FIG. 5A



FIG. 5B

EX0004-0013



FIG. 6



FIG. 7

EX0004-0015

US 6,898,799 B1

1

# MULTIMEDIA CONTENT NAVIGATION AND PLAYBACK

## BACKGROUND OF THE INVENTION

### 1. The Field of the Invention

The present invention relates to filtering multimedia content. More specifically, the present invention relates to methods, systems, and computer program products for automatically identifying and filtering portions of multimedia content during the decoding process.

### 2. The Prior State of the Art

Often, movies and other multimedia content contain scenes or language that are unsuitable for viewers of some ages. To help consumers determine whether a particular movie is appropriate for an audience of a given age, the Motion Picture Association of America ("MPAA") has developed the now familiar NC-17/R/PG-13/PG/G rating system. Other organizations have developed similar rating systems for other types of multimedia content, such as television programming, computer software, video games, and music.

Both the quantity and context of potentially objectionable material are significant factors in assigning multimedia content a rating. However, a relatively small amount of mature-focused subject matter may be sufficient to remove multimedia content from a rating category recommended for younger children. For example, in a motion picture setting, a single scene of particularly explicit violence, sexuality, or language may require an "R" rating for what would otherwise be a "PG" or "PG-13" movie. As a result, even if an "R" rated motion picture has a general public appeal, individuals trying to avoid "R" rated content, and teenagers restricted by the "R" rating, may choose not to view a motion picture that they would otherwise desire to view if it were not for the inclusion of the explicit scene.

Many consumers may prefer an alternate version of the multimedia content, such as a version that has been modified to make the content more suitable for all ages. To provide modified versions of multimedia works, the prior art has focused on manipulating the multimedia source. The details of how multimedia content is modified depends largely on the type of access the source media supports. For linear access media, such as videotape or audiotape, undesired content is edited from the tape and the remaining ends are spliced back together. The process is repeated for each portion of undesired content the multimedia source contains. Due to the need for specialized tools and expertise, it is impractical for individual consumers to perform this type of editing. While third parties could perform this editing to modify content on a consumer's behalf, the process is highly inefficient because it requires physically handling and repeating the editing for each individual tape.

Modifying direct access media, such as DVD, also has focused on modifying the multimedia source. Unlike linear media, direct access media allows for accessing any arbitrary portion of the multimedia content in roughly the same amount of time as any other arbitrary portion of the multimedia content. Direct access media allows for the creation and distribution of multiple versions of multimedia content, including versions that may be suitable to most ages, and storing the versions on a single medium. The decoding process creates various continuous multimedia streams by identifying, selecting, retrieving and transmitting content segments from a number of available segments stored on the content source.

2

To help in explaining the prior art for creating multiple versions of a multimedia work on a single source, a high-level description of the basic components found in a system for presenting multimedia content may be useful. Typically, such systems include a multimedia source, a decoder, and an output device. The decoder is a translator between the format used to store or transmit the multimedia content and the format used for intermediate processing and ultimately presenting the multimedia content at the output device. For example, multimedia content may be encrypted to prevent piracy and compressed to conserve storage space or bandwidth. Prior to presentation, the multimedia content must be decrypted and/or uncompressed, operations usually performed by the decoder.

The prior art teaches creation and distribution of multiple versions of a direct access multimedia work on a single storage medium by breaking the multimedia content into various segments and including alternate interchangeable segments where appropriate. Each individually accessible segment is rated and labeled based on the content it contains, considering such factors as subject matter, context, and explicitness. One or more indexes of the segments are created for presenting each of the multiple versions of the multimedia content. For example, one index may reference segments that would be considered a "PG" version of the multimedia whereas another index may reference segments that would be considered an "R" version of the content. Alternatively, the segments themselves or a single index may include a rating that is compared to a rating selected by a user.

There are a variety of benefits to the prior art's indexing of interchangeable segments to provide for multiple versions of a multimedia work on a single storage medium. Use of storage space can be optimized because segments common to the multiple versions need only be stored once. Consumers may be given the option of setting their own level of tolerance for specific subject matter and the different multimedia versions may contain alternate segments with varying levels of explicitness. The inclusion of segment indexing on the content source also enables the seamless playback of selected segments (i.e., without gaps and pauses) when used in conjunction with a buffer. Seamless playback is achieved by providing the segment index on the content source, thus governing the selection and ordering of the interchangeable segments prior to the data entering the buffer.

The use of a buffer compensates for latency that may be experienced in reading from different physical areas of direct access media. While read mechanisms are moved from one disc location to another, no reading of the requested content from the direct access media occurs. This is a problem because, as a general rule, the playback rate for multimedia content exceeds the access rate by a fairly significant margin. For example, a playback rate of 30 frames per second is common for multimedia content. Therefore, a random access must take less than 1/30th of a second (approximately 33 milliseconds) or the random access will result in a pause during playback while the reading mechanism moves to the next start point. A typical 16×DVD drive for a personal computer, however, has an average access rate of approximately 95 milliseconds, nearly three times the 33 milliseconds allowed for seamless playback. Moreover, according to a standard of the National Television Standards Committee ("NTSC"), only 5 to 6 milliseconds are allowed between painting the last pixel of one frame and painting the first pixel of the next frame. Those of skill in the art will recognize that the above calculations are exemplary of the time constraints involved

EX0004-0016

US 6,898,799 B1

3

in reading multimedia content from direct access media for output to a PC or television, even though no time is alloted to decoding the multimedia content after it has been read, time that would need to be added to the access time for more precise latency calculations.

Once access occurs, DVD drives are capable of reading multimedia content from a DVD at a rate that exceeds the playback rate. To address access latency, the DVD specification teaches reading multimedia content into a track buffer. The track buffer size and amount of multimedia content that must be read into the track buffer depend on several factors, including the factors described above, such as access time, decoding time, playback rate, etc. When stored on a DVD, a segment index, as taught in the prior art, with corresponding navigation commands, identifies and orders the content segments to be read into the track buffer, enabling seamless playback of multiple version of the multimedia content. However, segment indexes that are external to the content source are unable to completely control the navigation commands within the initial segment identification/selection/retrieval process since external indexes can interact with position codes only available at the end of the decoding process. As a result, external segment indexes may be unable to use the DVD track buffer in addressing access latency as taught in the prior art.

As an alternative to buffering, segments from separate versions of multimedia content may be interlaced. This allows for essentially sequential reading of the media, with unwanted segments being read and discarded or skipped. The skips, however, represent relatively small movements of the read mechanism. Generally, small movements involve a much shorter access time than large movements and therefore introduce only minimal latency.

Nevertheless, the prior art for including multiple versions of a multimedia work on a single direct access media suffers from several practical limitations that prevent it from widespread use. One significant problem is that content producers must be willing to create and broadly distribute multiple versions of the multimedia work and accommodate any additional production efforts in organizing and labeling the content segments, including interchangeable segments, for use with the segment indexes or maps. The indexes, in combination with the corresponding segments, define a work and are stored directly on the source media at the time the media is produced. In short, while the prior art offers a tool for authoring multiple versions of a multimedia work, that tool is not useful in and of itself to consumers.

A further problem in the prior art is that existing encoding technologies must be licensed in order to integrate segment indexes on a direct access storage medium and decoding technologies must be licensed to create a decoder that uses the segment indexes on a multimedia work to seamlessly playback multiple versions stored on the direct access medium. In the case of DVD, the Motion Pictures Entertainment Group ("MPEG") controls the compression technology for encoding and decoding multimedia files. Furthermore, because producers of multimedia content generally want to prevent unauthorized copies of their multimedia work, they also employ copy protection technologies. The most common copy protection technologies for DVD media are controlled by the DVD Copy Control Association ("DVD CCA"), which controls the licensing of their Content Scramble System technology ("CSS"). Decoder developers license the relevant MPEG and CSS technology under fairly strict agreements that dictate how the technology may be used. In short, the time and cost associated with licensing existing compression and copy protection technologies or

4

developing proprietary compression and copy protection technologies may be significant costs, prohibitive to the wide-spread use of the prior art's segment indexing for providing multiple versions of a multimedia work on a single direct access storage medium.

Additionally, the teachings of the prior art do not provide a solution for filtering direct access multimedia content that has already been duplicated and distributed without regard to presenting the content in a manner that is more suitable for most ages. At the time of filing this patent application, over 5000 multimedia titles have been released on DVD without using the multiple version technology of the prior art to provide customers the ability to view and hear alternate versions of the content in a manner that is more suitable for most ages.

The prior art also has taught that audio portions of multimedia content may be identified and filtered during the decoding process by examining the closed caption information for the audio stream and muting the volume during segments of the stream that contain words matching with a predetermined set of words that are considered unsuitable for most ages. This art is limited in its application since it cannot identify and filter video segments and since it can only function with audio streams that contain closed captioning information. Furthermore, filtering audio content based on closed captioning information is imprecise due to poor synchronization between closed captioning information and the corresponding audio content.

## SUMMARY OF THE INVENTION

These and other problems with the prior art are overcome by the present invention, which is directed toward automatically identifying and filtering portions of multimedia content during the decoding process. As taught in the prior state of the art, the technology for presenting original multimedia content that is suitable for most ages has been concentrated on altering the multimedia at its source. Unlike the prior art's control of the input or source side of a decoder, the present invention permits filtering multimedia content at the output side of a decoder. As a result, the present invention may be practiced without necessarily imposing any particular requirements on the source of the multimedia content.

The present invention includes the creation of navigation objects to define portions of the multimedia content that should be filtered. Each navigation object contains a start position, a stop position, and a filtering action to be performed on the portion of the multimedia content that is defined by the start position and stop position. The navigation objects are placed in an object store. There is no particular limitation on the format of the navigation objects and the object store. For example, the object store may be a file, such as a database, and the navigation objects may be records within the database.

Navigator software reads navigation objects from the object store and monitors the decoder for the current position code of the multimedia as the multimedia content is being decoded. For DVD multimedia, the position code may be a time code that identifies portions of the multimedia content by hours, minutes, seconds, and frame number. The position code is compared against the start and stop positions defined in each navigation object. When playback reaches a portion of the multimedia defined by a particular navigation object, the navigator activates the editing action assigned to that navigation object.

For example, one type of filtering action is a skip. When the navigator determines that the time code for the multi-

EX0004-0017

5

media content currently being decoded has reached the start position of a navigation object with a skip filtering action, the navigator instructs the decoder to discontinue decoding at the current multimedia position and to resume decoding at the stop position of the navigation object. By discontinuing the decoding process at the start position of the navigation object and resuming the decoding process at the stop position of the navigation object, the portion of the multimedia content defined by the start and stop positions of the multimedia content is never decoded and as a result is never transferred to a multimedia output device, such as a video display. In some cases, the navigator may not begin accessing the stop position to resume the decoding process until after determining that the start position for discontinuing decoding has been accessed, preventing the Navigator from using a read buffer to compensate for the access time required in moving the read mechanism from the start position to the stop position where decoding will resume.

Mute is another type of filtering action. When the navigator determines that the time code for the multimedia content currently being decoded has reached the start position of a navigation object with a mute filtering action, the navigator suppresses the audio decoding. Suppressing audio decoding may be accomplished by setting the volume of the multimedia content to be inaudible. Muting continues until the navigator determines that the time code for the multimedia content then being decoded reaches the stop position defined in the navigation object. Once the stop position has been reached, the volume is returned the level in effect prior to the navigator activating the mute filtering action. Unlike the skip action, the muted portion of the multimedia content is decoded and may be transferred to an output device such as speaker, but with the volume set to be inaudible or with the audio decoding suppressed in some other way, the muted portion is effectively filtered from the multimedia content.

A further type of filtering action is a reframe. In cases where the visual information presented to the viewer only contains unsuitable material in a certain physical area of a scene, the multimedia content can be enlarged if needed and then positioned in the viewing frame in a manner that effectively crops the objectionable information from view. The sizing and framing can be adjusted during the reframe action to continually crop the objectionable material from view. When the navigator determines that the position code for the multimedia content currently being decoded has reached the end position of a reframe navigation object, the navigator instructs the current multimedia to resume to the original framing. For example, if the multimedia includes a head to toe shot of a person with a bloody leg wound, the content can be resized and reframed to show only a head to waist shot.

Depending on the multimedia content, some editing actions may produce more noticeable discontinuities, irregularities, or artifacts than others. To reduce a user's perception of potential artifacts, incremental editing actions or editing actions with an incremental component provide for gradual transitions before and/or after an editing action. For example, the display of video content may fade from normal to blank prior to a skip editing action and, after the editing action, from blank back to normal. Similarly, muting actions may fade audio volume in and out to insure smooth transitions for editing actions. As used in this application, editing actions should be interpreted broadly to encompass all types of actions that may be useful in editing multimedia content, including incremental editing actions that are either separate from or combined with other editing actions.

Depending on the multimedia content, some filtering actions may produce more noticeable discontinuities,

6

irregularities, or artifacts than others. To reduce a user's perception of potential artifacts, incremental filtering actions or filtering actions with an incremental component provide for gradual transitions before and/or after a filtering action. For example, the display of video content may fade from normal to blank prior to a skip filtering action and, after the filtering action, from blank back to normal. Similarly, muting actions may fade audio volume in and out to insure smooth transitions for filtering actions. As used in this application, filtering actions should be interpreted broadly to encompass all types of actions that may be useful in filtering multimedia content, including incremental filtering actions that are either separate from or combined with other filtering actions.

The present invention may be practiced in a variety of computerized systems, including servers, personal computers, television systems, and audio systems. A typical system for a personal computer includes a DVD drive with decoding hardware and/or software, navigator software with navigation objects for a particular DVD title, a computer display for video output, and speakers for audio output. For television systems with a conventional DVD player and television set, the navigator software and navigation objects may be stored in a remote control device that communicates with the DVD player and television set over a traditional infrared channel. Alternatively, the television system may include a DVD player that includes the navigator software and navigation object store.

Additional features and advantages of the invention will be set forth in the description which follows, and in part will be obvious from the description, or may be learned by the practice of the invention. The features and advantages of the invention may be realized and obtained by means of the instruments and combinations particularly pointed out in the appended claims. These and other features of the present invention will become more fully apparent from the following description and appended claims, or may be learned by the practice of the invention as set forth hereinafter.

BRIEF DESCRIPTION OF THE DRAWINGS

In order to describe the manner in which the above-recited and other advantages and features of the invention can be obtained, a more particular description of the invention briefly described above will be rendered by reference to specific embodiments thereof which are illustrated in the appended drawings. Understanding that these drawings depict only typical embodiments of the invention and are not therefore to be considered to be limiting of its scope, the invention will be described and explained with additional specificity and detail through the use of the accompanying drawings in which:

FIG. 1 illustrates an exemplary system that provides a suitable operating environment for the present invention;

FIG. 2 is high-level block diagram showing the basic components of a system embodying the present invention;

FIGS. 3A, 3B, and 3C, are block diagrams of three systems that provide greater detail for the basic components shown in FIG. 2;

FIGS. 4A, 5A, and 7, are flowcharts depicting exemplary methods for editing multimedia content according to the present invention;

FIGS. 4B and 5B illustrate navigation objects in relation to mocked-up position codes for multimedia content; and

FIG. 6 is a flowchart portraying a method used in customizing the editing of multimedia content.

US 6,898,799 B1

**7**

### DETAILED DESCRIPTION OF THE INVENTION

The present invention extends to methods, systems, and computer program products for automatically identifying and filtering portions of multimedia content during the decoding process. The embodiments of the present invention may comprise a special purpose or general purpose computer including various computer hardware, a television system, an audio system, and/or combinations of the foregoing. These embodiments are discussed in greater detail below. However, in all cases, the described embodiments should be viewed a exemplary of the present invention rather than as limiting it's scope.

Embodiments within the scope of the present invention also include computer-readable media for carrying or having computer-executable instructions or data structures stored thereon. Such computer-readable media may be any available media that can be accessed by a general purpose or special purpose computer. By way of example, and not limitation, such computer-readable media can comprise RAM, ROM, EEPROM, CD-ROM or other optical disk storage, magnetic disk storage or other magnetic storage devices, or any other medium which can be used to carry or store desired program code means in the form of computer-executable instructions or data structures and which can be accessed by a general purpose or special purpose computer. When information is transferred or provided over a network or another communications link or connection (either hardwired, wireless, or a combination of hardwired or wireless) to a computer, the computer properly views the connection as a computer-readable medium. Thus, any such a connection is properly termed a computer-readable medium. Combinations of the above should also be included within the scope of computer-readable media. Computer-executable instructions comprise, for example, instructions and data which cause a general purpose computer, special purpose computer, or special purpose processing device to perform a certain function or group of functions.

FIG. 1 and the following discussion are intended to provide a brief, general description of a suitable computing environment in which the invention may be implemented. Although not required, the invention will be described in the general context of computer-executable instructions, such as program modules, being executed by computers in network environments. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types. Computer-executable instructions, associated data structures, and program modules represent examples of the program code means for executing steps of the methods disclosed herein. The particular sequence of such executable instructions or associated data structures represent examples of corresponding acts for implementing the functions described in such steps. Furthermore, program code means being executed by a processing unit provides one example of a processor means.

Those skilled in the art will appreciate that the invention may be practiced in network computing environments with many types of computer system configurations, including personal computers, hand-held devices, multi-processor systems, microprocessor-based or programmable consumer electronics, network PCs, minicomputers, mainframe computers, and the like. The invention may also be practiced in distributed computing environments where tasks are performed by local and remote processing devices that are linked (either by hardwired links, wireless links, or by a combination of hardwired or wireless links) through a communications network. In a distributed computing environment, program modules may be located in both local and remote memory storage devices.

**8**

With reference to FIG. 1, an exemplary system for implementing the invention includes a general purpose computing device in the form of a conventional computer 120, including a processing unit 121, a system memory 122, and a system bus 123 that couples various system components including the system memory 122 to the processing unit 121. The system bus 123 may be any of several types of bus structures including a memory bus or memory controller, a peripheral bus, and a local bus using any of a variety of bus architectures. The system memory includes read only memory (ROM) 124 and random access memory (RAM) 125. A basic input/output system (BIOS) 126, containing the basic routines that help transfer information between elements within the computer 120, such as during start-up, may be stored in ROM 124.

The computer 120 may also include a magnetic hard disk drive 127 for reading from and writing to a magnetic hard disk 139, a magnetic disk drive 128 for reading from or writing to a removable magnetic disk 129, and an optical disk drive 130 for reading from or writing to removable optical disk 131 such as a CD-ROM or other optical media. The magnetic hard disk drive 127, magnetic disk drive 128, and optical disk drive 130 are connected to the system bus 123 by a hard disk drive interface 132, a magnetic disk drive-interface 133, and an optical drive interface 134, respectively. The drives and their associated computer-readable media provide nonvolatile storage of computer-executable instructions, data structures, program modules and other data for the computer 120. Although the exemplary environment described herein employs a magnetic hard disk 139, a removable magnetic disk 129 and a removable optical disk 131, other types of computer readable media for storing data can be used, including magnetic cassettes, flash memory cards, digital video disks, Bernoulli cartridges, RAMs, ROMs, and the like.

Program code means comprising one or more program modules may be stored on the hard disk 139, magnetic disk 129, optical disk 131, ROM 124 or RAM 125, including an operating system 135, one or more application programs 136, other program modules 137, and program data 138. A user may enter commands and information into the computer 120 through keyboard 140, pointing device 142, or other input devices (not shown), such as a microphone, joy stick, game pad, satellite dish, scanner, or the like. These and other input devices are often connected to the processing unit 121 through a serial port interface 146 coupled to system bus 123. Alternatively, the input devices may be connected by other interfaces, such as a parallel port, a game port or a universal serial bus (USB). A monitor 147 or another display device is also connected to system bus 123 via an interface, such as video adapter 148. In addition to the monitor, personal computers typically include other peripheral output devices (not shown), such as speakers and printers.

The computer 120 may operate in a networked environment using logical connections to one or more remote computers, such as remote computers 149a and 149b. Remote computers 49a and 49b may each be another personal computer, a server, a router, a network PC, a peer device or other common network node, and typically include many or all of the elements described above relative to the computer 120, although only memory storage devices 150a and 150b and their associated application programs 136a

EX0004-0019

US 6,898,799 B1

**9**

and **136b** have been illustrated in FIG. 1. The logical connections depicted in FIG. 1 include a local area network (LAN) **151** and a wide area network (WAN) **152** that are presented here by way of example and not limitation. Such networking environments are commonplace in office-wide or enterprise-wide computer networks, intranets and the Internet.

When used in a LAN networking environment, the computer **120** is connected to the local network **151** through a network interface or adapter **153**. When used in a WAN networking environment, the computer **120** may include a modem **154**, a wireless link, or other means for establishing communications over the wide area network **152**, such as the Internet. The modem **154**, which may be internal or external, is connected to the system bus **123** via the serial port interface **146**. In a networked environment, program modules depicted relative to the computer **120**, or portions thereof, may be stored in the remote memory storage device. It will be appreciated that the network connections shown are exemplary and other means of establishing communications over wide area network **152** may be used.

Turning next to FIG. 2, a high-level block diagram identifying the basic components of a system for filtering multimedia content are shown. The basic components include content source **230**, decoders **250**, navigator **210**, and output device **270**. Content source **230** provides multimedia to decoder **250** for decoding, navigator **210** controls decoder **250** so that filtered content does not reach output device **270**, and output device **270** plays the multimedia content it receives. As used in this application, the term "multimedia" should be interpreted broadly to include audio content, video content, or both.

The present invention does not require a particular content source **230**. Any data source that is capable of providing multimedia content, such as a DVD, a CD, a memory, a hard disk, a removable disk, a tape cartridge, and virtually all other types of magnetic or optical media may operate as content source **230**. Those of skill in the art will recognize that the above media includes read-only, read/write, and write-once varieties, whether stored in an analog or digital format. All necessary hardware and software for accessing these media types are also part of content source **230**. Content source **230** as described above provides an example of multimedia source means.

Multimedia source **230** generally provides encoded content. Encoding represents a difference in the formats that are typically used for storing or transmitting multimedia content and the formats used for intermediate processing of the multimedia content. Decoders **250** translate between the storage and intermediate formats. For example, stored MPEG content is both compressed and encrypted. Prior to being played at an output device, the stored MPEG content is decrypted and uncompressed by decoders **250**. Decoders **250** may comprise hardware, software, or some combination of hardware and software. Due to the large amount of data involved in playing multimedia content, decoders **250** frequently have some mechanism for transferring data directly to output device **270**. Decoders **250** are an exemplary embodiment of decoder means.

Output device **270** provides an example of output means for playing multimedia content and should be interpreted to include any device that is capable of playing multimedia content so that the content may be perceived. For a computer system, like the one described with reference to FIG. 1, output device **270** may include a video card, a video display, an audio card, and speakers. Alternatively, output device **270**

**10**

may be a television or audio system. Television systems and audio systems cover a wide range of equipment. A simple audio system may comprise little more than an amplifier and speakers. Likewise, a simple television system may be a conventional television that includes one or more speakers and a television screen. More sophisticated television and audio systems may include audio and video receivers that perform sophisticated processing of audio and video content to improve sound and picture quality.

Output device **270** may comprise combinations of computer, television, and audio systems. For example, home theaters represent a combination audio and television systems. These systems typically include multiple content sources, such as components for videotape, audiotape, DVD, CD, cable and satellite connections, etc. Audio and/or television systems also may be combined with computer systems. Therefore, output device **270** should be construed as including the foregoing audio, television, and computer systems operating either individually, or in some combination. Furthermore, when used in this application, computer system (whether for a consumer or operating as a server), television system, and audio system may identify a system's capabilities rather than its primary or ordinary use. These capabilities are not necessarily exclusive of one another. For example, a television playing music through its speakers is properly considered an audio system because it is capable of operating as an audio system. That the television ordinarily operates as part of a television system does not preclude it from operating as an audio system. As a result, terms like consumer system, server system, television system, and audio system, should be given their broadest possible interpretation to include any system capable of operating in the identified capacity.

Navigator **210** is software and/or hardware that control the decoders **250** by determining if the content being decoded needs to be filtered. Navigator **210** is one example of multimedia navigation means. It should be emphasized that content source **230**, decoders **250**, output device **270**, and navigator **210** have been drawn separately only to aid in their description. Some embodiments may combine content source **230**, decoders **250**, and navigator **210** into a single set-top box for use with a television and/or audio system. Similarly, a computer system may combine portions of decoder **250** with output device **270** and portions of decoder **250** with content source **230**. Many other embodiments are possible, and therefore, the present invention imposes no requirement that these four components must exist separately from each other. As such, the corresponding multimedia source means, decoder means, output means, and multimedia navigation means also need not exist separately from each other and may be combined together as is appropriate for a given embodiment of the present invention. It is also possible for content source **230**, decoders **250**, output device **270**, and/or navigator **210** to be located remotely from each other and linked together with a communication link.

As noted previously, FIGS. 3A, 3B, and 3C, are block diagrams of three exemplary systems that provide greater detail for the basic components shown in FIG. 2. However, the present invention is not limited to any particular physical organization of the components shown in FIG. 2. Those of skill in the art will recognize that these basic components are subject to a wide-range of embodiments, including a single physical device or several physical devices. Therefore, FIG. 2 and all other figures should be viewed as exemplary of embodiments according to the present invention, rather than as restrictions on the present invention's scope.

EX0004-0020

US 6,898,799 B1

**11**

Similar to FIG. 2, FIG. 3A includes navigator 310a, content source 330a, audio and video decoders 350a, and output device 370a, all located at consumer system 380a. Content source 330a includes DVD 332a and DVD drive 334a. The bi-directional arrow between content source 330a and audio and video decoders 350a indicates that content source 330 provides multimedia content to audio and video decoders 350a and that audio and video decoders 350a send commands to content source 330a when performing filtering operations.

Navigator 310a monitors decoders 350a by continuously updating the time code of the multimedia content being decoded. (Time codes are an example of positions used in identifying portions of multimedia content. In the case of time codes, positioning is based on an elapsed playing time from the start of the content. For other applications, positions may relate to physical quantities, such as the length of tape moving from one spool to another in a videotape or audiotape. The present invention does not necessarily require any particular type of positioning for identifying portions of multimedia content.) In one embodiment, the time code updates occur every 1/10th of a second, but the present invention does not require any particular update interval. (The description of FIGS. 4B and 5B provides some insight regarding factors that should be considered in selecting an appropriate update interval.)

Communication between Navigator 310a and audio and video decoders 350a occurs through a vendor independent interface 352a. The vendor independent interface 352a allows navigator 310a to use the same commands for a number of different content sources. Microsoft's® DirectX® is a set of application programming interfaces that provides a vendor independent interface for content sources 330a in computer systems running a variety of Microsoft operating systems. Audio and video decoders 350a receive commands through vendor independent interface 352a and issue the proper commands for the specific content source 330a.

Audio and video decoders 350a provide audio content and video content to output device 370a. Output device 370a includes graphics adapter 374a, video display 372a, audio adaptor 376a, and speakers 378a. Video display 372a may be any device capable of displaying video content, regardless of format, including a computer display device, a television screen, etc.

Usually, graphics adaptors and audio adaptors provide some decoding technology so that the amount of data moving between content source 330a and output device 370a is minimized. Graphics adaptors and audio adaptors also provide additional processing for translating multimedia content from the intermediate processing format to a format more suitable for display and audio playback. For example, many graphics adaptors offer video acceleration technology to enhance display speeds by offloading processing tasks from other system components. In the case of graphics and audio adaptors, the actual transition between decoders 350a and output device 370a may be a somewhat fuzzy. To the extent graphics adaptor 374a and audio adapter 376a perform decoding, portions of those adaptors may be properly construed as part of decoders 350a.

Navigator 310a includes navigation software 312a and object store 316a. Bi-directional arrow 314a indicates the flow of data between navigation software 312a and object store 316a. Object store 316a contains a plurality of navigation objects 320a. Within object store 316a, navigation objects may be stored as individual files that are specific to

**12**

particular multimedia content, they may be stored in one or more common databases, or some other data management system may be used. The present invention does not impose any limitation on how navigation objects are stored in object store 316a.

Each navigation object 320a defines when (start 321a and stop 323a) an filtering action (325a) should occur for a particular system (329a) and provides a description (327a) of why the navigation object was created. Start and stop positions (321a and 323a) are stored as time codes, in hours:minutes:seconds:frame format; actions may be either skip or mute (325a); the description is a text field (327a); and configuration is an identifier (329a) used to determine if navigation object 320a applies to a particular consumer system 380b. The values indicate that the start position 321a is 00:30:10:15; stop position 323a is 00:30:15:00; the filtering action 325a is skip; the description 327a is "scene of bloodshed" and the configuration 329a is 2.1. More detail regarding navigation objects, such as navigation object 320a, will be provided with reference to FIGS. 4B and 5B.

As navigator 310a monitors audio and video decoders 350a for the time code of the multimedia content currently being decoded, the time code is compared to the navigation objects in object store 316a. When the position code falls within the start and stop positions defined by a navigation object, navigator 310a activates the filtering action assigned to the navigation object. For navigation object 320a, a time code within the approximately four-second range of 00:30:10:15–00:30:15:00 result in navigator 310a issuing a command to audio and video decoders 350a to skip to the end of the range so that the multimedia content within the range is not decoded and is not given to output device 370a. The process of filtering multimedia content will be described in more detail with reference to FIGS. 4A, 5A, 6, and 7.

As in FIG. 3A, FIG. 3B includes a content source 330b, audio and video decoders 350b, and output device 370b. In FIG. 3B, however, object store 316b is located at server system 390b, and all other components are located at consumer system 380b. As shown by start 321b, stop 323b, action 325b, description 327b, and configuration 329b, the contents of navigation object 320b remain unchanged.

Content source 330b, including DVD drive 334b and DVD 332b, have been combined with audio and video decoders 350b, vendor independent interface 352b, and navigation software 312b into a single device. Communication between navigation software 312b and object store 316b occurs over communication link 314b. Communication link 314b is an example of communication means and should be interpreted to include any communication link for exchanging data between computerized systems. The particular communication protocols for implementing communication link 314b will vary from one embodiment to another. In FIG. 3B, at least a portion of communication link 314b may include the Internet.

Output device 370b includes a television 372b with video input 374b and an audio receiver 377b with an audio input 376b. Audio receiver 377b is connected to speakers 378b. As noted earlier, the sophistication and complexity of output device 370b depends on the implementation of a particular embodiment. As shown, output device 370b is relatively simple, but a variety of components, such as video and audio receivers, amplifiers, additional speakers, etc., may be added without departing from the present invention. Furthermore, it is not necessary that output device 370b include both video and audio components. If multimedia content includes only audio content, the video components are not needed.

EX0004-0021

US 6,898,799 B1

13

Likewise, if the multimedia content includes only video data, the audio components of output device 370b may be eliminated.

Moving next to FIG. 3C, navigator 310c, content source 330c, audio and video decoders 350c, and output device 370c are all present. Like FIG. 3B, FIG. 3C includes a server/remote system 390c and a consumer system 380c. For the embodiment shown in FIG. 3C, navigator 310C is located at server/remote system 390c and content source 330c, audio and video decoders 350c, and output device 370c are located at the consumer system 380c.

Navigator 310c includes server navigation software 312c and object store 316c, with data being exchanged as bi-directional arrow 314c indicates. Start 321c, stop 323c, action 325c, description 327c, and configuration 329c, show that the contents of navigation object 320c remain unchanged from navigation objects 320b and 320a (FIGS. 3B and 3A). Content source 330c includes DVD drive 334c and DVD 332c, and output device 370c includes graphics adaptor 374c, video display 372c, audio adapter 376c, and speakers 378c. Because content source 330c and output device 370c are identical to the corresponding elements in FIG. 3A, their descriptions will not be repeated here.

In contrast to FIG. 3A, client navigator software 354c had been added to audio and video decoders 350c and vendor independent interface 352c. Client navigator software 354c supports communication between navigation software 312c and vendor independent interface 352c through communication link 356c. In some embodiments, no client navigator software 354c will be necessary whereas in other embodiments, some type of communication interface supporting communication link 356c may be necessary. For example, suppose consumer system 380c is a personal computer, server/remote system 390c is a server computer, and at least a portion of communication link 356c includes the Internet. Client navigator software 354c may be helpful in establishing communication link 356c and in passing information between consumer system 380c and server/ remote system 390c.

Now, suppose content source 330c and audio and video decoders 350c are combined as in a conventional DVD player. Server/remote system 390c may be embodied in a remote control unit that controls the operation of the DVD player over an infrared or other communication channel. Neither client navigator software 354c nor vendor independent interface 352c may be needed for this case because server/remote system 390c is capable of direct communication with the DVD player and the DVD player assumes responsibility for controlling audio and video decoders 350c.

Several exemplary methods of operation for the present invention will be described with reference to the flowcharts illustrated by FIGS. 4A, 5A, 6, and 7, in connection with the mocked-up position codes and navigation objects presented in FIGS. 4B and 5B. FIG. 4A shows a sample method for filtering multimedia content according to the present invention. Although FIGS. 4A, 5A, 6, and 7 show the method as a sequence of events, the present invention is not necessarily limited to any particular ordering. Because the methods may be practiced in both consumer and server systems, parentheses have been used to identify information that is usually specific to a server.

Beginning with a consumer system, such as the one shown in FIG. 3A, an object store may be part of a larger data storage. For example, a separate object store may exist for multimedia content stored on individual DVD titles.

14

Because many object stores have been created, at block 412 the multimedia content title is retrieved from the content source. Alternatively, a single object store may contain navigation objects corresponding to more than one DVD title. At block 414, with the title identifier, the object store and corresponding navigation objects that are specific to a particular DVD title are selected. (Receive fee, block 416, will be described later, with reference to a server system.) At block 422, the first navigation object for the DVD title identified at 412 is retrieved.

Turning briefly to FIG. 4B, a navigation object is shown in the context of multimedia content. Content positions 480 identify various positions, labeled $P4_1$, $P4_2$, $P4_3$, $P4_4$, $P4_5$, $P4_6$, and $P4_7$, that are associated with the multimedia content. The navigation object portion 490 of the content begins at start 491 ($P4_2$) and ends at stop 493 ($P4_6$). Skip 495 is the filtering action assigned to the navigation object and scene of bloodshed 497 is a text description of the navigation object portion 490 of the multimedia content. Configuration 499 identifies the hardware and software configuration of a consumer system to which the navigation object applies. For example, configuration 499 may include the make, model, and software revisions for the consumer's computer, DVD drive, graphics card, sound card, and may further identify the DVD decoder and the consumer computer's motherboard.

The motivation behind configuration 499 is that different consumer systems may introduce variations in how navigation objects are processed. As those variations are identified, navigation objects may be customized for a particular consumer system without impacting other consumer systems. The configuration identifier may be generated according to any scheme for tracking versions of objects. In FIG. 4B, the configuration identifier includes a major and minor revision, separated by a period.

Returning now to FIG. 4A, a navigation object as described above has been retrieved at block 422. Decision block 424 determines whether the configuration identifier of the navigation object matches the configuration of the consumer system. Matching does not necessarily require exact equality between the configuration identifier and the consumer system. For example, if major and minor revisions are used, a match may only require equality of the major revision. Alternatively, the configuration identifier of a navigation object may match all consumer configurations. Configuration identifiers potentially may include expressions with wildcard characters for matching one or more characters, numeric operators for determining the matching conditions, and the like. If no match occurs, returning to block 422 retrieves the next navigation object.

Retrieving a content identifier (412), selecting navigation objects (414), retrieving a navigation object (422), and determining whether the configuration identifier matches the consumer system configuration (424) have been enclosed within a dashed line to indicate that they are all examples of acts that may occur within a step for providing an object store having navigation objects.

With a navigation object identified, the decoders begin decoding the multimedia content (432) received from the DVD. Once decoded, the content is transferred (434) to the output device where in can be played for a consumer. While decoding the multimedia content, the position code is updated continuously (436). The acts of decoding (432), transferring (434), and continuously updating the position code (436) have been enclosed in a dashed line to indicate that they are examples of acts that are included within a step

EX0004-0022

US 6,898,799 B1

15

16

for using a decoder to determine when multimedia content is within a navigation object (430).

A step for filtering multimedia content (440) includes the acts of comparing the updated position code to the navigation object identified in block 422 to determine if the updated position code lies within the navigation object and the act of activating an filtering action (444) when appropriate. If the updated position code is not within the navigation object, decoding continues at block 432. But if the updated position code is within the navigation object, the filtering action is activated (444). Following activation of the filtering action, the next navigation object is retrieved at block 422.

Using the navigation object illustrated in FIG. 4B, the method of FIG. 4A will be described in greater detail. The navigation object is retrieved in block 422 and passes the configuration match test of block 424. After the multimedia content is decoded at block 432 and transferred to the output device at block 434, the position code is updated at block 436. $P4_1$ corresponds to the updated position code. Because $P4_1$ is not within the start and stop positions (491 and 493), more multimedia content is decoded (432), transferred to the output device (434), and the position code is updated again (436).

The updated position code is now $P4_2$. $P4_2$ also marks the beginning of the navigation object portion 490 of the multimedia content defined by the start and stop positions (491 and 493) of the navigation object. The video filtering action, skip 495 is activated in block 444. Activating the video filtering action sends a command to the decoder to discontinue decoding immediately and resume decoding at stop position 493. The content shown between $P4_2$ and $P4_6$ is skipped. Following the skip, the next navigation object is retrieved at block 422 and the acts describe above are repeated.

Abruptly discontinuing and resuming the decoding may lead to noticeable artifacts that detract from the experience intended by the multimedia content. To diminish the potential for artifacts, filtering actions may be incrementally activated or separate incremental filtering action may be used. For example, a fade out (e.g., normal to blank display) filtering action may precede a skip filtering action and a fade in (e.g., blank to normal display) filtering action may follow a skip filtering action. Alternatively, the fading out and fading in may be included as part of the skip filtering acting itself, with the start and stop positions being adjusted accordingly. The length of fade out and fade in may be set explicitly or use an appropriately determined default value. Incremental filtering actions need not be limited to a specific amount of change, such as normal to blank display, but rather should be interpreted to include any given change, such as normal to one-half intensity, over some interval. Furthermore, incremental filtering actions may be used to adjust virtually any characteristic of multimedia content.

Where multimedia content includes visual information being presented to a viewer, it is possible that unsuitable material may be localized to only a certain physical area of the scene as it is presented. In these cases one or more navigation objects with reframe filtering actions may be appropriate. The entire scene need not be skipped because the viewing frame may be positioned to avoid showing the unsuitable material and the remaining content may be enlarged to provide a full-size display. By continually adjusting the framing and sizing of multimedia content during a scene, the unsuitable material is effectively cropped from view.

Each reframe navigation object is capable of performing a number of reframe/resize actions, including the ability to reframe and resize on a frame-by-frame basis. Therefore, the number of reframe navigation objects used in cropping a particular scene depends on a variety of factors, including how the scene changes with time. A single navigation object may be sufficient to filter a relatively static scene, whereas more dynamic scenes will likely require multiple navigation objects. For example, one navigation object may be adequate to reframe a scene showing an essentially static, full-body, view of a person with a severe leg wound to a scene that includes only the person's head and torso. However, for more dynamic scenes, such as a scene where the person with the severe leg wound is involved in a violent struggle or altercation with another person, multiple reframe navigation objects may be required for improved results.

Positions $P4_1$, $P4_2$, $P4_3$, $P4_4$, $P4_5$, $P4_6$, and $P4_7$ are separated by the update interval. Those of skill in the art will recognize that a shorter update interval will allow for more precise filtering. For example, if start 491 were shortly after position $P4_2$, multimedia decoding and output would continue until position $P4_3$, showing nearly ¼ of the multimedia content that was to be filtered. With an update interval occurring ten times each second, only a minimal amount of multimedia content that should be filtered (e.g., less than ⅒th of a second) will be displayed at the output device. As has been implied by the description of configuration identifier 499, it is reasonable to expect some variability in consumer systems and the invention should not be interpreted as requiring exact precision in filtering multimedia content. Variations on the order of a few seconds may be tolerated and accounted for by expanding the portion of content defined by a navigation object, although the variations will reduce the quality of filtering as perceived by a consumer because scenes may be terminated prior to being completely displayed.

The differences enclosed in parentheses for server operation are relatively minor and those of skill in the art will recognize that a consumer and server may cooperate, each performing a portion of the processing that is needed. FIG. 3B provides an exemplary system where processing is shared between a server system and a consumer system. Nevertheless, the following will describe the processing as it would occur at a server system, similar to the one shown in FIG. 3C, but with only the output device located at the consumer system.

At block 412, the server receives the DVD title identifier so that the proper navigation objects can be selected in block 414. The server receives a fee from the consumer system, in block 416, for allowing the consumer system access to the navigation objects. The fee may be a subscription for a particular time period, a specific number of accesses, etc. The first navigation object for the DVD title identified at 412 is retrieved in block 422 and checked for a configuration match in block 424. Because the configuration match is checked at the server, the consumer system supplies its configuration information or identifier. As described above, receiving a content identifier (412), selecting navigation objects (414), receiving a fee (416), retrieving a navigation object (422), and determining whether the configuration identifier matches the consumer system configuration (424) have been enclosed within a dashed line to indicate that they are all examples of acts that make up a step for the server system providing an object store having navigation objects.

Decoding the multimedia content (432) may occur at either the consumer system or the server system. However,

EX0004-0023

US 6,898,799 B1

17

sending decoded multimedia from a server system to a consumer system requires substantial communication bandwidth. At block **434**, the multimedia content is transferred to the output device. The server system then queries (**436**) the client system decoder to update the position code. Alternatively, if the decoding occurred at the server system, the position code may be updated (**436**) without making a request to the consumer system. The acts of decoding (**432**), transferring (**434**), and continuously updating or querying for the position code (**436**) have been enclosed in a dashed line to indicate that they are examples of acts that are included within a step for the server system using a decoder to determine when multimedia content is within a navigation object (**430**).

The server system performing a step for filtering multimedia content (**440**) includes the acts of (i) comparing the updated position code to the navigation object identified in block **422** to determine if the updated position code lies within the navigation object, and (ii) activating or sending a filtering action (**444**) at the proper time. Decoding continues at block **432** for updated position codes that are not within the navigation object. Otherwise, the filtering action is activated or sent (**444**) for updated position codes within the navigation object. Activating occurs when the decoder is located at the consumer system, but if the decoder is located at the consumer system, the filtering action must be sent to the consumer system for processing. The next navigation object is retrieved at block **422** following activation of the filtering action, and processing continues as described above. The analysis of FIG. **4B** will not be repeated for a server system because the server operation is substantially identical to the description provided above for a consumer system.

FIG. **5A** illustrates a sample method for filtering audio content, possibly included with video content, according to the present invention. The steps for providing **510** and using **530**, including the acts shown in processing blocks **512**, **514**, **516**, **522**, **524**, **532**, **534**, and **536** are virtually identical to the corresponding steps and acts described with reference to FIG. **4A**. Therefore, the description of FIG. **5A** begins with a step for filtering (**540**) multimedia content.

Decision block **542** determines if an updated or queried position code (**536**) is within the navigation object identified in blocks **522** and **524**. If so, decision block **552** determines whether or not an filtering action is active. For portions of multimedia content within a navigation object where the filtering action is active or has been sent (in the case of server systems), decoding can continue at block **532**. If the filtering action is not active or has not been sent, block **544** activates or sends the filtering action and then continues decoding at block **532**.

If decision block **542** determines that the updated or queried position code (**536**) is not within the navigation object, decision block **556** determines whether or not an filtering action is active or has been sent. If no filtering action is active or has been sent, decoding continues at block **532**. However, if an filtering action has been activated or sent and the updated position code is no longer within the navigation object, block **546** activates or sends and end action and continues by identifying the next navigation object in blocks **522** and **524**.

In general, some filtering may be accomplished with one action, like the video action of FIG. **4B**, while others require ongoing actions, like the audio action of FIG. **5B**. The mocked-up position codes and audio navigation object shown in FIG. **5B** help explain the differences between

18

single action filtering of multimedia content and continuous or ongoing filtering of multimedia content. Content positions **580** identify various positions, labeled $P5_1$, $P5_2$, $P5_3$, $P5_4$, $P5_5$, $P5_6$, and $P5_7$, that are associated with the multimedia content. The navigation object portion **590** of the content begins at start **591** ($P5_2$) and ends at stop **593** ($P5_6$). Mute **595** is the filtering action assigned to the navigation object and "F" word **597** is a text description of the navigation object portion **590** of the multimedia content. Like configuration **499** of FIG. **4B**, configuration **599** identifies the hardware and software configuration of a consumer system to which the navigation object applies.

After the multimedia content is decoded at block **532** and transferred to the output device at block **534**, the position code is updated at block **536**. $P5_1$ corresponds to the updated position code. Because $P5_1$ is not within (**542**) the start position **591** and stop position **593** and no filtering action is active or sent (**556**), more multimedia content is decoded (**532**), transferred to the output device (**534**), and the position code is updated again (**536**).

The updated position code is now $P5_2$. $P5_2$ also marks the beginning of the navigation object portion **590** of the multimedia content defined by the start and stop positions (**591** and **593**) of the navigation object, as determined in decision block **542**. Because not action is active or sent, decision block **552** continues by activating or sending (**544**) the filtering action assigned to the navigation object to mute audio content, and once again, content is decoded (**532**), transferred to the output device (**534**), and the position code is updated or queried (**536**).

Muting, in its most simple form, involves setting the volume level of the audio content to be inaudible. Therefore, a mute command may be sent to the output device without using the decoders. Alternatively, a mute command sent to the decoder may eliminate or suppress the audio content. Those of skill in the art will recognize that audio content may include one or more channels and that muting may apply to one or more of those channels.

Now, the updated or queried position code (**536**) is $P5_3$. Decision block **542** determines that the updated or queried position code (**536**) is within the navigation object, but an filtering action is active or has been sent (**552**), so block **532** decodes content, block **524** transfers content to the output device, and block **536** updates or queries the position code. The audio content continues to be decoded and the muting action continues to be activated.

At this point, the updated or queried position code (**536**) is $P5_4$. Now decision block **542** determines that the updated or queried position code (**536**) is no longer within the navigation object, but decision block **556** indicates that the muting action is active or has been sent. Block **546** activates or sends and end action to end the muting of the audio content and the decoding continues at block **532**. For DVD content, the result would be that the video content is played at the output device, but the portion of the audio content containing an obscenity, as defined by the navigation object, is filtered out and not played at the output device.

Abruptly altering multimedia content may lead to noticeable artifacts that detract from the experience intended by the multimedia content. To diminish the potential for artifacts, filtering actions may be incrementally activated or separate incremental filtering action may be used. For example, a fade out (e.g., normal to no volume) filtering action may precede a mute filtering action and a fade in (e.g., no volume to normal) filtering action may follow a mute filtering action. Alternatively, the fading out and fading in

EX0004-0024

US 6,898,799 B1

19

may be included as part of the mute filtering acting itself, with the start and stop positions being adjusted accordingly. The length of fade out and fade in may be set explicitly or use an appropriately determined default value. Incremental filtering actions are not limited to any particular amount of change, such as normal to no volume, but rather should be interpreted to include any change, such as normal to one-half volume, over some interval. Furthermore, incremental filtering actions may adjust virtually any characteristic of multimedia content.

Like the method shown in FIG. 4A, the method shown in FIG. 5A may be practiced at both client systems and server system. However, the methods will not be described in a server system because the distinctions between a consumer system and a server system have been adequately identified in the description of FIGS. 4A and 4B.

FIG. 6 is a flowchart illustrating a method used in customizing the filtering of multimedia content. At block 610, a password is received to authorize disabling the navigation objects. A representation of the navigation objects is displayed on or sent to (for server systems) the consumer system in block 620. Next, as shown in block 630, a response is received that identifies any navigation objects to disable and, in block 640, the identified navigation objects are disabled.

Navigation objects may be disabled by including an indication within the navigation objects that they should not be part of the filtering process. The act of retrieving navigation objects, as shown in blocks 422 and 522 of FIGS. 4A and 5A, may ignore navigation objects that have been marked as disabled so they are not retrieved. Alternatively, a separate act could be performed to eliminate disabled navigation objects from being used in filtering multimedia content.

The acts of receiving a password (610), displaying or sending a representation of the navigation objects (620), receiving a response identifying navigation objects to disable (630), and disabling navigation objects (640), have been enclosed in a dashed line to indicate that they are examples of acts that are included within a step for deactivating navigation objects (660). As with the exemplary methods previously described, deactivating navigation objects may be practiced in either a consumer system or a server system.

FIG. 7 illustrates an exemplary method for assisting a consumer system in automatically identifying and filtering portions of multimedia content. A step for providing an object store (710) includes the acts of creating on objects (712), creating an object store (714), and placing the navigation objects in the object store 716. A step for providing navigation objects (720) follows. The step for providing navigation objects (720) includes the acts of receiving a content identifier (722), such as a title, and receiving a request for the corresponding navigation objects (726).

In the step for charging (730) for access to the navigation objects, block 732 identifies the act of determining if a user has an established account. For example, if a user is a current subscriber then no charge occurs. Alternatively, the charge could be taken from a prepaid account without prompting the user (not shown). If no established account exists, the user is prompted for the fee, such as entering a credit card number or some other form of electronic currency, at block 734 and the fee is received at block 736. A step for providing navigation objects (740) follows that includes the act of retrieving the navigation objects (742) and sending the navigation objects to the consumer system (744). The act of

20

downloading free navigation software that makes use of the navigation objects also may be included an inducement for the fee-based service of accessing navigation objects.

The present invention may be embodied in other specific forms without departing from its spirit or essential characteristics. The described embodiments are to be considered in all respects only as illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

What is claimed and desired to be secured by United States Letters Patent is:

1. In a computerized system for enabling a consumer to digitally filter multimedia content that is comprised of video content, audio content, or both, and wherein a consumer computer system includes a processor, a memory, a decoder, and an output device for playing the multimedia content, a method for assisting the consumer to automatically identify portions of the multimedia content that are to be filtered and to thereafter automatically filter the identified portions, the method comprising the acts of:

creating an object store which can be loaded into a memory of the consumer computer system, the object store including a plurality of navigation objects, each of which defines a portion of the multimedia content that is to be filtered by defining a start position and a stop position and a specific filtering action to be performed on the portion of the multimedia content defined by the start and stop positions for that portion;

decoding the multimedia content on the consumer computer system and as the multimedia content is output from a decoder of the consumer computer system, continuously updating a position code;

as the multimedia content is decoding, continuously monitoring the position code to determine whether the position code of the multimedia content falls is within the star and stop positions defined by one of the navigation objects;

when the position code is determined to fall within the star and stop positions defined a particular navigation object, activating the filtering action assigned to the particular navigation object in order to filter the portion of the multimedia content defined by the particular navigation object;

transferring the multimedia content to an output device, whereby the multimedia content is played at the output device excluding each portion thereof which is filtered in accordance with the plurality of navigation objects;

displaying a representation of the plurality of navigation objects, the representation including a description of each of the plurality of navigation objects;

receiving a password to authorize disabling at least one of the plurality of navigation objects;

receiving a response to the representation of the plurality of navigation objects, the response identifying the at least one of the plurality of navigation objects to be disabled; and

disabling the at least one of the plurality of navigation objects such that the specific filtering action specified by the at least one of the plurality of navigation objects is ignored.

2. A method as recited in claim 1 wherein the filtering action is either skipping or reframing the portion of the multimedia content defined by the particular navigation object.

3. A method as recited in claim 2, wherein the filtering action is skipping the portion of the multimedia content

EX0004-0025

US 6,898,799 B1

defined by the particular navigation object, the method further comprising the acts of:

    terminating the decoding of the multimedia content at the start position of the particular navigation object;

    advancing to the stop position of the particular navigation object; and

    resuming the decoding of the multimedia content at the stop position of the particular navigation object.

**4.** A method as recited in claim **1** wherein the multimedia content is comprised of one or more channels of audio content and the filtering action assigned to the particular navigation object is muting at least one channel of the audio content for the portion of the audio content defined by the particular navigation object.

**5.** A method as recited in claim **1** wherein the decoder includes a vendor independent interface and wherein interaction with the decoder occurs through the vendor independent interface.

**6.** A method as recited in claim **1** wherein the consumer computer system comprises one of (i) components of a personal computer, (ii) components of television system, and (iii) components of an audio system.

**7.** A method as recited in claim **1** wherein a plurality of object stores are available, the method further comprising the acts of:

    retrieving a title of the multimedia content from the decoder; and

    selecting the object store from the plurality of object stores based on the title of the multimedia content retrieved from the decoder.

**8.** A method as recited in claim **1** wherein the consumer's computer system includes a source of the multimedia content comprising one of a DVD, a CD, a random access memory, a hard drive, a removable disk storage medium, and a tape storage medium.

**9.** A method as recited in claim **1** wherein the position codes are time codes.

**10.** A method as recited in claim **1** wherein the plurality of navigation objects are based at least in part on the age appropriateness of the portions of the multimedia content defined by the plurality of navigation objects, age appropriateness being determined according to either industry or community standards.

**11.** A method as recited in claim **1** wherein the object store at least initially is located at a remote system, and wherein the consumer's computer system and the remote system are interconnected through a communication link, the method further comprising the act of accessing the object store over the communication link.

**12.** In a computerized system for enabling a consumer to digitally filter multimedia content that is comprised of video content, audio content, or both, and wherein a consumer computer system includes a processor, a memory, a decoder, and an output device for playing the multimedia content, a method for assisting the consumer to automatically identify portions of the multimedia content that are to be filtered and to thereafter automatically filter the identified portions, the method comprising the acts of:

    creating an object store which can be loaded into a memory of the consumer computer system, the object store including a plurality of navigation objects, each of which defines a portion of the multimedia content that is to be filtered by defining a start position and a stop position and a specific filtering action to be performed on the portion of the multimedia content defined by the start and stop positions for that portion;

    decoding the multimedia content on the consumer computer system and as the multimedia content is output

    from a decoder of the consumer computer system, continuously updating a position code;

    as the multimedia content is decoding, continuously monitoring the position code to determine whether the position code of the multimedia content falls is within the star and stop positions defined by one of the navigation objects;

    when the position code is determined to fall within the star and stop positions defined by a particular navigation object, activating the filtering action assigned to the particular navigation object in order to filter the portion of the multimedia content defined by the particular navigation object;

    transferring the multimedia content to an output device, whereby the multimedia content is played at the output device excluding each portion thereof which is filtered in accordance with the plurality of navigation objects;

    assigning a configuration identifier to the decoder;

    comparing the configuration identifier of the particular navigation object with the configuration identifier of the decoder to determine if that particular navigation object applies to the decoder; and

    determining that the particular navigation object applies to the decoder based on the configuration identifier of the particular navigation object matching the configuration identifier of the decoder.

**13.** In a computerized system for enabling a consumer to digitally filter video content, wherein a consumer computer system includes a processor, a memory, a decoder, and an output device for playing the video content, a method for assisting the consumer to automatically identify portions of the video content that are to be filtered and to thereafter automatically filter the identified portions, comprising the acts of:

    creating an object store which can be loaded into a memory of the consumer computer system, the object store including a plurality of navigation objects, each of which defines a portion of the video content that is to be filtered by defining a start position and a stop position and a specific filtering action to be performed on the portion of the video content defined by the start and stop positions for that portion;

    decoding the video content on the consumer computer system and as the video content is output from a decoder of the consumer computer system, continuously updating a position code;

    as the video content is decoding, continuously monitoring the position code to determine whether to the position code of the video content falls is within the star and stop positions defined by one of the navigation objects;

    when the position code is determined to fall within the star and stop positions defined a particular navigation object, activating the filtering action assigned to the particular navigation object in order to filter the portion of the video content defined by the particular navigation object; and

    transferring the video content to an output device, whereby the video content is played at the output device excluding each portion thereof which is filtered in accordance with the plurality of navigation objects;

    displaying a representation of the plurality of navigation objects, the representation including a description of each of the plurality of navigation objects;

    receiving a password to authorize disabling at least one of the plurality of navigation objects;

    receiving a response to the representation of the plurality of navigation objects, the response identifying the at least one of the plurality of navigation objects to be disabled; and

US 6,898,799 B1

**23**

disabling the at least one of the plurality of navigation objects such that the specific filtering specified by the at least one of the plurality of navigation objects is ignored.

**14.** A method as recited in claim **13** wherein the position codes are time codes.

**15.** A method as recited in claim **14** wherein the filtering action is either skipping or refraining the portion of the video content defined by the particular navigation object.

**16.** A method as recited in claim **15**, wherein the filtering action is skipping the portion of the multimedia content defined by the particular navigation object, the method further comprising the acts of:

terminating the decoding of the video content at the start position of the particular navigation object;

advancing to the stop position of the particular navigation object; and

resuming the decoding of the video content at the stop position of the particular navigation object.

**17.** A method as recited in claim **16** wherein the video content includes audio content that corresponds to the video content, the method further comprising the acts of:

terminating the decoding of the audio content at the start position of the particular navigation object;

advancing to the stop position of the particular navigation object; and

resuming the decoding of the audio content at the stop position of the particular navigation object.

**18.** A method as recited in claim **13** wherein a plurality of object stores are available, the method further comprising the acts of:

retrieving a title of the video content from the decoder; and

selecting the object store from the plurality of object stores based on the title of the video content retrieved from the decoder.

**19.** A method as recited in claim **13** wherein the decoder includes a vendor independent interface and wherein interaction with the decoder occurs through the vendor independent interface.

**20.** A method as recited in claim **19** wherein the consumer computer system includes a source of video content comprising one of a DVD, a CD, a random access memory, a hard drive, a removable disk storage medium, and a tape storage medium.

**21.** A method as recited in claim **20** wherein consumer's computer system comprises one of (i) components of a personal computer, (ii) components of a television system, and (iii) components of an audio system.

**22.** In a computerized system for enabling a consumer to digitally filter multimedia content that is comprised of video content, audio content, or both, and wherein a consumer computer system includes a processor, a memory, and an output device for playing the multimedia content, a computer program product for implementing a method of assisting the consumer to automatically identify portions of the multimedia content that are to be filtered and to thereafter automatically filter the identified portions, comprising:

a computer readable medium for carrying machine-executable instructions for implementing the method; and

wherein said method is comprised of machine-executable instructions for performing the acts of:

creating an object store which can be loaded into a memory of the consumer computer system, the object store including a plurality of navigation objects, each of which defines a portion of the

**24**

multimedia content that is to be filtered by defining a start position and a stop position and a specific filtering action to be performed on the portion of the multimedia content defined by the start and stop positions for that portion;

decoding the multimedia content on the consumer computer system and as the multimedia content is output from a decoder of the consumer computer system, continuously updating a position code;

as the multimedia content is decoding, continuously monitoring the position code to determine whether the position code of the multimedia content falls is within the star and stop positions defined by one of the navigation objects;

when the position code is determined to fall within the star and stop positions defined by a particular navigation object, activating the filtering action assigned to the particular navigation object in order to filter the portion of the multimedia content defined by the particular navigation object;

transferring the multimedia content to an output device, whereby the multimedia content is played at the output device excluding each portion thereof which is filtered in accordance with the plurality of navigation objects;

displaying a representation of the plurality of navigation objects, the representation including a description of each of the plurality of navigation objects;

receiving a password to authorize disabling at least one of the plurality of navigation objects; receiving a response to the representation of the plurality of navigation objects, the response identifying the at least one of the plurality of navigation objects to be disabled; and

disabling the at least one of the plurality of navigation objects such that the specific filtering action specified by the at least one of the plurality of navigation objects is ignored.

**23.** A computer program product as recited in claim **22** wherein the position codes are time codes.

**24.** A computer program product as recited in claim **22** wherein the filtering action is skipping the portion of the multimedia content defined by the particular navigation object, the method comprised further of machine-executable instructions for performing the acts of:

terminating the decoding of the multimedia content at the start position of the particular navigation object;

advancing to the stop position of the particular navigation object; and

resuming the decoding of the multimedia content at the stop position of the particular navigation object.

**25.** A computer program product as recited in claim **22** wherein the multimedia content is comprised of one or more channels of audio content and the filtering action assigned to the particular navigation object is muting, the method comprised further of machine-executable instructions for performing the act of muting at least one channel of the audio content for the portion of the audio content defined by the particular navigation object.

**26.** A computer program product as recited in claim **22** wherein the decoder includes a vendor independent software interface and wherein the method is comprised further of machine-executable instructions for performing the act of interacting with the decoder through the vendor independent software interface.

**27.** A computer program product as recited in claim **22** wherein the method is comprised further of machine-executable instructions for performing the act of:

US 6,898,799 B1

**25**

retrieving a title of the multimedia content from the decoder; and

selecting the plurality of navigation objects based on the title of the multimedia content retrieved from the decoder.

**28**. A computer program product as recited in claim **22** wherein the object store at least initially is located at a

**26**

remote system, and wherein the consumer computer system and the remote system are interconnected through a communication link, the method comprised further of machine-executable instructions for performing act of accessing the object store over the communication link.

\* \* \* \* \*

EX0004-0028

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,898,799 B1                                    Page 1 of  2
DATED          : May 24, 2005
INVENTOR(S)  : Matthew T. Jarman

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page,
Item [57], **ABSTRACT**,
Line 6, delete "an" and insert therefor -- a --.

Column 8,
Line 62, delete "an" and insert therefor -- a --.

Column 20,
Line 37, delete "is".
Lines 38 and 40, delete "star" and insert therefor -- start --.
Line 41, between "defined" and "a", insert -- by --.

Column 22,
Line 5, delete "is".
Lines 6, 8, 49 and 51, delete "star" and insert therefor -- start --.
Line 48, delete "to".
Line 49, delete "is".
Line 52, between "defined" and "a", insert -- by --.

Column 23,
Line 2, between "filtering" and "specified", insert -- action --.
Line 46, delete "consumer's" and insert therefor -- the consumer --.

EX0004-0029

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,898,799 B1                                    Page 2 of 2
DATED          : May 24, 2005
INVENTOR(S)  : Matthew T. Jarman

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 24,
Line 12, delete "is".
Lines 13 and 16, delete "star" and insert therefor -- start --.

Signed and Sealed this

Fourth Day of October , 2005

JON W. DUDAS
*Director of the United States Patent and Trademark Office*



US006898799C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (11841st)

# United States Patent

### Jarman

(10) **Number:** US 6,898,799 C1

(45) **Certificate Issued:** May 7, 2021

(54) **MULTIMEDIA CONTENT NAVIGATION AND PLAYBACK**

(75) Inventor: **Matthew Jarman**, Salt Lake City, UT (US)

(73) Assignee: **CLEARPLAY, INC.**, Salt Lake City, UT (US)

**Reexamination Request:**
No. 90/014,596, Oct. 21, 2020

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | 6,898,799 |
| Issued: | May 24, 2005 |
| Appl. No.: | 09/694,873 |
| Filed: | Oct. 23, 2000 |

Certificate of Correction issued Oct. 4, 2005

(51) **Int. Cl.**
| | |
|---|---|
| H04N 7/16 | (2011.01) |
| H04N 21/439 | (2011.01) |
| H04N 5/85 | (2006.01) |
| H04N 21/426 | (2011.01) |
| H04N 21/432 | (2011.01) |
| H04N 21/433 | (2011.01) |
| H04N 21/4402 | (2011.01) |
| H04N 21/45 | (2011.01) |
| H04N 21/454 | (2011.01) |
| H04N 21/4545 | (2011.01) |
| H04N 21/84 | (2011.01) |
| H04N 21/845 | (2011.01) |

(52) **U.S. Cl.**
CPC ........... *H04N 21/4396* (2013.01); *H04N 5/85* (2013.01); *H04N 7/16* (2013.01); *H04N 7/163* (2013.01); *H04N 21/42646* (2013.01); *H04N 21/433* (2013.01); *H04N 21/4325* (2013.01); *H04N 21/4402* (2013.01); *H04N 21/440281* (2013.01); *H04N 21/4532* (2013.01); *H04N 21/4542* (2013.01); *H04N 21/45455* (2013.01); *H04N 21/84* (2013.01); *H04N 21/8456* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/014,596, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Karin Reichle

(57) **ABSTRACT**

In accordance with the present invention, a filtering process is based on the output side of a multimedia decoder. A navigator monitors the current play position of the multimedia content and compares that position with navigation objects. Each navigation object defines a start position, a stop position, and a filtering action to perform on the portion of the multimedia content that begins at the start position and ends at the stop position. When the current play position falls within the portion of multimedia content defined by a particular navigation object, the navigator activates the filtering action that was assigned to the navigation object. Filtering actions include skipping, muting, reframing, etc., the portion of multimedia content defined by a navigation object. A variety of systems may be used to implement the present invention, such as computer systems (consumer and server), television systems, and audio systems.



US 6,898,799 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claim **12** is confirmed.

Claims **1-11** and **13-28** were not reexamined.

\* \* \* \* \*

**2**

EX0004-0032

US006898799C2

(12) **EX PARTE REEXAMINATION CERTIFICATE** (12149th)

# United States Patent
Jarman

(10) **Number:** US 6,898,799 C2
(45) **Certificate Issued:** *Oct. 11, 2022

(54) **MULTIMEDIA CONTENT NAVIGATION AND PLAYBACK**

(75) Inventor: **Matthew Jarman**, Salt Lake City, UT (US)

(73) Assignee: **CLEARPLAY, INC.**, Salt Lake City, UT (US)

**Reexamination Request:**
No. 90/019,027, Oct. 22, 2021

**Reexamination Certificate for:**
Patent No.: 6,898,799
Issued: May 24, 2005
Appl. No.: 09/694,873
Filed: Oct. 23, 2000

Reexamination Certificate C1 6,898,799 issued May 7, 2021

Certificate of Correction issued Oct. 4, 2005

( * ) Notice: This patent is subject to a terminal disclaimer.

(51) **Int. Cl.**
| H04N 7/16 | (2011.01) |
| H04N 21/433 | (2011.01) |
| H04N 21/439 | (2011.01) |
| H04N 21/45 | (2011.01) |
| H04N 21/4402 | (2011.01) |
| H04N 21/454 | (2011.01) |
| H04N 21/845 | (2011.01) |

(52) **U.S. Cl.**
CPC .............. *H04N 7/16* (2013.01); *H04N 7/163* (2013.01); *H04N 21/433* (2013.01); *H04N 21/4396* (2013.01); *H04N 21/4402* (2013.01);

*H04N 21/4532* (2013.01); *H04N 21/4542* (2013.01); *H04N 21/8456* (2013.01)

(58) **Field of Classification Search**
CPC .. H04N 7/16; H04N 21/4396; H04N 21/4402; H04N 21/433; H04N 7/163; H04N 21/4532

See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/019,027, please refer to the USPTO's Patent Electronic System.

*Primary Examiner* — Catherine M Tarae

(57) **ABSTRACT**

In accordance with the present invention, a filtering process is based on the output side of a multimedia decoder. A navigator monitors the current play position of the multimedia content and compares that position with navigation objects. Each navigation object defines a start position, a stop position, and an filtering action to perform on the portion of the multimedia content that begins at the start position and ends at the stop position. When the current play position falls within the portion of multimedia content defined by a particular navigation object, the navigator activates the filtering action that was assigned to the navigation object. Filtering actions include skipping, muting, reframing, etc., the portion of multimedia content defined by a navigation object. A variety of systems may be used to implement the present invention, such as computer systems (consumer and server), television systems, and audio systems.



EX0004-0033

US 6,898,799 C2

**1**

**2**

# EX PARTE
# REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claim **12** is confirmed.

Claims **1-11** and **13-28** were not reexamined.

\*    \*    \*    \*    \*

EX0004-0034

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 23-2134

**Short Case Caption:** Clearplay, Inc. v. DISH Network L.L.C.

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains __9_____ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 06/28/2024

Signature: /s/ Joseph R. Re

Name: Joseph R. Re

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(b).  This brief contains 13,973 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point font Times New Roman.


KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated:  June 28, 2024            By: /s/ Joseph R. Re
                                     Joseph R. Re

                                     *Attorney for Appellant,*
                                     *ClearPlay, Inc.*


59776597